Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Liaison Counsel for Plaintiff Steamfitters Local 449 Pension Plan*

Christopher J. Keller
Eric J. Belfi
Francis P. McConville
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails:    ckeller@labaton.com
                ebelfi@labaton.com
                fmcconville@labaton.com

*Counsel for Plaintiff Steamfitters Local 449 Pension Plan*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                           Plaintiff,<br><br>        vs.<br><br>MOLINA HEALTHCARE, INC., J. MARIO MOLINA, JOHN C. MOLINA, TERRY P. BAYER, and RICK HOPFER,<br><br>                           Defendant. | **Case No.:**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Steamfitters Local 449 Pension Plan ("Steamfitters 449 Pension" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Molina Healthcare, Inc. ("Molina" or the "Company"), Molina's filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Molina common stock between October 31, 2014 and August 2, 2017, inclusive (the "Class Period"). The action is brought against Molina and certain of its officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Molina is a managed care company, focused on 4.5 million members eligible for Medicaid, Medicare, and other government-sponsored healthcare programs. Molina's health plans are operated by various wholly-owned subsidiaries, each of which is licensed as a health maintenance organization ("HMO"). As of December 31, 2017, Molina had 5,300 employees and operated in thirteen states and the Commonwealth of Puerto Rico.

3. During the Class Period, Molina misled investors regarding the scalability of its existing administrative infrastructure. Scalability refers to a system's capacity to handle a growing amount of work, and administrative infrastructure refers to personnel, processes, and technology that allow Molina to

administer health plans through various business functions, including provider payment and utilization management.  Utilization management is a cost management tool that evaluates the necessity and efficiency of healthcare.  Molina executives falsely claimed that the Company's existing administrative infrastructure could support rapid growth into existing Medicaid markets and new Patient Protection and Affordable Care Act health insurance marketplaces ("ACA Health Exchanges") in a cost-effective manner.  Molina later admitted that its existing administrative infrastructure was built for a "much smaller, simpler business" and was "never" designed to support the Company's growth strategy.

4.     The truth regarding Molina's failed growth strategy and inadequate administrative infrastructure was revealed through a series of partial disclosures, including the Company's April 28, 2016 earnings release.  On that date, Molina reported a sharp earnings miss for the first quarter ended March 31, 2016 and drastically cut full-year 2016 earnings guidance.  Molina blamed the poor results on higher costs tied to administrative capacity issues.  On this news, Molina's common stock price fell $12.46 per share, or 19.40 percent, to close at $51.76 per share on April 29, 2016.

5.     On February 15, 2017, Molina announced its financial results for the fourth quarter and full-year ended December 31, 2016.  Despite Molina's prior expressions of commitment to a rapid growth strategy, Molina executives cautioned that the Company could not commit to ACA Health Exchange participation beyond 2017.  On this news, Molina's common stock price fell $10.71 per share, or 17.88 percent, to close at $49.18 per share on February 16, 2017.

6.     On August 2, 2017, Molina announced its financial results for the second quarter ended June 30, 2017.  The Company reported a net loss of $230 million for the quarter, termination of its ACA Health Exchange participation in Utah and Wisconsin, and a major restructuring plan.  During the related earnings

1   call, Molina revealed that its administrative infrastructure was never designed to

2   sustain such rapid growth.  On this news, Molina's common stock price fell $3.92

3   per share, or 5.92 percent, to close at $62.32 per share on August 3, 2017.

4       7.     As a result of Defendants' wrongful acts and omissions, and the

5   precipitous decline in the market value of the Company's common stock, Plaintiff

6   and other Class members have suffered significant losses and damages.

7   <center>**JURISDICTION AND VENUE**</center>

8       8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the

9   Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated

10   thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over

11   the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and

12   Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13       9.     Venue is proper in this District pursuant to Section 27 of the

14   Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in

15   furtherance of the alleged fraud or the effects of the fraud have occurred in this

16   Judicial District.  Many of the acts charged herein, including the preparation and/or

17   dissemination of materially false and/or misleading information, occurred in

18   substantial part in this Judicial District.  Molina transacts business in this District,

19   and the Company's principal executive offices are located within this District at

20   200 Oceangate, Suite 100, Long Beach, California 90802.

21       10.    In connection with the acts alleged in this complaint, Defendants,

22   directly or indirectly, used the means and instrumentalities of interstate commerce,

23   including, but not limited to, the mails, interstate telephone communications, and

24   the facilities of the national securities markets.

25   <center>**PARTIES**</center>

26       11.    Plaintiff Steamfitters 449 Pension purchased Molina common stock

27   during the Class Period, as set forth in the certification attached hereto, and was

28   damaged as the result of Defendants' wrongdoing as alleged in this complaint.

---

CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

12. Defendant Molina is a Delaware corporation with its principal executive offices located at 200 Oceangate, Suite 100, Long Beach, California 90802. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "MOH."

13. Defendant J. Mario Molina ("CEO Molina") served as President and Chief Executive Officer ("CEO") of Molina during all relevant times prior to May 2, 2017.

14. Defendant John C. Molina ("CFO Molina") served as Chief Financial Officer ("CFO") of Molina during all relevant times prior to May 2, 2017.

15. Defendant Terry P. Bayer ("COO Bayer") served as Chief Operating Officer ("COO") during all relevant times. Molina announced COO Bayer's retirement on January 11, 2018.

16. Defendant Rick Hopfer ("CIO Hopfer") has served as Chief Information Officer ("CIO") for Molina since January 2011.

17. Defendants CEO Molina, CFO Molina, COO Bayer, and CIO Hopfer are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Molina's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded

1   herein, as those statements were each "group-published" information, the result of

2   the collective actions of the Individual Defendants.

3       18.    Molina and the Individual Defendants are collectively referred to

4   herein as "Defendants."

5                          **SUBSTANTIVE ALLEGATIONS**

6   **Background**

7       19.    Molina is a Long Beach, California-based managed care company that

8   derives premium revenues from thirteen state health plans and a health plan in the

9   Commonwealth of Puerto Rico.  Molina has three reportable segments: Health

10  Plans, including Molina's various HMOs; Molina Medicaid Solutions ("MMS"),

11  which provides business processing, information technology ("IT") development,

12  and administrative services solutions to state Medicaid agencies; and Other, which

13  consists primarily of Molina's behavioral health and social services subsidiary,

14  Pathways.  Molina's Health Plans segment accounted for 96.07, 96.87, and 98.40

15  percent of Molina's 2015, 2016, and 2017 revenues, respectively.

16      20.    As early as 2012, Molina indicated that the Company would soon

17  double its revenue.  Molina also said that much of that growth would stream from

18  ACA Health Exchanges.  To prepare for that growth, Molina invested large

19  amounts of capital expenditures ("CapEx") into its administrative infrastructure,

20  including personnel, processes, and technology.

21      21.    On February 21, 2013, during the Company's first 2013 Investor Day,

22  CFO Molina stated, "[O]ver the next three years, we believe that we'll grow

23  revenues from $6 billion today to $12 billion[,] . . . [with] about a third of the

24  additional revenues coming from reforms related to the Affordable Care Act."

25  Several months later, during Molina's earnings call for the second quarter ended

26  June 30, 2013, CFO Molina explained how the Company would prepare for that

27  growth: "Most of the increase in [general and administrative ("G&A") expense] . .

28  . is a ramp-up in administrative expenses as we make the necessary infrastructure

investments to support [Medicare/Medicaid dual eligible plans ("Duals")] and [ACA] marketplace program implementations without any offsetting revenue."

22.     Later on in 2013, Molina outlined its administrative infrastructure strategy.  On September 19, 2013, during the Company's second 2013 Investor Day, COO Bayer described how a single administrative infrastructure would support growth in both Medicaid markets and ACA Health Exchanges:

> [I]n addition to the investments in people, process and technology, our campaign this year has been all about One Molina.  And what One Molina means is that we can now take advantage of many of the investments we've made over the last few years to standardize our operations. . . .  It gives us the ability to scale more quickly, and to leverage the design and the implementation of the corporate systems.  **So One Molina means doing it one way**.

23.     From 2012 through 2014, Molina made significant investments to update its existing administrative infrastructure.  Molina continued to claim that build-up in a single administrative infrastructure would support rapid growth in both existing and new markets, including ACA Health Exchanges.  On February 10, 2014, during the Company's earnings call for the fourth quarter and full-year ended December 31, 2013, CEO Molina commented on this point: "[We are] preparing our organization for the implementation of the Affordable Care Act, requiring us to scale and build the infrastructure required to accommodate Medicaid expansion and the new [ACA] marketplace products."

24.     On January 13, 2015, during a J.P. Morgan-sponsored healthcare conference, CEO Molina emphasized the dynamic between investing in a single administrative infrastructure and the Company's rapid growth strategy:

> So in 2013, . . . [t]here was a big investment in infrastructure and, as you'll recall from our filings, our admin costs rose to

about 10% of revenue. . . .  We were getting ready for [ACA]
marketplace, Medicaid expansion. . . .  So all these things
required us to build additional infrastructure.

25.     From 2015 through 2016, Molina engaged in an acquisition spree that allowed the Company to aggressively expand its Medicaid business and its ACA Health Exchange business.  Throughout this period, Molina executives lauded the Company's "scalable admin infrastructure," which Company executives claimed had the capacity to support sustained growth in both Medicaid markets and ACA Health Exchanges.  Because Molina's existing administrative infrastructure was touted as "scalable" (resulting from the 2012 through 2014 "ramp-up"), investors believed the Company could cut costs associated with building new systems.  Investors were led to believe that aggressive expansion (and revenue growth) plus reduced costs would drive share value.

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on October 31, 2014, the day after Molina issued a press release announcing financial results for the third quarter ended September 30, 2014.  During the related earnings call, CEO Molina stated, "Administrative costs are also tracking just as we expected.  We continue to reap the benefit of the investments in infrastructure that we made last year."  CFO Molina also remarked on the Company's improving "administrative cost leverage" and margins:

> We continue to achieve greater administrative cost leverage.  At
> our investor day events in 2013, we communicated how we are
> investing in the infrastructure to support our growth, driving
> administrative costs as a percentage of revenue up. . . At our
> investor day in 2012, we embarked on an ambitious plan to
> double our revenue, decrease our administrative ratio and

1       increase our margin.  We are well on our way to accomplishing

2       the first two of these goals.

3  Throughout the Class Period, Molina executives repeatedly invoke the strategy of

4  "leveraging" the Company's administrative infrastructure.  When a company has

5  high margins and low fixed costs, it has good "operating leverage."

6      27.   On February 9, 2015, Molina issued a press release announcing

7  financial results for the fourth quarter and full-year ended December 31, 2014.

8  During the related earnings call, CEO Molina stated that Molina "achieved greater

9  economies of scale" compared to 2013, "evidenced by the consistent decline in

10  [the] administrative cost ratio throughout the year."  CEO Molina added that the

11  Company was "very excited" about 2014 growth and the Company's "successes in

12  lowering the percentage of revenue spent on administrative costs."  While the

13  Company "did not meet [its] earnings expectations in 2014," CFO Molina

14  reassured investors that the Company "did make good on many of [its]

15  commitments to revenue growth and a greater administrative efficiency."

16      28.   For several quarters prior to February 2015, investors and analysts

17  expressed concern over Molina's CapEx related to administrative infrastructure.

18  Despite Molina's lackluster 2014 financial performance, CFO Molina explained

19  that CapEx directed to administrative infrastructure was the key to future growth:

20  "As we discussed last year, we devoted significant resources to infrastructure and

21  human capital investments that were necessary to fuel our anticipated growth.  As

22  our new growth businesses came online during the year, we were able to finally

23  realize the benefits of those investments."

24      29.   On February 12, 2015, during Molina's first 2015 Investor Day, CEO

25  Molina stressed that the Company could leverage its "[s]calable admin

26  infrastructure" to spur rapid growth and improve margins: "[B]ecause of the things

27  that we have done in terms of our IT and in terms of some of the other

28  infrastructure things, we do have the ability to grow and I think leverage that

administrative infrastructure." CEO Molina also addressed the Company's capacity to sustain rapid growth: "So one of the questions is, we will show you there is going to be more growth in 2015. Can [we] handle that [growth]? And from an IT standpoint, absolutely. We have built the systems to do that." CFO Molina added that Molina would "improve [its] model of care, enhance [its] systems, and improve margins."

30.    On February 26, 2015, Molina filed its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Annual Report"). In the "Business Operations" section of its 2014 Annual Report, Molina lists the Company's administrative infrastructure as one of several strategic strengths. Under the subheading "Administrative Efficiency" the Company claims, "**Operationally, our two business segments share a common systems platform, which allows for economies of scale. . . . [W]e have designed our administrative and operational infrastructure to be scalable for cost-effective expansion into new and existing markets.**"

31.    The 2014 Annual Report contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants CEO Molina and CFO Molina, who certified the following:

1.    I have reviewed this annual report on Form 10-K for the fiscal year ended December 31, 2014, of Molina Healthcare, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period for which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for

external purposes in accordance with generally

accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's

disclosure controls and procedures and

presented in this report our conclusions about

the effectiveness of the disclosure controls and

procedures, as of the end of the period covered

by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the

registrant's internal control over financial

reporting that occurred during the registrant's

most recent fiscal quarter (the registrant's fourth

fiscal quarter in the case of an annual report)

that has materially affected, or is reasonably

likely to materially affect, the registrant's

internal control over financial reporting; and

5.    The registrant's other certifying officer and I have

disclosed, based on our most recent evaluation of

internal control over financial reporting, to the

registrant's auditors and the audit committee of the

registrant's board of directors (or persons performing

the equivalent functions):

    (a)    All significant deficiencies and material

weaknesses in the design or operation of internal

control over financial reporting which are

reasonably likely to adversely affect the

registrant's ability to record, process, summarize

and report information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32.      On May 7, 2015, Molina issued a press release announcing financial results for the first quarter ended March 31, 2015.  During the related earnings call, Company executives continued to tout the Company's rapid growth strategy, underpinned by its administrative infrastructure.  CEO Molina highlighted, "We delivered 38% enrollment growth and 53% revenue growth. . . .  This success underscores the current growth opportunities of our business and validates our strategic push to diversify into new markets and new programs . . . and to leverage our administrative infrastructure."  CFO Molina added, **"[A]dministrative cost leverage is improving our profitability."**

33.      On July 30, 2015, Molina issued a press release announcing financial results for the second quarter ended June 30, 2015.  During the related earnings call, CEO Molina stated, "In-market acquisitions are an important part of our growth strategy and highly accretive, helping us to expand margins in the future. . . .  For the most part, speed to integration . . ., coupled with our existing infrastructure, result in significant accretion value."  In finance, accretion refers to growth, or increase by gradual addition.  Here again, CEO Molina is invoking the strategy of "leveraging" the Company's administrative infrastructure to improve margins and profitability.

34.      On September 17, 2015, during Molina's second 2015 Investor Day, CEO Molina stressed, "Scalable administrative infrastructure, this is important too because as we get bigger, a lot of these services can be shared.  It will help us to continue to drive down the administrative cost."

35.      On October 29, 2015, Molina issued a press release announcing financial results for the third quarter ended September 30, 2015.  During the related

earnings call, CEO Molina elaborated on the Company's high-growth strategy for new markets: "When we target a new market, our goal is to continue to diversify our geographic footprint by increasing the number of state contracts that we hold. Over the long-term, this allows us to **leverage our administrative infrastructure across a broader revenue base and drive down costs.**"  With respect to existing markets, CEO Molina claimed, "[T]he integration process for in-market acquisitions benefits from our existing infrastructure and local presence."  CFO Molina added, "**We continue to benefit from administrative cost leverage**. . . ."

36.     On January 11, 2016, during a J.P. Morgan-sponsored healthcare conference, CEO Molina commented that the Company likes existing market acquisitions "because the integration risk is very small.  **We already have the infrastructure in place.**  Oftentimes we already have the provider contracts in place, and **we're just adding more members to an existing platform.**"

37.     On February 8, 2016, Molina issued a press release announcing financial results for the fourth quarter and full-year ended December 31, 2015. During the related earnings call, CEO Molina focused on the Company's rapid growth strategy: "Of the nine acquisitions we announced in 2015, eight were in-market or tuck-in acquisitions in four of our existing states.  These acquisitions alone will add about [$1.2] billion in premium revenue in 2016 . . . and allow us to spread existing administrative overhead costs over a larger membership."  CEO Molina also stated, "[A]dministrative costs rose . . ., pressured by costs associated with the [ACA] marketplace.  Nevertheless, we have made solid progress on improving our margins."

38.     On February 11, 2016, during Molina's first 2016 Investor Day, CEO Molina  explained that the Company benefited from sharing one administrative infrastructure that services Molina's various segments:

> [O]ur Medicaid portfolio . . . is the primary driver of our
> business.  As you know, we operate 12 health plans in 11 states

and in Puerto Rico.  We also provide information management services for five states and for the US Virgin Islands, complementary to our Medicaid business, **because the IT systems that we use in our health plans and the IT systems that we're using to help the states manage their Medicaid information are primarily the same.**

39.     On February 26, 2016, Molina filed its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 Annual Report").  In the "Overview" section of its 2015 Annual Report, Molina lists the Company's administrative infrastructure as one of several strategic strengths. While its related statement appears under a new subheading ("Scalable Administrative Infrastructure" versus "Administrative Efficiency"), Molina's claims are substantially similar to those that appear in the Company's 2014 Annual Report: "**Our operations share common systems platforms, which allow for economies of scale. . . . [W]e have designed our administrative and operational infrastructure to be scalable for cost-effective expansion into new and existing markets.**"

40.     The 2015 Annual Report also contained certifications signed by Defendants CEO Molina and CFO Molina pursuant to SOX substantially similar in all material respects to those set forth in ¶ [31], *supra*.

41.     The statements contained in ¶¶ [26–40] were materially false and/or misleading when made because Defendants failed to disclose that: (1) Molina's administrative infrastructure was never designed to handle the size and complexity of the Company's rapid growth strategy; (2) Molina failed to remediate systemic issues and costly disruptions with critical administrative infrastructure functions including provider payment and utilization management; and (3) as a result, Molina common stock traded at artificially inflated prices during the Class Period.

42.     The truth regarding Molina's failed growth strategy and inadequate administrative infrastructure was revealed through a series of partial disclosures. On April 28, 2016, Molina issued a press release announcing financial results for the first quarter ended March 31, 2016.  Molina shocked investors by delivering a 37 percent earnings miss for the first quarter and a 30 percent earnings guidance cut for full-year 2016.  Molina blamed the poor results on higher costs related to administrative capacity issues.  This was the first glimpse into Molina's overburdened administrative infrastructure, but the Company defended its rapid growth strategy.  On this news, Molina's common stock price fell $12.46 per share, or 19.40 percent, to close at $51.76 per share on April 29, 2016.

43.     During the related earnings call, CEO Molina described the issues facing the Company: "[W]e anticipated enrollment growth, but our results exceeded even our own projections.  Assimilating this membership stretched our operational resources.  Accordingly, we redoubled our efforts around member and provider services, care and utilization management, provider payment, and information technology, all areas that felt the strain of rapid growth."  Despite these problems, CFO Molina reassured investors that any administrative infrastructure issues were under control:

> **We've . . . added to the IT infrastructure so that now we've got the bandwidth or the pipes to allow us to maintain and increase this enrollment without having big glitches or stopgaps**. . . .  [W]e have built the capacity that we need for the next several years, and we're confident that we're not going to have another strain like we just experienced in the first quarter of this year.

44.     On June 9, 2016, during a Barclays-sponsored loan conference, CFO Molina reiterated the Company's commitment to rapid growth and continuing to rely on Molina's existing administrative infrastructure: "[W]e also like acquiring

1  Medicaid contracts from other health plans in existing markets. . . .  Those tend to
2  be very accretive short term, because **we bring over a lot of revenue and don't**
3  **have a lot of administrative infrastructure buildup**."  Regarding administrative
4  infrastructure capacity, CFO Molina echoed the Company's prior statements
5  regarding scalability: "We have a scalable administrative infrastructure."

6       45.    On July 13, 2016, Molina issued a press release entitled "Molina
7  Healthcare Selects VCE Vblock All-Flash for Rapid Scale and Growth."  In the
8  press release, Molina touted that it was "updating its data center with VCE Vblock
9  system 740s converged infrastructure and the added power of all-flash[,]" which
10  the Company claimed would "improve several critical areas including service
11  deployment and the infrastructure that supports its high-volume call center."
12  Molina emphasized that, "[o]ver the past five years," the Company had
13  "experienced rapid growth," and, with the new technology, the Company gained
14  "critical agility and speed for the IT organization to quickly respond to increasing
15  business demands as the company prepares for its next phase of growth."  CIO
16  Hopfer stressed how the new "converged infrastructure" would help the
17  Company's administrative infrastructure "scale" reliably for sustained rapid
18  growth:

19         During the past three years Molina has added over 2.3 million
20         members.  **Supporting this kind of growth demands an**
21         **infrastructure that scales, is reliable and cost effective.**
22         **Through VCE converged infrastructure with all-flash**
23         **technology, we are able to leverage a high workload**
24         **demanding application** that can run mission-critical data with a
25         faster processing time.  This can save time, resources and
26         prevents outages that result from data overload.

27       46.    On July 27, 2016, Molina issued a press release announcing financial
28  results for the second quarter ended June 30, 2016.  During the related earnings

1  call, Molina stressed improvements to existing administrative infrastructure and

2  commitments to rapid growth.  CEO Molina stated:

3      We continue to improve our information technology and medical

4      management infrastructure. . . .  **In order to avoid a repeat of**

5      **what happened in the first quarter, we have re-prioritized**

6      **and accelerated improvements that were already planned**

7      **and budgeted for 2016**. . . .  Two improvements are worth

8      specific mention.  In the area of information technology, we have

9      supplemented our systems with a hyperconverged infrastructure.

10      This software-centric architecture enables us to achieve a greater

11      level of scalability, improved operational efficiency, shorter

12      deployment times, and enhanced security by tightly integrating

13      our computing, storage, and virtualization resources.

14  CFO Molina confirmed resolution of the Company's first quarter 2016 issues:

15  "Operationally, we have addressed the infrastructure problems that contributed to

16  our first-quarter difficulties."

17      47.    On October 27, 2016, Molina issued a press release announcing

18  financial results for the third quarter ended September 30, 2016.  During the related

19  earnings call, Molina continued to tout the Company's updated administrative

20  infrastructure, rapid growth plan, and improving margins.  CEO Molina claimed,

21  "During the third quarter, we upgraded the newer version of our existing enterprise

22  core administration platform across 12 health plans.  **The upgrade allows us to**

23  **continue to accommodate growth and increase administrative efficiency**. . . ."

24  CFO Molina also stated, "[W]e continued to benefit from greater administrative

25  costs efficiency."

26      48.    On January 9, 2017, during a J.P. Morgan-sponsored healthcare

27  conference, CEO Molina reiterated, "We have a scalable administrative

28  infrastructure, a consistent national brand, an experienced management team, and a

mission-driven culture." During the questions and answers segment, CFO Molina added, "Now [during 2016] . . ., I think that there were some holes, but we have plugged those holes. . . ."

49.     The statements contained in ¶¶ [42–48] were materially false and/or misleading when made because Defendants failed to disclose that: (1) Molina's administrative infrastructure was never designed to handle the size and complexity of the Company's rapid growth strategy; (2) Molina failed to remediate systemic issues and costly disruptions with critical administrative infrastructure functions including provider payment and utilization management; and (3) as a result, Molina common stock traded at artificially inflated prices during the Class Period.

50.     On February 15, 2017, Molina issued a press release announcing financial results for the fourth quarter and full-year ended December 31, 2016. Despite Molina's prior expressions of commitment to a rapid growth strategy, Molina executives cautioned that the Company could not commit to ACA Health Exchange participation beyond 2017. On this news, Molina's common stock price fell $10.71 per share, or 17.88 percent, to close at $49.18 per share on February 16, 2017.

51.     During the related earnings call, CEO Molina addressed the Company's new position regarding ACA Health Exchange growth: "[W]e believe there are simply too many unknowns with the marketplace program to commit to our participation beyond 2017. We will wait and see how the new administration and Congress will adjust the program and we plan to evaluate our participation on a state-by-state basis." CEO Molina attempted to shift investors' focus to margin improvements and administrative cost leverage, but the concern over ACA Health Exchange participation was paramount: "We also lowered medical costs . . . and we continue to reduce our administrative costs. . . . [H]owever, **ongoing issues related to the Affordable Care Act's insurance marketplace have continued and have had a significant adverse impact on our financial results during the**

1   **fourth quarter**.”  CEO Molina also claimed that Molina’s poor financial results

2   belied the Company’s overall growth story: “I want to emphasize that while the

3   losses that we incurred in the marketplace program are likely to capture headlines

4   and overshadow the operational progress we have made during 2016, it has not

5   changed the positive trajectory in our core business.”

6        52.    On February 16, 2017, during Molina’s first 2017 Investor Day,

7   Molina executives continued to point to improving margins, and re-committed to

8   leveraging existing administrative infrastructure to spur additional growth.  CEO

9   Molina claimed, “[T]here are a number of ongoing operational improvements that

10   we will continue that were begun last year[,]” including “leveraging our

11   technology, integrating behavioral health and care coordination.”  COO Bayer

12   added:

13            **One of the ways we leverage technology is to monitor unit**

14            **costs**, tie that to position provider costs, and we direct members

15            to those markets.  Reducing hospitalizations, because it is such a

16            significant contributor to overall medical costs. . . .  **We’re**

17            **leveraging technology in our analytics and also in improving**

18            **our internal business processes**.  So the processes of utilization

19            management and care coordination as you can imagine, involve

20            coordinating vast amounts of data and lots of different

21            employees.  We have underway now, the implementation of a

22            workflow tool that will integrate our case management, our

23            utilization management and bring together a holistic picture of

24            the patient.  We expect that to result and not only reduce

25            administrative cost, because we’re leveraging technology, but

26            better outcomes. . . .

27        53.    On March 1, 2017, Molina filed its Annual Report with the SEC on

28   Form 10-K for the fiscal year ended December 31, 2016 (the “2016 Annual

Report").  Unlike the 2014 Annual Report and the 2015 Annual Report, Molina's prior positive statements regarding its "scalable administrative infrastructure" were conspicuously absent, and the Company did not describe its existing administrative infrastructure as a "strategic strength."

54.    The 2016 Annual Report also contained certifications signed by Defendants CEO Molina and CFO Molina pursuant to SOX substantially similar in all material respects to those set forth in ¶ [31], *supra*.

55.    On May 2, 2017, Molina issued a press release announcing the termination of both CEO Molina and CFO Molina.  Joseph W. White ("CFO White") was named interim President and CEO, replacing J. Mario Molina, and White was also named CFO, replacing John C. Molina.  While J. Mario Molina and John C. Molina would retain their positions on the Board of Directors, they were both excluded from a new executive committee consisting of solely independent directors.  Dale B. Wolf, the Chairman of the Board of Directors stated, "In light of the Company's disappointing financial performance, the Board has determined to change leadership in order to drive profitability through operational improvements.  These changes represent targeted and deliberate actions to enhance the Company's focus and improve its competitive position within the healthcare industry."

56.    The statements contained in ¶¶ [50–55] were materially false and/or misleading when made because Defendants failed to disclose that: (1) Molina's administrative infrastructure was never designed to handle the size and complexity of the Company's rapid growth strategy; (2) Molina failed to remediate systemic issues and costly disruptions with critical administrative infrastructure functions including provider payment and utilization management; and (3) as a result, Molina common stock traded at artificially inflated prices during the Class Period.

57.    On August 2, 2017, Molina issued a press release announcing financial results for the second quarter ended June 30, 2017.  The Company

1  reported a net loss of $230 million for the quarter, termination of its ACA Health

2  Exchange participation in Utah and Wisconsin, and a major restructuring plan.  On

3  this news, Molina's common stock price fell $3.92 per share, or 5.92 percent, to

4  close at $62.32 per share on August 3, 2017.

5       58.    During the related earnings call, CFO White revealed the real reason

6  behind Molina's financial woes:

7            [L]et's talk about how we got here. . . .  First, **we did not**

8            **properly adjust our business to absorb the growth that**

9            **resulted from the Affordable Care Act.  Second, we did not**

10           **fully appreciate that growth in the ACA Marketplace**

11           **required robust development of new capabilities that we did**

12           **not have**. . . .  The implementation of the Affordable Care Act

13           brought a sudden growth.  We prepared for that growth by

14           spending more on existing processes, procedures, capabilities

15           and technologies.  In hindsight, this was a mistake.  **As a result**

16           **of trying to manage our rapid growth within an**

17           **infrastructure designed for a much smaller, simpler business,**

18           **we experienced breakdowns in areas like provider payment,**

19           **utilization management, risk adjustment and information**

20           **management**.

21  Until now, Molina had touted its existing administrative infrastructure as

22  "scalable."  In fact, CFO White's statement reveals that Molina's existing

23  administrative infrastructure never had the capacity to support the Company's

24  rapid growth strategy.

25       59.    During the same earnings call, CFO White also revealed that Molina

26  had known about serious issues with its existing administrative infrastructure as

27  early as January 2016:

28

**The utilization management issues we saw last year, in the first quarter of 2016, and the out-of-period claims expenses occurred in this quarter were emblematic of these difficulties**, as are the challenges we have faced in adequately measuring our exposure to Marketplace risk adjustment liabilities.  In retrospect, a better approach would have been to undertake a full review of the organization in anticipation of the potential growth resulting from the Affordable Care Act.  Instead of increasing investment in existing processes, we should have conducted the full redesign of our business that we are doing now.

CFO White further revealed that its Medicaid-based administrative infrastructure was incompatible with planned growth in ACA Health Exchanges:

Our challenges in the [ACA] Marketplace point to the second source of our current difficulties: the **failure to fully appreciate the unique demands of the [ACA] Marketplace product. . . . [T]he [ACA] Marketplace is fundamentally an individual insurance market and, in some respects, very different form the Medicaid market**. . . .  [T]here were . . . aspects of the [ACA] Marketplace business for which we were not as well prepared: member billing, risk adjustment and pricing, to name a few.

60.    During the same earnings call, CFO White described how Molina's previous massive CapEx spend into existing administrative infrastructure was misdirected:

**A lot of the build we've done in the company in 2012, in 2013, into 2014, when we were talking to you all about the way we were spending more money on admin.  Honestly, I think we**

1    **directed it -- we placed it in the wrong direction**.  And I think

2    we were doubling down on existing processes, existing methods

3    of doing things when we actually needed to just essentially strip

4    down to the fundamentals and rebuild the chassis of the business.

5    That's something we've been spending a lot of time with our --

6    among ourselves as a leadership team and with our consultants

7    over the last 6 months or so."

8    Thus, no later than January 2017, Molina executives were taking active measures,

9    including hiring outside consultants, to remediate major undisclosed problems with

10   the Company's administrative infrastructure.

11   61.    As a result of Defendants' wrongful acts and omissions, and the

12   precipitous decline in the market value of the Company's common stock, Plaintiff

13   and other Class members have suffered significant losses and damages.

14   **ADDITIONAL SCIENTER ALLEGATIONS**

15   62.    During the Class Period, as alleged herein, the Individual Defendants

16   acted with scienter in that the Individual Defendants knew or were reckless as to

17   whether the public documents and statements issued or disseminated in the name

18   of the Company during the Class Period were materially false and misleading;

19   knew or were reckless as to whether such statements or documents would be issued

20   or disseminated to the investing public; and knowingly and substantially

21   participated or acquiesced in the issuance or dissemination of such statements or

22   documents as primary violations of the federal securities laws.

23   63.    The Individual Defendants permitted Molina to release these false and

24   misleading statements and failed to file the necessary corrective disclosures, which

25   artificially inflated the value of the Company's common stock.

26   64.    As set forth herein, the Individual Defendants, by virtue of their

27   receipt of information reflecting the true facts regarding Molina, their control over,

28   receipt, and/or modification of Molina's allegedly materially misleading statements

and omissions, and/or their positions with the Company that made them privy to confidential information concerning Molina, participated in the fraudulent scheme alleged herein.

65.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Molina common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Molina's business, operations, and management and the intrinsic value of Molina common stock and caused Plaintiff and members of the Class to purchase Molina common stock at artificially inflated prices.

**LOSS CAUSATION/ECONOMIC LOSS**

66.     During the Class Period, as detailed herein, Molina and Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Molina common stock, and operated as a fraud or deceit on Class Period purchasers of Molina common stock by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Molina common stock declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of Molina common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

67.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

1          (b)     the omissions and misrepresentations were material;

2          (c)     the Company's common stock traded in an efficient market;

3          (d)     the misrepresentations alleged would tend to induce a

4    reasonable investor to misjudge the value of the Company's common stock; and

5          (e)     Plaintiff and other members of the Class purchased Molina

6    common stock between the time Defendants misrepresented or failed to disclose

7    material facts and the time the true facts were disclosed, without knowledge of the

8    misrepresented or omitted facts.

9          68.     At all relevant times, the markets for Molina common stock were

10   efficient for the following reasons, among others:

11         (a)     as a regulated issuer, Molina filed periodic public reports with

12   the SEC;

13         (b)     Molina regularly communicated with public investors via

14   established market communication mechanisms, including through regular

15   disseminations of press releases on the major news wire services and through other

16   wide-ranging public disclosures, such as communications with the financial press,

17   securities analysts, and other similar reporting services;

18         (c)     Molina was followed by several securities analysts employed

19   by major brokerage firm(s) who wrote reports that were distributed to the sales

20   force and certain customers of their respective brokerage firm(s) and that were

21   publicly available and entered the public marketplace; and

22         (d)     Molina common stock was actively traded in an efficient

23   market, and Molina common stock was traded on the NYSE under the ticker

24   symbol "MOH."

25         69.     As a result of the foregoing, the market for Molina common stock

26   promptly digested current information regarding Molina from publicly available

27   sources and reflected such information in Molina's common stock price(s).  Under

28   these circumstances, all purchasers of Molina common stock during the Class

1   Period suffered similar injury through their purchase of Molina common stock at

2   artificially inflated prices and the presumption of reliance applies.

3       70.     Further, to the extent that the Defendants concealed or improperly

4   failed to disclose material facts with regard to the Company, Plaintiff is entitled to

5   a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v.*

6   *United States*, 406 U.S. 128, 153 (1972).

7                                **NO SAFE HARBOR**

8       71.     The statutory safe harbor provided for forward-looking statements

9   under certain circumstances does not apply to any of the allegedly false statements

10  pleaded in this Complaint.  The statements alleged to be false and misleading

11  herein all relate to then-existing facts and conditions.  In addition, to the extent

12  certain of the statements alleged to be false may be characterized as forward

13  looking, they were not identified as "forward-looking statements" when made and

14  there were no meaningful cautionary statements identifying important factors that

15  could cause actual results to differ materially from those in the purportedly

16  forward-looking statements.  In the alternative, to the extent that the statutory safe

17  harbor is determined to apply to any forward-looking statements pleaded herein,

18  Defendants are liable for those false forward-looking statements because at the

19  time each of those forward-looking statements were made, the speaker had actual

20  knowledge that the forward-looking statement was materially false or misleading,

21  and/or the forward-looking statement was authorized or approved by an executive

22  officer of Molina who knew that the statement was false when made.

23                          **CLASS ACTION ALLEGATIONS**

24      72.     Plaintiff brings this action as a class action pursuant to Rule 23 of the

25  Federal Rules of Civil Procedure on behalf of all persons or entities who purchased

26  or otherwise acquired Molina common stock between October 31, 2014 and

27  August 2, 2017, inclusive (the "Class").  Excluded from the Class are Defendants,

28  members of the immediate family of each of the Individual Defendants, any

1  subsidiary or affiliate of Molina, and the directors and officers of Molina and their

2  families and affiliates at all relevant times.

3      73.    The members of the Class are so numerous that joinder of all

4  members is impracticable.  The disposition of their claims in a class action will

5  provide substantial benefits to the parties and the Court.  As of February 23, 2018,

6  Molina had: 59,727,000 shares of common stock outstanding.

7      74.    There is a well-defined community of interest in the questions of law

8  and fact involved in this case.  Questions of law and fact common to the members

9  of the Class which predominate over questions which may affect individual Class

10  members include:

11          (a)    Whether the Exchange Act was violated by Defendants;

12          (b)    Whether Defendants omitted and/or misrepresented material

13  facts;

14          (c)    Whether Defendants' statements omitted material facts

15  necessary in order to make the statements made, in light of the circumstances

16  under which they were made, not misleading;

17          (d)    Whether Defendants knew or recklessly disregarded that their

18  statements were false and misleading;

19          (e)    Whether the price of Molina common stock was artificially

20  inflated; and

21          (f)    The extent of damage sustained by Class members and the

22  appropriate measure of damages.

23      75.    Plaintiff's claims are typical of those of the Class because Plaintiff

24  and the Class sustained damages from Defendants' wrongful conduct.

25      76.    Plaintiff will adequately protect the interests of the Class and has

26  retained counsel experienced in securities class action litigation.  Plaintiff has no

27  interests that conflict with those of the Class.

28

77.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

78.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)     Employed devices, schemes, and artifices to defraud;

> (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Molina common stock during the Class Period.

81.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Molina common stock.  Plaintiff and the Class would not have purchased Molina common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

82.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Molina common stock during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

83.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Molina within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Molina, the Individual Defendants had the power and ability to control the actions of Molina and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 27, 2018

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Robert V. Prongay*
Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Liaison Counsel for Plaintiff Steamfitters Local 449 Pension Plan*

Christopher J. Keller
Eric J. Belfi
Francis P. McConville
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ckeller@labaton.com
          ebelfi@labaton.com
          fmcconville@labaton.com

*Counsel for Plaintiff Steamfitters Local 449 Pension Plan*

## <u>CERTIFICATION</u>

I, Joseph M. Little, as Chairman of the Board of Trustees of Steamfitters Local 449 Pension

Plan ("Local 449"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Local

449.  I have reviewed a Complaint prepared against Molina Healthcare, Inc. ("Molina") alleging

violations of the federal securities laws;

2.      Local 449 did not purchase common stock of Molina at the direction of counsel or

in order to participate in any private action under the federal securities laws;

3.      Local 449 is willing to serve as a lead plaintiff and representative party in this matter,

including providing testimony at deposition and trial, if necessary;

4.      Local 449's transactions in Molina common stock during the Class Period are

reflected in Exhibit A, attached hereto;

5.      Local 449 sought to serve or currently serves as a lead plaintiff in the following class

actions under the federal securities laws filed during the last three years:

*International Brotherhood of Electrical Workers Local No. 38 Pension Fund Pension Plan v. KLX Inc.*,
No. 9:16-cv-80023 (S.D. Fla.)
*Lentch v. Vista Outdoor*, No. 1:17-cv-0012 (D. Utah.)

6.      Local 449 sought to serve as a representative party but not as a lead plaintiff in the

following class action under the federal securities laws filed during the last three years:

*Steamfitters Local 449 Pension Plan v. Eaton Corporation PLC*, No. 1:16-cv-06393 (S.D.N.Y.)
*Steamfitters Local 449 Pension Plan v. Maximus, Inc.*, No. 1:17-cv-0884 (E.D. Va.)
*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, No. 1:17-cv-08107 (S.D.N.Y.)

7.      Beyond its pro rata share of any recovery, Local 449 will not accept payment for

serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement

of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 26th day of April, 2018.

Joseph M. Little
Chairman of the Board of Trustees
Steamfitters Local 449 Pension Plan

**EXHIBIT A**

**TRANSACTIONS IN MOLINA HEALTHCARE, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 07/16/15 | 1,920.00 | $72.32 | ($138,854.40) |
| Purchase | 07/17/15 | 190.00 | $73.04 | ($13,877.60) |
| Purchase | 08/18/15 | 890.00 | $80.70 | ($71,823.00) |
| Purchase | 09/23/15 | 5.00 | $76.35 | ($381.75) |
| Sale | 09/23/15 | -10.00 | $76.34 | $763.40 |
| Purchase | 09/24/15 | 727.00 | $76.66 | ($55,731.82) |
| Purchase | 01/27/16 | 30.00 | $55.35 | ($1,660.50) |
| Purchase | 01/27/16 | 33.00 | $55.35 | ($1,826.55) |
| Purchase | 06/13/16 | 380.00 | $50.53 | ($19,201.40) |
| Sale | 09/13/16 | -584.00 | $54.77 | $31,985.68 |
| Sale | 09/13/16 | -890.00 | $54.77 | $48,745.30 |
| Purchase | 12/30/16 | 482.00 | $54.44 | ($26,240.08) |
| Sale | 03/15/17 | -1,553.00 | $44.83 | $69,620.99 |
| Sale | 03/15/17 | -1,620.00 | $44.83 | $72,624.60 |