1   Robert V. Prongay (#270796)
    Lesley F. Portnoy (#304851)
2   **GLANCY PRONGAY & MURRAY LLP**
3   1925 Century Park East, Suite 2100
    Los Angeles, CA 90067
4   Telephone: (310) 201-9150
    Facsimile: (310) 201-9160
5   Email: info@glancylaw.com

6   *Liaison Counsel for Lead Plaintiff*
    *Steamfitters Local 449 Pension Plan and*
7   *the Proposed Class*

8   Jonathan Gardner (*pro hac vice*)
    Michael P. Canty (*pro hac vice application*
9   *filed*)
    Christine M. Fox (*pro hac vice*)
10  Theodore J. Hawkins (*pro hac vice*)
    **LABATON SUCHAROW LLP**
11  140 Broadway
    New York, NY 10005
12  Telephone: (212) 907-0700
    Facsimile: (212) 818-0477
13  Emails:
    jgardner@labaton.com
14  mcanty@labaton.com
    cfox@labaton.com
15  thawkins@labaton.com

16  *Counsel for Lead Plaintiff Steamfitters*
    *Local 449 Pension Plan and the Proposed*
17  *Class*

18              **UNITED STATES DISTRICT COURT**

19              **CENTRAL DISTRICT OF CALIFORNIA**

20  STEAMFITTERS LOCAL 449 PENSION      )
    PLAN, Individually and on Behalf of All  )
21  Others Similarly Situated,               )   **Case No.: 2:18-cv-03579 (MR)**
                                             )
22                         Plaintiff,        )   **CLASS ACTION**
                                             )
23          vs.                              )   **AMENDED CLASS ACTION**
                                             )   **COMPLAINT FOR VIOLATION**
24  MOLINA HEALTHCARE, INC., J.              )   **OF THE FEDERAL SECURITIES**
    MARIO MOLINA, JOHN C. MOLINA,           )   **LAWS**
25  TERRY P. BAYER, and RICK HOPFER,        )
                                             )   **DEMAND FOR JURY TRIAL**
26                         Defendant.        )
    ─────────────────────────────────────────)
27

28

---

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS - CASE NO.: 2:18-CV-03579 (MR)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

GLOSSARY OF TERMS AND ABBREVIATIONS USED IN
AMENDED COMPLAINT ................................................................................iv

I.    NATURE OF THE ACTION.............................................................. 1

II.   JURISDICTION AND VENUE ........................................................15

III.  PARTIES.............................................................................................16

IV.   CONTROL PERSON ALLEGATIONS ..........................................19

V.    SUBSTANTIVE ALLEGATIONS...................................................21

      A.    Background .............................................................................21

      B.    Molina's Traditional Business ..............................................22

      C.    Molina's Administrative Infrastructure ...............................23

      D.    Expansion of Molina's Business into the ACA Marketplace............24

            1.    Supposed Ramp-Up of Molina's Administrative
                  Infrastructure................................................................24

            2.    Molina's 2015 Equity Offering and Acquisition Spree............26

      E.    Serious Problems with the Company's Administrative
            Infrastructure Plagued Molina Throughout the Class Period,
            Were Made Known to the Individual Defendants, But Were Not
            Disclosed to the Market During that Time .........................29

            1.    Problems with Enrollment Data .................................29

            2.    Problems with Claims and Utilization Management...............35

            3.    Problems with Provider Data Maintenance and Payment........42

            4.    Lack of Integrity of Data Causes Miscalculation of Risk
                  Scores.............................................................................44

            5.    Lack of Integrity of Data Causes Mispricing of ACA
                  Plans...............................................................................46

            6.    Molina's Refusal to Upgrade to a More Robust Platform .......46

            7.    The Individual Defendants and Other Members of
                  Molina Senior Management Are Informed of the Serious
                  Limitations and Lack of Scalability of the Company's
                  Administrative Infrastructure ....................................47

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................... 51

    A.   Third Quarter Fiscal 2014 Results ............................................... 51

    B.   Fourth Quarter and Full Year 2014 Results and Investor Day ........... 54

    C.   First Quarter Fiscal 2015 Results ............................................... 59

    D.   Second Quarter Fiscal 2015 Results and Investor Day ..................... 59

    E.   Third Quarter Fiscal 2015 Results ............................................... 61

    F.   J.P. Morgan Healthcare Conference – January 11, 2016 ................... 61

    G.   Fourth Quarter and Full Year 2015 Results and Investor Day ........... 62

    H.   The Truth Begins To Emerge, But Defendants Continue to Mislead Investors ............................................................... 64

        1.   First Quarter Fiscal 2016 Results (First Partial Corrective Disclosure) ............................................................... 64

        2.   Barclays Conference - June 9, 2016 ........................................ 73

        3.   Press Release - July 13, 2016 ............................................... 73

        4.   Second Quarter Fiscal 2016 Results ........................................ 74

        5.   Third Quarter Fiscal 2016 Results........................................... 76

        6.   J.P. Morgan Healthcare Conference – January 9, 2017 .......... 76

        7.   Fourth Quarter and Full Year 2016 Results and February 16, 2017 Investor Day (Second Partial Corrective Disclosure) ............................................................... 77

        8.   2016 Annual Report Disclosing A Material Weakness in Molina's Internal Control Over Financial Reporting .............. 84

        9.   Firing of the Molina Brothers – May 2, 2017 .......................... 86

        10.   First Quarter 2017 Results – May 2, 2017 ............................. 88

VII.   THE FULL TRUTH IS REVEALED ............................................... 89

VIII.   POST-CLASS PERIOD EVENTS ............................................... 94

IX.   ADDITIONAL EVIDENCE OF SCIENTER........................................... 100

    A.   Certain Defendants' Stock Sales During the Class Period Were Highly Unusual and Suspicious ............................................... 101

        1.   The Value and Amount of Trading by these Defendants Was Highly Unusual................................................... 102

|     | (a) | The Nominal Amount and Percentage of Molina Holdings Sold During the Class Period Were Extremely Large ..... 103 |

(a) The Nominal Amount and Percentage of Molina Holdings Sold During the Class Period Were Extremely Large ....................................................................... 103

(b) These Defendants' Stock Sales Were Inconsistent With Prior Trading Practices ........................................... 105

(c) The Timing of the Stock Sales Was Suspicious .......... 106

2. The Presence of 10b5-1 Trading Plans Adopted by the Individual Defendants Does Not Absolve Them of Liability .................................................................................. 106

B. Statements by Former Molina Employees Corroborate that Defendants Knew or Were Reckless in Not Knowing That the Company's Administrative Infrastructure Was Not Scalable and Could Not Handle the Growth in Molina's Business During the Class Period ......................................................................................... 108

C. Defendants' Admissions Regarding the Company's Failed Infrastructure Build-Out Also Provide Strong Evidence of Scienter ...................................................................................... 111

D. The Wholesale Replacement of Molina's Senior Management, Including the Sudden Departure of the Individual Defendants During or Immediately Following the Class Period, Also Provides Strong Evidence of Scienter ................................ 115

E. Growth in Health Plan Membership Was Extremely Important to the Company's Success and Defendants Spoke Frequently About Molina's Growth Strategy and Reliance on its Administrative Infrastructure to Support that Growth ..................... 117

X. LOSS CAUSATION/ECONOMIC LOSS ...................................................... 123

XI. CLASS ACTION ALLEGATIONS ............................................................... 126

XII. PRESUMPTION OF RELIANCE .................................................................. 127

XIII. NO SAFE HARBOR ........................................................................................ 129

XIV. CLAIMS FOR RELIEF .................................................................................... 129

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ............................................................ 129

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants .................................................................. 132

PRAYER FOR RELIEF ......................................................................................................... 134

JURY DEMAND ....................................................................................................................... 134

## GLOSSARY OF TERMS AND ABBREVIATIONS
## USED IN AMENDED COMPLAINT

| Term | Definition |
| --- | --- |
| ABD | Aged, Blind and Disabled.  Medicaid provides coverage for a broad range of health services, including doctors' visits, hospital care, and medical equipment if the patient is over 65, blind, or has a disability, and meets financial eligibility requirements. |
| ACA | The Patient Protection and Affordable Care Act, often shortened to the Affordable Care Act or nicknamed Obamacare, is a United States federal statute enacted by the 111th United States Congress and signed into law by President Barack Obama on March 23, 2010. |
| Acuity | Generally refers to the level of care a patient requires.  A general accepted system for patient acuity based on a scale that adequately represents the patients' complex level of care. |
| Administrative infrastructure | Refers to the information technology ("IT") systems that allow Molina to process health plan business functions including, but not limited to: collecting and processing enrollment data, provider enrollment and credentialing, Eligibility Benefit Inquiry and Response, member billing, claims processing, provider payment and seeking appropriate payments and reimbursements from states and the federal government.  Molina's administrative infrastructure includes its hardware, software, networks, and other IT assets such as the Company's claims |

| Term | Definition |
|------|------------|
| | processing platform, QNXT. |
| Auto-approval | This refers to the process by which requests for clinical services and procedures were automatically approved instead of reviewed and approved individually due to system slowdowns and outages at Molina. |
| CHIP | Children's Health Insurance Program. CHIP is a joint federal and state matching program that provides health care coverage to children whose families earn too much to qualify for Medicaid coverage. |
| COSO | Committee of Sponsoring Organizations of the Treadway Commission |
| CMS | Centers for Medicare and Medicaid Services |
| Duals | Refers to a member-centered health care approach for people who are eligible for both Medicaid and Medicare. |
| LMRP | Local Medical Review Policy (LMRP) Information Definition of an LMRP. An LMRP is a Local Medical Review Policy. LMRPs are the coverage policies that are developed by the Medicare Insurance Carriers and apply directly to claims made to the Insurance Carrier for Coverage under Medicare. |
| MCR | Medical Care Ratio, also known as medical cost ratio. Metric that healthcare facilities accepting Medicare must send to CMS on time each year. Used in managed health care and health insurance to measure medical costs as a percentage of premium revenues. |

| Term | Definition |
|---|---|
| Medical margin | Premium revenue minus direct pay out medical costs |
| MLR | Medical Loss Ratio |
| PMPM | Per-member per-month |
| Risk adjustment liabilities/payments | Under Medicare and ACA Guidelines, health plans' composite risk scores are compared with the overall average risk score for the relevant state and market pool. Health plans are required to make a risk transfer payment into the pool if their composite risk scores are below the average risk score, Conversely, health plans will receive a risk adjustment payment from the pool if their composite risk scores are above the average risk score. The goal of the risk adjustment program is to adjust payments to insurers to reflect the actual risk profile of the individuals who enroll in their plans relative to other plans in the same state and block. The goal of the risk adjustment program is to adjust payments to insurers to reflect the actual risk profile of the individuals who enroll in their plans relative to other plans in the same state and block. The risk adjustment program is divided into two stages. The first stage is the determination of a "risk score" of each insured population. The second stage is the risk transfer formula that is used to balance the premiums among the health plans to reflect differences in risk scores of the enrolled population by health plan. |
| Risk scores | Risk scores predict how a health plan's liability will differ from the State average due to the health status of its |

| Term | Definition |
|------|------------|
| | enrollees.  Health plans such as Molina calculate their own risk scores based on claims experience of its member population.  Molina's claim experience is derived from paid claims information within its IT systems. Risk scores can be affected by non-paid claims or pending approval claims. |
| Scalability | Refers to a system's capacity to handle a growing amount of work.  In this context, it refers to Molina's ability to grow membership and growth claims processed based on its existing IT systems, rather than migrate to different IT systems. |
| TANF | Temporary Assistance for Needy Families. The TANF program is designed to help needy families achieve self-sufficiency. |
| Utilization Management | Cost management tool that evaluates the medical necessity, appropriateness, and efficiency of the use of health care procedures and facilities under the provisions of the applicable health benefits plan.  Includes CCI (National Correct Coding Initiative Policy). |

1    Court-appointed Lead Plaintiff Steamfitters Local 449 Pension Plan
2  ("Steamfitters 449 Pension" or "Plaintiff"), individually and on behalf of all others
3  similarly situated, by its undersigned counsel, hereby brings this Amended Class
4  Action Complaint ("Complaint") against Molina Healthcare, Inc. ("Molina" or the
5  "Company"), J. Mario Molina, John C. Molina, Terry P. Bayer, and Rick Hopfer
6  (collectively, "Defendants").[1] The allegations herein are based on Plaintiff's
7  personal knowledge as to its own acts and on information and belief as to all other
8  matters, such information and belief having been informed by the investigation
9  conducted by and under the supervision of Lead Counsel, which includes a review
10  of: U.S. Securities and Exchange Commission ("SEC") filings by Molina;
11  securities analysts' reports and advisories about the Company; press releases and
12  other public statements issued by the Company; media reports about the Company;
13  interviews of former employees of Molina and its subsidiaries with knowledge of
14  the matters alleged herein; and consultation with experts in the areas of: (1)
15  Healthcare IT Systems; and (2) loss causation and damages.[2] Lead Counsel's
16  investigation into the matters alleged herein is ongoing and many relevant facts are
17  known only to, or are exclusively within the custody or control of, the Defendants.
18  Plaintiff believes that substantial additional evidentiary support will exist for the
19  allegations set forth herein after a reasonable opportunity for discovery. On behalf
20  of itself and the class it seeks to represent, Plaintiff alleges as follows:

21  **I.    NATURE OF THE ACTION**

22      1.    This is a federal securities class action on behalf of all persons and
23  entities who purchased or otherwise acquired Molina publicly traded common
24  stock during the period from October 31, 2014 through August 2, 2017, inclusive

25

26  _____
    [1] J. Mario Molina ("CEO Mario Molina"), John C. Molina ("CFO John
    Molina"), Terry P. Bayer ("COO Bayer"), and Rick Hopfer ("CIO Hopfer") are
27  referred to collectively as the "Individual Defendants."
    [2] Confidential witnesses ("CWs") will be identified herein by number (CW-1,
28  CW-2, etc.). All CWs will be described in the masculine to protect their identities.

(the "Class Period") and who were damaged thereby. The action is brought against Molina and certain of its former officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Molina provides managed health care services under the Medicaid and Medicare programs and the then-emerging Patient Protection and Affordable Care Act health insurance marketplaces ("ACA Health Exchanges" or "ACA Marketplace"). Molina's health plans are operated by various wholly-owned subsidiaries, each of which is licensed as a health maintenance organization ("HMO"). Molina derives its revenues primarily from health insurance premiums. Molina's primary customers are state Medicaid agencies and the federal government. As of December 31, 2016, Molina had 7,700 employees and operated in twelve states and the Commonwealth of Puerto Rico.

3.     During the Class Period, Molina engaged in an acquisition spree that allowed the Company to aggressively expand its Medicaid business and fuel its touted growth strategy. Molina senior executives, including the Individual Defendants, lauded the Company's "scalable administrative infrastructure," throughout the Class Period, which Company executives claimed had the capacity to support sustained growth in both Medicaid markets and ACA Health Exchanges.[3] Indeed, Defendants falsely stated, among other things:

> •"[t]here is going to be more growth in 2015. Can [we] handle that [growth]? And from an IT standpoint, absolutely. We have built the systems to do that." (¶140).

---

[3] "Administrative infrastructure" refers to the information technology ("IT") systems that allow Molina to administer health plans through various business functions including, but not limited to: collecting and processing enrollment data, member billing, claims processing, provider payment and seeking appropriate payments and reimbursements from states and the federal government. Molina's administrative infrastructure includes its hardware, software, networks, and other IT assets such as the Company's managed care platform, QNXT.

1

2   •"Scalable administrative infrastructure . . .will help us to

3   continue to drive down the administrative cost." (¶149).

4

5   •"We already have the infrastructure in place. . . .and we're just

6   adding more members to an existing platform." (¶154).

7

8   •"[t]he IT systems that we use in our health plans and the IT

9   systems that we're using to help the states manage their

10   Medicaid information are primarily the same." (¶157).

11 Because Molina's existing administrative infrastructure was touted as "scalable,"

12 investors were led to believe that the Company's aggressive expansion and revenue

13 growth, plus reduced costs, would drive share value, and that the anticipated

14 growth would not require a rebuild of the Company's existing platform or a

15 migration to an entirely new platform.

16      4.      The statements of former Molina employees with knowledge of the

17 Company's systems and ACA business confirm that senior executives at Molina,

18 including the Individual Defendants, were aware, *from the beginning of the Class*

19 *Period,* that Molina's administrative infrastructure, including its legacy QNXT

20 platform, could not handle the complexities and rapid expansion into the ACA

21 Marketplace.  For example:

22      • CW-1, former Associate Vice President, Information Systems,

23      in the Office of the CIO from September 2015 to December

24      2017, confirmed that CEO Mario Molina was made aware of IT

25      issues at Molina through strategic plans CW-1 prepared which

26      were presented to Molina's senior executives, including CEO

27      Mario Molina, which identified, among other things, ongoing IT

28      issues and planned investments in IT infrastructure. CW-1

1   described his  job as "bring[ing] light to problems" within

2   Molina regarding the Company's IT issues including that the

3   system had "chronic, lingering issues" with the expansion into

4   the ACA Marketplace, Molina could not get the various systems

5   to work together, and data integrity was always an issue.  CW-1

6   also communicated directly with CEO Mario Molina about the

7   IT concerns described herein. (¶¶69-75, 118, 122, 271);

8

9   • CW-2, former Program Director for the Company's Enterprise

10  PMO ("EPMO") Marketplace line of business from February

11  2015 to May 2016 and a contractor in Molina's EPMO for six

12  months before that, confirmed that QNXT was unable to manage

13  Molina's ACA Marketplace business because the custom

14  code/development, and how QNXT managed rates, patient

15  specific information, and claims, was not built for ACA. CW-2

16  confirmed that CIO Hopfer and COO Bayer, among other senior

17  Molina executives, were made aware of the IT issues at Molina.

18  CW-2 prepared weekly status reports that broke down IT issues

19  by state. CW-2 described the weekly status reports as

20  PowerPoint presentations related to Molina's ACA business that

21  he presented at weekly Steering Committee Meetings held at the

22  Molina executive tower in Long Beach, CA.  According to CW-

23  2, in March 2016, the Steering Committee consisted of COO

24  Bayer, CIO Hopfer, and other executives including the VP of

25  Health Insurances/Marketplace, the VP of Information Systems,

26  and CW-2's boss, Sanjay Bhat, VP of Projects).  The reports

27  prepared by CW-2, and circulated to the attendees by email –

28

including COO Bayer and CIO Hopfer – identified QNXT
systems problems by state. (¶¶76-82, 113, 119, 123, 272);

• CW-3, former Senior Project Manager-PM III at Molina from
October 2015 to September 2017 and Project Management
consultant from September 2013 to October 2015, also prepared
materials for inclusion in presentations for the weekly status
meetings which were circulated to COO Bayer, CIO Hopfer,
Sanjay Bhat, and others from the executive team at Molina
corporate, in which CW-3 highlighted the enrollment data
challenges QNXT could not handle adequately as observed
during EDGE server processing. (¶¶83-88, 112, 117, 120, 123,
127, 273);

• CW-4, former leader at Molina California, participated in
Monthly Network Strategy calls periodically attended by COO
Bayer where "huge problems" with QNXT frequently were
discussed.  (¶¶89-95, 108-111, 121, 128, 129, 274-275);

• CW-5, former Associate Vice President of Utilization
Management from November 2012 until January 2017, stated
that as a result of QNXT's difficulty in handling both the
Medicaid and ACA expansion, the system experienced
slowdowns and outages. Given the severity and length of these
outages, Molina's senior management, including COO Bayer
who was copied on the outage notifications, must have been
aware of the problems. CW-5 also confirmed that system
scalability and capacity issues were brought to the attention of

his boss, Karen Warren, Vice President of Clinical Program
Operations, and Molina's Chief Medical Officer ("CMO") Keith
Wilson, at regularly scheduled meetings that CW-5 participated
in telephonically and which CIO Hopfer and COO Bayer also
attended periodically.  According to CW-5, minutes were taken
during these meetings and were circulated to all of the attendees
including CIO Hopfer and COO Bayer, when they attended the
meetings. CW-5 also participated in quarterly meetings with CIO
Hopfer, COO Bayer, Wilson and Warren, during which a host of
system issues were discussed including problems with QNXT,
how problems with Molina's QNXT system were negatively
impacting the Utilization Management part of Molina's business,
overall concerns with Molina's systems including patching the
QNXT system, and concerns about reporting to regulators such
as the Centers for Medicare and Medicaid Services ("CMS").
CW-5 also informed CFO John Molina of his concerns with the
deficiencies in Molina's utilization management system and
repeatedly requested a new utilization management system
which was not approved until approximately the beginning of
2017.  (¶¶96-106, 130-133, 276-279).

5.    Documents prepared for Molina's Steering Committee, and dated
March 31, 2016 and April 14, 2016,  provided by the CWs, confirm that while the
Defendants were publicly touting the scalability of the Company's administrative
infrastructure, the Company's Steering Committee (including Steering Committee
members COO Bayer and CIO Hopfer) was discussing "critical" problems with
"Enrollment & Billing" (including "Gaps in the design and processing logic
lead[ing] to mismatch in enrollment status between Molina and Exchange, causing
significant downstream issues and exceptions") and Molina's "Contact Center"

(responsible for responding to member inquiries) and "At-Risk" problems with "Customer Experience", Brokers (including the inability to "receive payments from insurance premium support groups") and "Member Communications."

6.    These reports also identify serious system problems including but not limited to:

- more than 650 ongoing "current projects" for Molina's administrative infrastructure including "logic corrections and operational controls implementation";

- "No Marketplace O&M [operating and maintenance] process due to production instability; production defects are managed through portfolio projects";

- "changes in processing logic and system triggers are needed to alleviate current manual resolution and enable required capabilities";

- "Resource gaps have prevented project start-up and execution";

- "Redesign of select business and IT logic";

- "The Billing and Payment deep dive has identified key pain points that will require process and technology fixes";

- "Processing logic gaps" and "Capability Gaps";

- "Technical Deficiencies and System Limitations";

- "Upstream Eligibility Issues" including "inaccuracies with rate calculations"; and

- "Lack of prioritization framework for issue and project intake".

7.    These problems had serious implications for Molina (as indicated in the Steering Committee presentations) including "Significant manual workarounds to maintain process integrity", "Lack of visibility and transparency into fallout", "Reactive corrections and fixes built into normal processes to handle fallout", and "Member abrasions due to access to care issues."  The Steering Committee, along

1   with outside vendor Deloitte, also determined that twelve major projects were

2   required before going live in the ACA Marketplace in 2017 and several projects

3   required a deeper assessment to inform project scoping, including whether "there

4   will be a rebuild of [QNXT] 5.3 for Marketplace."

5       8.      Rather than inform the investing public of the severe problems the

6   Company was experiencing in areas like provider payment, utilization

7   management, risk adjustment and information management, Defendants continued

8   to tout the scalability of Molina's existing administrative infrastructure.  These

9   statements were materially false and/or misleading when made in that they failed

10  to disclose that:

11      (a)     Molina's administrative infrastructure was designed for a much

12  smaller, simpler business and was never designed to handle the size, complexity,

13  and unique demands of the Company's growth in the ACA Marketplace (i.e,

14  Molina's existing infrastructure was not scalable to handle the influx of business

15  without significant modification and increased expenditures);

16      (b)     Molina did not adjust its administrative infrastructure to absorb

17  the rapid growth that resulted from the Company's expansion into the ACA

18  Marketplace, which the Company has admitted was very different from its

19  traditional Medicaid business;

20      (c)     Molina failed, or was unable due to system limitations, to add

21  necessary functionalities to its existing administrative infrastructure to:

22          (i)      accurately and timely process enrollment data and bill

23  members on ACA-leveled plans;

24          (ii)     adequately and timely handle utilization management and

25  claims processing;

26          (iii)    adequately and timely pay providers;

27

28

1             (iv)    accurately calculate the Company's "risk scores", which

2 were used to determine Molina's risk adjustment liabilities in the ACA and

3 Medicare markets; and

4             (v)    appropriately price its ACA plans;

5        (d)    Molina failed to properly remediate systemic issues and costly

6 disruptions to its administrative infrastructure;

7        (e)    Molina failed to rebuild, or migrate, the administrative

8 infrastructure of the business, and instead "doubl[ed]- down" on existing

9 insufficient processes and methods;

10        (f)    Molina's system problems were compounded by the

11 Company's inability to successfully integrate data and systems from acquisitions it

12 had completed during the Class Period into Molina's existing administrative

13 infrastructure. These challenges gave rise to significant intangible assets (such as

14 goodwill), increased costs, and an inability to adequately monitor and control its

15 operations;

16        (g)    Due to administrative infrastructure limitations, Molina

17 experienced systematic breakdowns in enrollment and claims processing,

18 utilization management, provider payment, and state and federal reimbursement,

19 resulting in, among other things:

20             (i)    member coverage disruptions;

21             (ii)    frequent payment disputes with healthcare providers

22 ultimately resulting in significant provider settlements and state penalties in 2018;

23             (iii)    increased risk adjustment liabilities; and

24             (iv)    ballooning operating costs driven primarily by increased

25 medical care costs and increased administrative expenses.

26        (h)    Molina's failure to remediate the Company's administrative

27 infrastructure problems made it extremely difficult for the Company to quickly

28 react to emerging trends in the ACA Marketplace.  Nevertheless, Defendants

continued to mislead the market with respect to the Company's ability to scale its systems for it rapidly growing business.  As a result, the Company's common stock traded at artificially inflated prices during the Class Period.

9.     The truth regarding Molina's failed growth strategy and inadequate administrative infrastructure was revealed to the market through a series of partial disclosures  beginning *on April 28, 2016,* after the market closed, when the Company announced a sharp earnings miss for the first quarter ended March 31, 2016 and a drastic cut in full-year 2016 earnings guidance.  Molina blamed the poor results on higher costs tied to administrative capacity issues. CEO Mario Molina represented: "[W]e anticipated enrollment growth, but our results exceeded even our own projections.  Assimilating this membership stretched our operational resources.  Accordingly, we redoubled our efforts around member and provider services, care and utilization management, provider payment, and information technology, all areas that felt the strain of rapid growth."  On this news, Molina's common stock price fell $12.46 per share, *or 19.40 percent*, to close at $51.76 per share on April 29, 2016 on unusually high trading volume.

10.     However, Defendants continued to mislead the market by falsely reassuring investors that any administrative infrastructure issues were under control, stating: "We've . . . added to the IT infrastructure so that now we've got the bandwidth or the pipes to allow us to maintain and increase this enrollment without having big glitches or stopgaps. . . .  [W]e have built the capacity that we need for the next several years, and we're confident that we're not going to have another strain like we just experienced in the first quarter of this year." Defendants failed to disclose that Molina's administrative infrastructure was designed for a much smaller, simpler business and that even the additional expenditures on administrative capacity issues could not remediate the fact that the system lacked necessary functionalities to properly process critical information such as enrollment and billing data, claims administration, and provider payments.

11.     The negative effects of the Company's insufficient administrative infrastructure in areas such as provider payment, utilization management, risk adjustment and information management were further revealed on ***February 15, 2017***, after the market closed, when the Company announced its financial results for the fourth quarter and full-year ended December 31, 2016 reporting a fourth quarter adjusted EPS loss of ($1.54) versus street estimates of $0.75 - driven by a sharp acceleration in losses in the ACA Marketplace. Notwithstanding Molina's prior expressions of the technical capability and commitment for a rapid growth strategy in the ACA Marketplace, and assurances that the Company's existing IT administrative infrastructure was sufficient, Molina executives cautioned that the Company could not commit to ACA Marketplace participation beyond 2017.  On this news, Molina's common stock price fell $10.71 per share, ***or 17.88 percent***, to close at $49.18 per share on February 16, 2017 on unusually high trading volume.

12.     Despite revealing part of the truth regarding the significant adverse impact issues related to the ACA Marketplace had on the Company's financial results during the fourth quarter, Defendants continued to mislead the market by falsely blaming losses for the fourth quarter on "additional challenges in the marketplace" and "increase[ed] utilization as members become more engaged with our care networks."  In fact, this subterfuge was designed to defer attention from the real problem that the Company did not have the proper administrative infrastructure for expansion into the ACA Marketplace and the increased membership and complexities of the Exchange plans were causing crippling QNXT problems including, among other things, critical enrollment and billing problems, increased auto-approval of claims (which increased Molina's healthcare costs)[4], massive delays and errors in claims administration and provider payments,

---

[4] As alleged herein, because of system slowdowns and outages, Molina's team of health care professionals responsible for determining the medical necessity, appropriateness, and efficiency of the use of health care procedures and facilities

*(continued)*

miscalculation of Molina's risk scores (used by CMS for risk adjustment liabilities), and mispricing of Molina's ACA plans.  Defendants also failed to disclose that it was Molina's existing administrative infrastructure, that it refused to rebuild or migrate to a more sophisticated platform, that was the source of the majority of the Company's problems, and it was not issues or uncertainties in the ACA Marketplace itself.

13.    On March 1, 2017, Molina disclosed a material weakness in the Company's internal control over financial reporting relating to its process for calculating the amount owed to the state of California pursuant to risk corridor formulas with the state, leading to a misstatement of Molina's income by $44 million for the year ended December 31, 2016.

14.    On May 2, 2017, Molina announced the sudden firing of both CEO Mario Molina and CFO John Molina (sons of Company founder, Dr. C. David Molina) purportedly due to the Company's "disappointing financial performance." Without a clear succession plan in place, Joseph W. White, formerly Molina's Chief Accounting Officer ("CAO"), was named interim President, CEO *and* CFO replacing both Mario and John Molina in their respective executive positions.  The market reacted favorably to this news, driving up Molina's stock price by 17.61% from a close on May 1, 2017 of $50.80 per share to a close on May 2, 2017 of $59.75 per share.

15.    The full truth was finally revealed ***on August 2, 2017***, after the market closed, when Molina finally admitted that its administrative infrastructure was built for a "much smaller, simpler business" and was never designed to support the

---

*(continued)*

under the provisions of the applicable health benefits plans (also called "Utilization Management") could not properly and timely review health care requests for approval and were forced, due to strict CMS deadlines, to automatically approve requests for procedures instead of reviewing and approving each request individually. This is referred to as "auto-approval."

1   Company's growth strategy. On that day, the Company issued a press release

2   announcing its financial results for the second quarter ended June 30, 2017.  The

3   Company reported a net loss of $230 million for the quarter, termination of its

4   ACA Health Exchange participation in Utah and Wisconsin, and a major

5   restructuring plan.  During the related earnings call, Molina **admitted** that the ACA

6   Marketplace was fundamentally different from the Medicaid market the Company

7   traditionally occupied, Molina's administrative infrastructure was never designed

8   to sustain such rapid growth into the ACA Marketplace, and that the Company

9   instead should have undertaken a "full redesign" of its infrastructure and business

10  "in anticipation of the potential growth resulting from the Affordable Care Act."

11  Moreover, the Company revealed that it had failed to update its systems to

12  properly handle member billing, risk adjustment and pricing for its ACA business.

13  Joseph W. White, Interim CEO, admitted: "we actually needed to just essentially

14  strip down to the fundamentals and rebuild the chassis of the business." On this

15  news, Molina's common stock price fell $3.92 per share, **or 5.92 percent**, to close

16  at $62.32 per share on August 3, 2017 on abnormally high trading volume.

17      16.    The reports of the CWs (¶¶69-106, 108-113, 117-123, 127-133) also

18  are corroborated by the Company's own post-Class Period admissions.  For

19  example, in February 2018, the Company admitted that Molina's inability to rely

20  on the Company's data from its IT systems made it difficult to identify and react in

21  real-time to emerging trends in the ACA Marketplace.

22      17.    Then, in May 2018, after almost the entire senior management of

23  Molina had been replaced, **including all four of the Individual Defendants**, the

24  Company admitted that in 2017 Molina experienced, among other things:

25          •   "inaccurate and inconsistent claims processing";

26          •   utilization management that was "inconsistent and sporadic"

27              and "not very effective in certain places";

28

- problems paying claims on a timely basis and sorting out its membership data;

- problems properly implementing network contracts which cost Molina hundreds of millions of dollars in provider settlements and late payment penalties to states;

- "very suboptimal processes, premium collection, enrollment and eligibility, deductibles, accumulators, all those things that become very big pain points for members and providers"; and

- routine underestimation of Molina's risk scores both in Medicare and the ACA Marketplace due, in part, to the Company's insufficient administrative infrastructure and poor data quality. The bad risk scores negatively affected the amount of Molina's risk transfer payments – a key cause of the Company's lower than expected financial results for fiscal 2016.

18.   Indeed, new CEO Joseph Zubretsky admitted, during the 2018 Investor Day on May 31, 2018, that Molina's risk score calculation pre-August 2017 was akin to throwing "a dart at a dartboard" and that the Company left significant money on the table with its underestimated risk scores. Other senior Molina executives echoed Zubretsky's acknowledgement that the Company's risk scores were inaccurate and that Molina had insufficient technological capabilities for its Marketplace business "relative to the level of risk transfer that we have within the organization. Our risk scores . . . clearly don't feel that they're nearly at the accuracy and completeness that they need to be, given the level of risk transfer that we have as a percent of our book -- of our premium. . ."

19.   Moreover, unbeknownst to investors, during the Class Period, Defendants Mario Molina, John Molina and Terry Bayer had been ***heavily selling***

1  *Molina stock in unusual and suspicious amounts totaling more than $55 million*
2  while in possession of material non-public information regarding the inability of
3  Molina's systems to be able to scale to support the Company's growth.

4         (a)    CEO Mario Molina sold 509,000 shares of Molina stock during
5  the Class Period for *proceeds of more than $31 million;*

6         (b)    CFO John Molina sold 231,367 shares of Molina stock during
7  the Class Period for *proceeds of $14.2 million*; and

8         (c)    COO Terry Bayer sold 149,211 shares of Molina stock during
9  the Class Period for *proceeds of $9.3 million*.

10      20.    Tellingly, Defendants Mario Molina, John Molina and Terry Bayer's
11  stock sales during the Class Period, when measured in amount and dollars, were
12  significantly higher than their Molina stock sales during the comparatively same
13  length period preceding the Class Period (the "Control Period"). *Defendant Mario*
14  *Molina's proceeds from Molina sales increased by 270 % during the Class*
15  *Period* – from $8.5 million during the Control Period to $31.5 million during the
16  Class Period. *Terry Bayer's trading also increased exponentially, more than*
17  *quadrupling* from $2 million during the Control Period to $9.3 million during the
18  Class Period.  And proceeds from Defendant John Molina's sales increased
19  approximately 60% during the Class Period, from $8.7 million during the Control
20  Period to more than $14.2 million during the Class Period.

21      21.    As a result of Defendants' wrongful acts and omissions, and the
22  precipitous decline in the market value of the Company's common stock, Plaintiff
23  and other Class members have suffered significant losses and damages.

24  **II.    JURISDICTION AND VENUE**

25      22.    The claims asserted herein arise under Sections 10(b) and 20(a) of the
26  Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated
27  thereunder by the SEC, 17 C.F.R. § 240.10b-5.

28

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Molina transacts business in this District, and the Company's principal executive offices are located within this District at 200 Oceangate, Suite 100, Long Beach, California 90802.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

26.     Court-appointed Lead Plaintiff Steamfitters 449 Pension is a union pension fund that is based in Pittsburgh, Pennsylvania.  It represents approximately 2,700 union-trained steamfitters and their beneficiaries and is a sophisticated institutional investor that had $535 million in total pension assets under management as of April 2018.  As set forth in the Certification previously submitted to the Court (ECF No. 1), Lead Plaintiff purchased Molina common stock at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Defendant Molina is a Delaware corporation with its principal executive offices located at 200 Oceangate, Suite 100, Long Beach, California 90802.  Molina provides managed health care services under the Medicaid and

1  Medicare programs and through the state insurance marketplaces.  The Company's

2  common stock is listed on the New York Stock Exchange ("NYSE") under the

3  ticker symbol "MOH."

4      28.    Defendant J. Mario Molina served as President and Chief Executive

5  Officer ("CEO") of Molina from 1996 until his termination on May 2, 2017.  CEO

6  Mario Molina's father (Dr. C. David Molina) formed Molina Healthcare in 1980.

7  CEO Mario Molina also served as a member of Molina's Board of Directors

8  throughout the Class Period.   CEO Mario Molina's  total estimated compensation

9  was approximately $17 million in 2017 (excluding severance payments and

10  benefits), $10 million in 2016 and 2015, and $7.8 million in 2014. During the

11  Class Period, CEO Mario Molina signed Molina's annual reports and certifications

12  pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial

13  information contained in the Company's financial reports was accurate and

14  disclosed any material changes to Molina's internal control over financial

15  reporting. Until his termination, CEO Mario Molina also participated in each of the

16  Company's quarterly earnings conference calls described herein. CEO Mario

17  Molina was a direct and substantial participant in the fraud.

18      29.    Defendant John C. Molina served as Chief Financial Officer ("CFO")

19  of Molina from 2003 until his termination on May 2, 2017.  CFO John Molina also

20  served as a member of Molina's Board of Directors  throughout the Class Period

21  and a member of the Board's "compliance and quality committee."  CFO John

22  Molina's  total estimated compensation was approximately $8 million in 2017

23  (excluding severance payments and benefits), $5.4 million in 2016, $4.4 million in

24  2015, and $3.4 million in 2014.  Until his termination, CFO John Molina signed

25  Molina's annual reports and quarterly and annual certifications pursuant to the

26  SOX stating that the financial information contained in the Company's financial

27  reports was accurate and disclosed any material changes to Molina's internal

28  control over financial reporting.  Until his termination on May 2, 2017, CFO John

1   Molina also participated in each of the Company's quarterly earnings conference
2   calls described herein. CFO John Molina was a direct and substantial participant in
3   the fraud.

4         30.     Defendant Terry P. Bayer served as Chief Operating Officer ("COO")
5   of Molina during all relevant times. COO Bayer's  total estimated compensation
6   was approximately  $3.6 million in 2017, $4.2 million in 2016, $ 3 million in 2015,
7   and $2.3 million in 2014.  Molina announced COO Bayer's retirement effective
8   February 2, 2018.  COO Bayer was a direct and substantial participant in the fraud.

9         31.     Defendant Rick Hopfer served as Chief Information Officer ("CIO")
10   of Molina from January 2011 until October 2017. CIO Hopfer also served on the
11   "Information Technology and Cybersecurity" subcommittee of Molina's Board of
12   Directors since October 2016.[5]  CIO Hopfer was a direct and substantial participant
13   in the fraud.

14         32.     Defendants CEO Mario Molina, CFO John Molina, COO Bayer, and
15   CIO Hopfer are collectively referred to hereinafter as the "Individual Defendants."

16         33.     CEO Mario Molina and CFO John Molina also are referred to herein
17   as the "Molina brothers."

18         34.     The Individual Defendants, because of their positions with the
19   Company, possessed the power and authority to control the contents of Molina's
20   reports to the SEC, press releases, and presentations to securities analysts, money
21   portfolio managers and institutional investors, *i.e.*, the market.  The Individual
22   Defendants were provided with copies of the Company's reports and press releases
23   alleged herein to be misleading prior to, or shortly after, their issuance and had the
24   ability and opportunity to prevent their issuance or cause them to be corrected.

25

26       [5] According to Molina's 2016 proxy (filed on March 13, 2017), the information
27   technology and cybersecurity committee's primary responsibilities includes
"providing a forum to review, evaluate, monitor, and provide feedback on
28   technology related matters, including strategies, objectives, capabilities, initiatives, and policies."

1   Because of their positions and access to material non-public information available

2   to them, the Individual Defendants knew that the adverse facts specified herein had

3   not been disclosed to, and were being concealed from, the public, and that the

4   positive representations which were being made were then materially false and/or

5   misleading.

6        35.    Molina and the Individual Defendants are collectively referred to

7   herein as "Defendants."

8   **IV.    CONTROL PERSON ALLEGATIONS**

9        36.    The Individual Defendants, by virtue of their high-level positions with

10   the Company, directly participated in the management of the Company, and were

11   directly involved in the day-to-day operations of the Company at the highest levels.

12   The Individual Defendants participated in drafting, preparing, and/or approving the

13   public statements and communications complained of herein and were aware of, or

14   recklessly disregarded, the material misstatements contained therein and omissions

15   therefrom, and were aware of their materially false and misleading nature.

16        37.    During the Class Period, the Individual Defendants followed, tracked,

17   and were aware of capabilities of the Company's technologies and infrastructure

18   and knew the Company's administrative infrastructure could not handle Molina's

19   exponential growth and expansion into the ACA Marketplace.

20        38.    The Individual Defendants, as senior executive officers of the

21   Company, were able to and did control the content of the various SEC filings,

22   press releases, and other public statements pertaining to the Company during the

23   Class Period.  The Individual Defendants were provided with copies of the

24   documents and statements alleged herein to be materially false and misleading

25   prior to or shortly after their issuance and/or had the ability and opportunity to

26   prevent their issuance or cause them to be corrected.  Accordingly, the Individual

27   Defendants are responsible for the accuracy of the public reports, releases, and

28

1  other statements detailed herein and are primarily liable for the misrepresentations

2  and omissions contained therein.

3       39.    The Individual Defendants, because of their positions of control and

4  authority as senior executive officers (and as Director for CEO Mario Molina and

5  CFO John Molina), had access to the adverse, undisclosed information about

6  Molina's business through their access to internal corporate documents and

7  information, conversations and associations with other corporate officers and

8  employees, attendance at regularly-held meetings, as well as other management

9  and Board of Directors meetings and committees thereof, and reports and other

10  information provided to them in connection therewith.

11       40.    As senior officers and controlling persons of a publicly-held company

12  whose common stock was, during the relevant time, registered with the SEC

13  pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants

14  each had a duty to promptly disseminate accurate and truthful information with

15  respect to the Company's operations and business, and to correct any previously

16  issued statements that were or had become materially misleading or untrue, so that

17  the market price of the Company's common stock would be based upon truthful

18  and accurate information. The Individual Defendants' wrongdoing during the Class

19  Period violated these specific requirements and obligations.

20       41.    Each of the Individual Defendants is liable as a primary participant in

21  a wrongful scheme and course of business that operated as a fraud and deceit on

22  purchasers of Molina common stock during the Class Period, which included the

23  dissemination of materially false and misleading statements (both affirmative

24  statements and statements rendered misleading because of material omission)

25  regarding how the Company's administrative infrastructure was incompatible with

26  planned growth in ACA Health Exchanges.  The scheme: (i) deceived the investing

27  public regarding Molina's operations and the true value of Molina's common stock;

28  and (ii) caused Plaintiff and other members of the Class to purchase Molina

1    common stock at artificially inflated prices, which fell as the truth concerning the

2    inability of Molina's systems to "absorb the growth" that resulted from its

3    burgeoning ACA business ultimately became known to the market.

4        42.    In making the statements complained of herein, the Individual

5    Defendants, who were senior officers and controlling persons of Molina, were

6    acting on behalf of the Company in the regular course of business. Therefore, each

7    of the statements made by the Individual Defendants is attributable to the

8    Company.

9    **V.    SUBSTANTIVE ALLEGATIONS**

10       **A.    Background**

11       43.    Molina is a Long Beach, California-based managed care company that

12   provides health care to people receiving government assistance, offering cost-

13   effective Medicaid-related solutions to meet the health care needs of low-income

14   families and individuals, and to assist government agencies in the administration of

15   the Medicaid program.

16       44.    Dr. C. David Molina (father of CEO Mario Molina and CFO John

17   Molina) founded the Company in 1980 as a provider organization serving the

18   Medicaid population in Southern California. Since then, Molina has significantly

19   increased its Health Plans membership, adding Molina Medicaid Solutions, and a

20   host of companies including Pathways. Indeed, between 2014 and 2017, Molina

21   doubled in size.

22       45.    Molina has three reportable segments: 1) Health Plans, including

23   Molina's various HMOs; 2) Molina Medicaid Solutions ("MMS"), which provides

24   business processing, information technology ("IT") development, and

25   administrative services solutions to state Medicaid agencies; and 3) "Other" which

26   consists primarily of Molina's behavioral health and social services subsidiary,

27   Pathways.  Molina's Health Plans segment accounted for 98.16%, 96.92%, and

28   97.33% of Molina's 2015, 2016, and 2017 revenues, respectively.

46.     As of December 31, 2016, Molina's health plans served over 4.2 million members eligible for Medicaid, Medicare, and other government-sponsored health care programs for low-income families and individuals. Molina's Medicaid programs grew from approximately 2.2 million members at December 31, 2014 to 3.2 million members as of December 31, 2016.[6]  During that same time, Molina's Marketplace enrollment grew from 15,000 members to approximately 526,000 members.

47.     Molina derives its revenues primarily from health insurance premiums from twelve state health plans and a health plan in the Commonwealth of Puerto Rico.  Molina's primary customers are state Medicaid agencies and the federal government. One of the key metrics used to assess the performance of Molina's most significant segment, the Health Plans segment, is the medical care ratio ("MCR"). The medical care ratio represents the amount of medical care costs as a percentage of premium revenue. Therefore, the underlying gross margin, or the amount earned by the Health Plans segment after medical costs are deducted from premium revenue, is the most important measure of earnings reviewed by management. Gross margin for Molina's Health Plans segment is also referred to as "medical margin."[7]

**B.     Molina's Traditional Business**

48.     Molina offers a comprehensive suite of Medicaid services, ranging from care, disease management, cost management, and direct delivery of health care services, to state-level Medicaid management information systems ("MMIS") administration through Molina Medicaid Solutions segment.  The most common state-administered Medicaid program is the TANF program, which covers

---

[6] This includes Molina's Temporary Assistance for Needy Families ("TANF"), Children's Health Insurance Program ("CHIP") and Medicaid Expansion programs.
[7] Medical margin is equal to premium revenue minus medical costs.

1  primarily low income mothers and children. In states that have elected to
2  participate, Medicaid expansion provides eligibility to nearly all low-income
3  people under age 65 with incomes at or below 138% of the federal poverty line.
4  Another common state-administered Medicaid program is for Aged, Blind and
5  Disabled ("ABD") Medicaid beneficiaries, which covers low-income persons with
6  chronic physical disabilities or behavioral health impairments.  Under its Medicaid
7  contracts, state government agencies pay Molina's health plans fixed per-member
8  per-month ("PMPM") rates that vary by state, line of business and demographics;
9  and Molina arranges, pays for and manages health care services provided to
10  Medicaid beneficiaries.

11      49.    Molina also offers a suite of Medicare services. Medicare is a federal
12  program that provides eligible persons age 65 and over and some disabled persons
13  with a variety of hospital, medical insurance, and prescription drug benefits.
14  Medicare is funded by Congress, and administered by the CMS.  Medicare
15  beneficiaries may enroll in a Medicare Advantage plan, under which managed care
16  plans contract with CMS to provide benefits that are comparable to original
17  Medicare. Under Medicare Advantage, managed care plans contract with CMS to
18  provide benefits in exchange for a fixed PMPM premium payment that varies
19  based on the county in which a member resides, and adjusted for demographic and
20  health risk factors.

21  **C.    Molina's Administrative Infrastructure**

22      50.    Prior to its expansion into the ACA Marketplace, all of Molina's
23  health plans operated on a single managed care platform for claims processing (the
24  QNXT system).[8]  According to the Company's  Report on Form 10-K for the fiscal
25

26  _____
[8] Trizetto HealthCare Products' QNXT Enterprise Core Administration System
27  purportedly allows a payer organization to manage its data and operations.
https://www.cognizant.com/trizetto/core-administration/qnxt.  Trizetto also
28  markets a platform called FACETS which is billed as a next-generation core
administration technology that drives growth, increases efficiency, enables
*(continued)*

1    year ended December 31, 2015, this approach purportedly "avoids the costs

2    associated with maintaining multiple systems, improves productivity, and enables

3    medical directors to compare costs, identify trends, and exchange best practices

4    among our plans" and "facilitates [Molina's] compliance with current and future

5    regulatory requirements."

6          The software we use is based on client-server technology and is

7          scalable. We believe the software is flexible, easy to use, and

8          allows us to accommodate anticipated enrollment growth and

9          new contracts. The open architecture of the system gives us the

10         ability to transfer data from other systems without the need to

11         write a significant amount of computer code, thereby facilitating

12         the integration of new plans and acquisitions.

13   **D.    Expansion of Molina's Business into the ACA Marketplace**

14         **1.    Supposed Ramp-Up of Molina's Administrative**

15               **Infrastructure**

16         51.    The ACA authorized the creation of Marketplace insurance

17   exchanges, allowing individuals and small groups to purchase federally subsidized

18   health insurance, effective January 1, 2014.

19         52.    As early as 2012, Molina indicated that the Company would soon

20   double its revenue and that much of that growth would come from ACA Health

21   Exchanges. To prepare for that growth, Molina told the market that it would be

22   investing into its administrative infrastructure.

23   

24   *(continued)*
     compliance and supports new business models. The FACETS Core Administration
25   platform is marketed as consisting of a "rich set of modules that allow payer
     organizations to meet their business requirements while positioning them for
26   growth and change." "With scalability to meet the transaction needs of the largest
     healthcare plans, FACETS addresses the needs of Commercial Group, Individual,
27   Consumer-Directed, Managed Medicaid, Medicare Advantage and, Part D,
     Disability and Specialty health plans."  https://www.cognizant.com/trizetto/core-
28   administration/facets

53.     On February 21, 2013, during the Company's 2013 Investor Day, CFO John Molina stated, "[O]ver the next three years, we believe that we'll grow revenues from $6 billion today to $12 billion[,] . . . [with] about a third of the additional revenues coming from reforms related to the Affordable Care Act."

54.     Several months later, on July 25, 2013, during Molina's earnings call for the second quarter ended June 30, 2013, CFO John Molina explained how the Company would prepare for that growth: "Most of the increase in [general and administrative ("G&A") expense] . . . is a ramp-up in administrative expenses as we make the necessary infrastructure investments to support [Medicare/Medicaid dual eligible plans ("Duals")] and [ACA] marketplace program implementations without any offsetting revenue."

55.     On September 19, 2013, Molina outlined its administrative infrastructure strategy during the Company's Investor Day. COO Bayer described how a single administrative infrastructure would support growth in both Medicaid markets and ACA Health Exchanges:

> [I]n addition to the investments in people, process and technology, our campaign this year has been all about One Molina.  And what One Molina means is that we can now take advantage of many of the investments we've made over the last few years to standardize our operations. . . .  It gives us the ability to scale more quickly, and to leverage the design and the implementation of the corporate systems.  So One Molina means doing it one way.

56.     From 2012 through 2014, Molina told investors it was updating its existing administrative infrastructure.  Molina continued to claim that build-up in a single administrative infrastructure would support rapid growth in both existing and new markets, including ACA Health Exchanges.  On February 10, 2014, during the Company's earnings call for the fourth quarter and full-year ended

December 31, 2013, CEO Mario Molina commented on this point: "[We are] preparing our organization for the implementation of the Affordable Care Act, requiring us to scale and build the infrastructure required to accommodate Medicaid expansion and the new [ACA] marketplace products."

57.    On January 13, 2015, during a J.P. Morgan-sponsored healthcare conference, CEO Mario Molina emphasized the dynamic between investing in a single administrative infrastructure and the Company's rapid growth strategy:

> So in 2013, . . . [t]here was a big investment in infrastructure and, as you'll recall from our filings, our admin costs rose to about 10% of revenue. . . .  We were getting ready for [ACA] marketplace, Medicaid expansion. . . .  So all these things required us to build additional infrastructure.

58.    For its Marketplace plans, Molina has represented that it develops premium rates during early spring each year for policies effective January 1st of the following year based on its estimates of projected member utilization, medical unit costs, member risk acuity, and administrative costs, with the intent of realizing a target pretax percentage profit margin.[9]

59.    As of December 31, 2016, Molina participated in the Marketplace in all of the states in which it operated except Illinois, New York, Puerto Rico and South Carolina.  Throughout the Class Period, Molina's footprint in the ACA Marketplace increased dramatically.

### 2.    Molina's 2015 Equity Offering and Acquisition Spree

60.    Throughout 2015 through 2016, Molina engaged in a series of acquisitions that allowed the Company to aggressively expand its Medicaid and ACA Marketplace business.  According to the Company's Report on Form 10-K for the year ended December 31, 2015 ("2015 Annual Report"), the acquisitions of

---

[9] In general terms, acuity refers to the level of care a patient requires.

1  other health plans and the assignment and assumption of Medicaid contract rights

2  of other health plans accounted for a significant amount of Molina's growth in

3  2015.

4        61.    To support those growth initiatives, in 2015, the Company raised

5  approximately $1.1 billion under debt and equity financing transactions (including

6  the equity offering described below), and supplemented its financing resources

7  under a new unsecured $250 million revolving credit facility – bringing its total

8  credit revolver to $500 million effective June 12, 2015.

9        62.    On June 1, 2015, Molina announced that it had commenced a public

10  offering of 5 million shares of its common stock. In connection with the offering,

11  Molina granted the underwriters a 30-day option to purchase up to 750,000

12  additional shares of its common stock. The offering was conducted pursuant to a

13  registration statement filed with the SEC on May 29, 2015.  UBS Securities LLC,

14  BofA Merrill Lynch and Wells Fargo Securities, LLC were lead underwriters for

15  the offering. The Company represented that it intended to use the net proceeds of

16  the offering for general corporate purposes including funding for acquisitions such

17  as its announced Medicaid expansion in Michigan. The offering was priced at

18  $67.75 per share.

19        63.    The Company's 2015 acquisitions included:

20        (a)    eight (8) in-market (or "tuck-in") acquisitions for Medicaid

21  contracts for existing health plans in Illinois, Michigan, Florida, and Washington

22  which were expected to add at least 221,000 Medicaid members in those states.

23  These acquisitions closed in the first quarter of 2016 and included (i) Preferred

24  Medical Plan in Florida; (ii) HealthPlus of Michigan; (iii) Integral Health Plan; (iv)

25  MyCare Chicago; and (v) Loyola Physician Health Partners; and

26        (b)    all of the outstanding ownership interests in Pathways Health

27  and Community Support LLC ("Pathways"), formerly known as Providence

28  Human Services, LLC, a provider of behavioral/mental health and social services.

64.     On July 30, 2015, CEO Mario Molina referred to the Company's, "[i]n-market acquisitions" as "an important part of our growth strategy and highly accretive, helping us to expand margins in the future. . . .  For the most part, speed to integration . . ., coupled with our existing infrastructure, result in significant accretion value.**"**

65.     According to the Company's February 8, 2016 fourth quarter 2015 earnings call, the acquisitions announced in 2015 would "add about [$1.2] billion in premium revenue in 2016 . . . and allow [Molina] to spread existing administrative overhead costs over a larger membership."

66.     In 2016, Molina acquired: (i) the outstanding equity interests of Molina Healthcare of New York, Inc., formerly known as Today's Options of New York, Inc., adding approximately 35,000 Medicaid members in the third quarter of 2016; and (ii) Universal American's Medicaid book.

67.     On February 16, 2017, Defendants represented that "[t]he acquisitions that we did in 2015 that we're able to absorb in 2016 were accretive and they're turning out for us and performing very well, just as we had thought they would."

68.     In fact, as discussed herein, Defendants failed to disclose that Molina's systems problems were further compounded by the Company's inability to successfully integrate data and systems from these acquisitions into Molina's existing administrative infrastructure. These challenges gave rise to significant intangible assets (such as goodwill), increased costs, and an inability to monitor and control the Company's operations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.      Serious Problems with the Company's Administrative Infrastructure Plagued Molina Throughout the Class Period, Were Made Known to the Individual Defendants, But Were Not Disclosed to the Market During that Time**

**1.      Problems with Enrollment Data**

69.      CW-1, was the former Associate Vice President, Information Systems at Molina from September 2015 to December 2017.  Prior to that, CW-1 was the Director, IT Strategy, Planning and Governance at Molina.  As AVP of Information Systems, CW-1 worked in the Office of the Chief Information Officer "("CIO"), Hopfer. CW-1 handled strategy, planning, performance, Enterprise architecture, vendor management and communications efforts.  CW-1 reviewed the Company's annual reports during his tenure and also listened in on Molina's investor calls.

70.      According to CW-1, Molina encountered problems integrating the ACA business into the Company's systems for its legacy Medicaid business. CW-1 reported that Molina's internal IT platform had a finite amount of resources, thus making the ACA business very cumbersome for Molina given all the demands that came with it. For example, CW-1 advised that ACA required significant technical capabilities at every stage of the process including, but not limited to, responding to Open Enrollment, Billing, and tracking customers' income levels.  CW-1 also confirmed that there were "performance issues" at the Company including during ACA open enrollment.

71.      CW-1 explained that Molina's business grew so much in such a short time and given the amount of data Molina had to handle, the software needed to be properly configured and customized which was *not* being timely done, in part, because Molina was acquiring additional companies at the same time as it was trying to configure and customize for its ACA business.

72.     According to CW-1, Molina "cobbled together" its system in an attempt to handle its expansion into ACA, but the system had "chronic, lingering issues" with the expansion.  CW-1 confirmed that Molina could not get the various systems to work together and data integrity was always an issue.

73.     CW-1 stated that some of Molina's members bounced back and forth between eligibility for Medicaid and ACA, another feature that was new to QNXT. CW-1 explained that the populations that enrolled in Molina's ACA programs also had financial situations that changed regularly, adding additional variables to the system that Molina was using to manage each subscriber.  For example, if a member was receiving a certain subsidy amount while working at McDonalds one month but the following month that person lost their job at McDonalds, their subsidy changed because they needed more assistance.  Thus, Molina's system needed to be able to track income, payments, subsidies, delinquencies, etc. which CW-1 described as complex and "quite difficult" and required the system to have more capabilities than it did.

74.     CW-1 also reported that as Molina entered new markets there were "limitations on scaling" and the Company should have halted the ACA expansion to customize its software and get its data center up and running.  CW-1 stated that during the second year of ACA enrollment, which CW-1 believed was 2015, Molina's IT systems were so overwhelmed that there was a system wide outage during open enrollment which included all of Molina's call centers.

75.     CW-1 noted that Molina had different versions of QNXT running, one for each state, and they all needed to be patched as the Company grew. CW-1 described how the IT department was tasked with building custom configurations for each state, but the IT department could not handle the complexities of doing that. These custom configurations made the existing system (QNXT) "brittle." CW-1 also noted that there was no "desire or time to fix" the IT problems, and thus, "temporary [IT] solutions became permanent."  CW-1 explained that once

Molina began expanding ACA to different states, it should have revamped its QNXT system rather than creating "13 patched, sliced" individual QNXT systems.

76.     CW-2 was a former Program Director for the Company's EPMO Marketplace line of business from February 2015 to May 2016.[10] As Program Director for the Company's Enterprise PMO Marketplace line of business, CW-2, who worked out of Molina's Long Beach, CA office, reported to Sanjay Bhat (former Vice President of Projects at Molina from March 2013 to August 2018), who reported to the Executive Vice President of PMO, Jane Dawson, who in turn reported to COO Bayer.  CW-2 also reported to Janet Fosdick, VP Health Insurance Exchanges / Marketplaces, concerning all ACA Marketplace issues.

77.     CW-2's responsibilities included handling all processes related to enrollment in all of the 13 states that Molina had expanded into the ACA Marketplace.  CW-2's team was in charge of making sure that all members were entered into QNXT and were getting their membership cards. CW-2 handled growth from the IT side of the business and was responsible for getting QNXT to handle Molina's significant data growth.

78.     According to CW-2, QNXT was the primary repository for data for the ACA platform at Molina, but that QNXT was not designed for the ACA Marketplace.  CW-2 explained that ACA was a "different beast" from Medicare and Medicaid and the QNXT system being used by Molina was unable to manage the ACA Marketplace business because the custom code/development was not built for ACA.  CW-2 stated that if you looked at Molina's QNXT platform, you would see that it was built to manage and handle claims for Medicare/Medicaid. He explained that this would be clear because of QNXTs unique structure and how it managed rates, patient specific information, and claims.

_____

[10] From August 2014 to February 2015, CW-2 worked through a third-party as a Senior Project Manager for Molina's EPMO.

79.     CW-2 confirmed that there were significant internal systems issues with enrollment during his tenure at Molina.  CW-2 confirmed that the Medicare/Medicaid structure was very different from the ACA Marketplace. For example, ACA has different levels of service for each state, like gold and bronze and QNXT was not built to support the different levels. According to CW-2, "all the things needed to support marketplace system were completely different." CW-2 explained that in order to support the different levels (gold vs. bronze), Molina needed to be able to put in the different rates (which varied by state). CW-2 stated that "the complexity within the marketplace system is much different and more layered" compared to Molina's Medicare/Medicaid business and that Medicare/Medicaid is much simpler because you have a singular rate, not the customization or "levels of complexity" that came with the ACA Marketplace. CW-2 explained that for each state there were multiple layers, or different ACA plans Molina offered in each state, that required QNXT to be custom built.

80.     CW-2 described problems with ACA enrollment data which the QNXT system was not set up to handle.  For example, ACA involved the collection of a lot of data including family members, salary information to calculate federal subsidies, verification of financial status from the federal government and other verification metrics. CW-2 gave the example of Washington state as one of the many states negatively impacted by the limitations of QNXT. CW- 2 advised that Washington has its own regulatory complexities that QNXT could not manage. He went on to say that the "system [QNXT] never helped any of us" because of its deficiencies in handling the data. CW-2 confirmed that bad data in Molina's QNXT system created massive clean-up for personnel at the Company.

81.     CW-2 stated that in 2015 there was an initiative to outsource processing of enrollment data to HealthPlan Services ("HPS"), a company located in Florida. According to CW-2, the reason for engaging HPS initiative was because Molina's QNXT system was unable to handle the increases in membership related

to the ACA expansion.[11] CW-2 attended meetings where they discussed HPS. However, according to CW-2, Molina could not even get its enrollment data in good enough shape to utilize HPS's services.

82.    According to CW-2, the problems with QNXT were exacerbated once the members were in the system. Molina had problems administering and handling member claims. CW-2 described the data in the QNXT system as "garbage in garbage out." CW-2 stated that Molina was constantly trying to retrofit QNXT to "make it work" rather than spend the money to replace the system.

83.    CW-3 was the former Senior Project Manager-PM III at Molina from October 2015 to September 2017.  CW-3 was previously a Project Management Consultant at Molina from September 2013 to October 2015. As Senior Project Manager, CW-3 reported to Vish Nath, former Director of Projects who reported to Sanjay Bhat, former VP of Projects who ultimately reported to COO Bayer. CW-3 was responsible for Molina's Enterprise PMO, supporting enrollment and claims processing, enterprise projects for Medicaid, Medicare and the ACA Health Exchange, EDGE Server operations, and reporting for Risk Adjustment.[12]

84.    CW-3 reported that Molina had "challenges" when it started expanding into the ACA Marketplace because it was not familiar with commercial processing.  CW-3 explained that unlike its legacy business, with the ACA expansion, Molina had to collect premiums. CW-3 stated that from 2016 until he left Molina in September 2017, Molina's ACA membership "exploded" and these problems got worse. CW-3 reiterated that ACA has a complicated commercial

---

[11] CW-2 recalled that the HPS initiative was run by COO Bayer, CIO Hopfer, Jane Fosdick, Jane Dawson and possibly Bob Gordon.
[12] According to CW-3, EDGE is a CMS-owned application that is able to pull aggregated "de-identified" enrollment, pharmacy, and claims data from Molina's QNXT system. CW-3 explained that CMS could run summary reports from EDGE, but did not see patient identifying details.

1   insurance structure because of additional things like cost sharing and premium

2   reductions/increases based on income level.

3       85.    CW-3 stated that many of the infrastructure problems at Molina were

4   due to processing "the level of enrollment data that was coming in," the sources it

5   was coming in from, and then being able to appropriately bill.  CW-3 advised that

6   if the enrollment data was not processed correctly or not "accepted" by the EDGE

7   server process, the claim would not process properly.  CW-3 described a "lack of

8   quality with enrollment data" on the EDGE server on which he was working at that

9   time. CW-3 advised that the way EDGE worked is that Molina's Enrollment Team

10  would perform an extract of the enrollment data for the current and prior years

11  (because some claims roll over). CW-3 would then get claims data from Molina's

12  Claims Team.

13      86.    According to CW-3, in order for the EDGE server to accept the data

14  which was ultimately shared with CMS, the claim had to match the enrollment

15  data, fall within the effective date of the enrollment, and the enrollment had to pass

16  CMS validation criteria. CW-3 recounted how Molina had "tons of enrollment

17  data" that was not accepted by the EDGE server because it was "dirty."  According

18  to CW-3, dirty data included, among other things, invalid codes, overlapping

19  enrollments, and problems with subscribers/dependents not matching.

20      87.    CW-3 also reported that Molina's internal systems could not

21  automatically process sponsor/dependent eligibility criteria with respect to

22  Marketplace claims for the state of Washington which caused serious delays in

23  processing such claims. CW-3 explained that with ACA if you enroll with your

24  family-you are the sponsor and your spouse/kids are dependents. According to

25  CW-3, the only way to process a claim for a dependent was for them to have a

26  valid sponsor.  The state of Washington had a process which assigned a "Mock"

27  sponsor, where the sponsor did not have ACA medical coverage.  This appears to

28  have been done to allow the sponsor to receive the bill for the dependents.  CW-3

recounted how the business enrollment team would spend months each year at the beginning of 2016 and 2017 manually cleaning up the enrollment data so that sponsor/dependent claims would be accepted by EDGE.

88.     CW-3 also reported that Molina contracted with HPS to handle all ACA Marketplace enrollment data for Molina, process the data and send it out to CMS after it was "clean." CW-3 believed that after the contract with HPS was signed, the plan was never implemented because Molina could never get to the point where the quality of its enrollment data could be shared with HPS.  CW-3 stated that internally Molina acknowledged that its enrollment data was "dirty" and the Company tried to clean up the data from QNXT for HPS. CW-3 stated that he believed "the Molina brothers had something" to do with the negotiations with HPS and also knew the escalating costs of cleaning up the Company's enrollment data for HPS. CW-3 described this as just one example of the many issues that Molina was having with its enrollment data at that time.

## 2.     Problems with Claims and Utilization Management

89.     CW-4 was a former leader at Molina California throughout the Class Period.  CW-4's team was responsible for the provider networks.[13]

90.     CW-4 stated that even before Molina's ACA expansion, the Company was already struggling with the inefficiency and difficulty of running managed care operations on QNXT and those problems were exacerbated by the ACA expansion.  According to CW-4, for Molina, QNXT was not initially used as a managed care solution system, but rather was Molina's initial platform for their staffed clinic operations. CW-4 stated that over the years as Molina grew, Molina "manipulated" QNXT or "bastardized" it to make it function as its primary

---

[13] Lead Plaintiff believes that the details of CW-4's position and responsibilities contained herein are sufficient to satisfy the requirements of the PSLRA. Lead Plaintiff can provide additional specificity, including CW-4's exact title and dates of employment, to the Court through an *in camera* submission.

managed care platform for processing claims, maintaining provider information, and managing member information, but it "functioned horribly."

91.    According to CW-4, the QNXT platform was "not functional" for efficiently managing the sharp growth in Molina's ACA subscribers.  As Molina's business grew, rather than take the time to completely remediate the QNXT platform or scratch it and start fresh, the Company instead would "manipulate [QNXT], retrofit it to try to make it work."  CW-4 reported that the problems with QNXT became significantly worse after Molina expanded into the ACA marketplace. The QNXT system was already problematic and became further flooded with the volume of claims and membership data (due to ACA): "you just exacerbate your issues." CW-4 described Molina as constantly trying to patch and remediate the problems rather than address the source of those problems.

92.    CW-4 confirmed that Molina did not efficiently manage the QNXT system and it could not get "the system fixed fast enough."  CW-4 stated that regardless of the membership expanding exponentially, the system data centric to claim processing, capitation payments, referrals and authorizations and PCP selection should have always been input and remediated in the systems, although it was not. This centric data is tied to the contracted provider network.  CW-4 explained that the major problems with QNXT was that Molina had "20 plus years of junk provider data in the system….they just piled junk on junk on junk."

93.    CW-4 advised that problems with Utilization Management and Downstream Claims issues could be "directly attributable" to the bad provider data in the QNXT system. CW-4 explained that Utilization Management involved authorizations allowing members to access care from a healthcare provider. During CW-4's tenure, Molina had two separate systems, one for authorizations and one for claims with QNXT for claims. According to CW-4, when dealing with managed care operations, it helps if the two systems "talk" to one another and they were not talking to each other.  Because the two systems did not communicate

properly due to the deficiencies with QNXT, Molina California would need a claims examiner to validate information prior to processing claims, including verification of authorizations, because many claims could not auto-adjudicate. According to CW-4, because of the problems with the system, the claims would require "manual intervention." He added that bad provider data in QNXT coupled with a Utilization Management system that had its own issues, was a "recipe for disaster."

94.     According to CW-4, QNXT (for the ACA Marketplace) also required a manual intervention process or otherwise resulted in subsequent claims adjustments.  CW-4 added that the plan would receive auto-adjudication reports from Molina corporate on a monthly basis.  According to CW-4, California had one of the worst rates of all of the states because of the size and the complexities of the Molina California plans. CW-4 stated that the constant manual adjudication of claims ended up costing Molina additional money as it costs more money to adjust claims than it is for the initial processing. CW-4 confirmed that Molina senior leadership at the state level repeatedly discussed problems with the QNXT system.

95.     According to CW-4, Molina corporate would create "attributes" or "work-arounds" to the QNXT system to help with claim processing.  CW-4 recalled that Molina had at least 100-150 attributes created by Molina's corporate IT department.  According to CW-4, through these attributes, QNXT was "retrofit with Band-Aids", and the data within QNXT was "not clean" which created additional problems and costs when trying to properly manage the claims.

96.     CW-5 was Molina's Associate Vice President of Utilization Management from November 2012 until January 2017 and reported directly to Karen Warren, the Vice President of Clinical Program Operations. [14] CW-5, a

---

[14] According to CW-5, Karen Warren initially reported to COO Bayer until approximately 2014/2015 when Warren began reporting to the new Chief Medical Officer, Dr. Keith Wilson, who in turn reported to COO Bayer.

1    Registered Nurse, was responsible for analyzing and reporting utilization trends

2    and patterns and participating in state and federal audits for all programs for

3    Medicare, Medicaid and the ACA Marketplace.   CW-5's Utilization Management

4    department also was responsible for Molina's patient approvals for all the states in

5    which the Company operated.

6         97.    CW-5 was very familiar with Molina's administrative infrastructure,

7    including its "capacity" and "scalability" as it related to Utilization Management.

8    According to CW-5, Molina relied on QNXT for everything including Utilization

9    Management and claims administration and was used by all of the doctors and

10   nurses at Molina to review claims. CW-5 stated that as the system became

11   inundated due to the influx of claims from the ACA members, Molina created "lots

12   of patch" jobs.   CW-5 confirmed that during his tenure, Molina's QNXT platform

13   was becoming inundated and was "double hit" with the integration of the ACA

14   business and the Company's Medicaid expansion. CW-5 confirmed that the ACA

15   Marketplace business "really pushed" the QNXT system over its limits.

16        98.    According to CW-5, a year or so into Molina's expansion into the

17   ACA Marketplace, CW-5's team expressed frustration because it was clear that no

18   patch job was going to remediate the significant problems that they were

19   encountering with QNXT. According to CW-5, Molina was having difficulty

20   adding all of the new patients that came on with Molina's ACA and Medicaid

21   expansion. CW-5 confirmed that it was clear that the platform was "overburdened"

22   beginning in 2014.  CW stated that as more members that were added to the

23   system, the more the system slowed down.  CW-5 explained that ACA was

24   different then Molina's legacy Medicaid business in that the benefits were

25   different.

26        99.    CW-5 could not believe that Molina continued with the patch jobs

27   because it was like trying to put a "square peg in a round hole."  CW-5 explained

28   that everyone knew that QNXT could not properly process or handle Molina's IT

1    needs after the Company expanded into ACA and further expanded its Medicaid

2    business.  CW-5 stated that QNXT works for a small company, but at that point

3    (2013/2014), Molina was no longer a small company.  CW-5 stated that QNXT is a

4    claims platform that Molina decided to "modify, modify, modify . . . tweak" to be

5    able to use it for Utilization Management and claims management and that instead

6    of overhauling the system, Molina kept making "little redesigns." CW-5 described

7    QNXT's lack of functionality as "a boat sinking."

8         100.   CW-5 was informed by his boss Karen Warren that the Molina

9    brothers (CFO John Molina and CEO Mario Molina) did not want to spend the

10    money to migrate to a new system despite the challenges that his department was

11    facing with the influx of ACA Marketplace members. CW-5's team was in

12    constant communication with a team from QNXT to combat the challenges with

13    the system and CW-5 understood from those communications that the Molina

14    brothers did not want to migrate away from QNXT. CW-5 confirmed that Molina's

15    senior management was aware of the problems with QNXT and the impact that

16    QNXT were having on Utilization Management, yet there was no intention to

17    migrate to a more appropriate system.

18         101.   CW-5 confirmed that Molina's internal system began to experience

19    frequent outages during the ACA and Medicaid expansions.  According to CW-5,

20    the "system went down a lot"- at least once a week for at least 2-3 hours and at

21    least once a month, the outages lasted up to a full day.  CW-5 stated that QNXT

22    stalled in 2015, which he described as a "big deal" and CIO Hopfer and COO

23    Bayer would have been made aware of the outage given the severity and length of

24    the outage.  CW-5 confirmed that the outages continued throughout 2016 and right

25    up until CW-5 left Molina in January 2017.  COO Bayer was on the email

26    distribution list for notification of when the system went down.

27         102.   CW-5 explained that QNXT outages were problematic for the

28    Utilization Management department because it slowed down, or sometimes even

1    completely prohibited review of the patient procedure approvals that his team was

2    responsible for because the system was stuck or "completely down."  According to

3    CW-5, "all the time" his team would just approve procedures without the

4    underlying information from QNXT because of system outages. CW-5 explained

5    that if his team was unable to go into QNXT due to an outage and the procedure

6    needed to be approved within a certain time frame, the Utilization Management

7    team would "auto-approve" it manually (approved without doctor/nurse review)

8    and then go into the system later to notate the approval.  CW-5 stated that

9    procedures (such as surgery) frequently required expedited review and approval

10   which was complicated by QNXT's lack of functionality.  CW-5 explained that

11   because claims were being auto-approved, the Company was essentially "flushing

12   money[down the toilet]" because the claims were not being reviewed prior to

13   approval and some of the members may not have needed the procedures that

14   Molina would auto-approve solely based on a slowdown with the system.

15        103.   According to CW-5, the healthcare approval process is governed by

16   CMS and it is important to have decisions made as quickly as possible.  CW-5

17   stated that if the executives at Molina had "listened and been proactive" when it

18   came to the problems caused by the QNXT system slowdowns and outages,

19   Molina's Utilization Management department would have made decisions on a

20   more timely basis and would not have had so many auto-approvals.  CW-5

21   reiterated that the deficiencies in Molina's internal system infrastructure caused the

22   Company to make less money on utilization management.

23        104.   CW-5 described another deficiency in QNXT that impacted

24   utilization management at the Company.  According to CW-5, instead of having

25   templates for its healthcare providers to complete for utilization management, on

26   QNXT there was "just a big open screen" where the providers could write

27   anything.  CW-5 explained that one doctor could write "patient is sick" while

28   another could write pages and pages of nonsense.  As one of the employees

1   managing approvals and denials, this made utilization management on QNXT

2   unwieldy.  CW-5 confirmed that it was not until the end of his tenure at Molina

3   (January 2017) when CFO John Molina finally approved the purchase of a new

4   utilization management system for the Company – after CW-5's long-standing

5   efforts to get financial initiatives and a new code of standards for utilization

6   management approved by CFO John Molina.

7          105.   CW-5 also reported that there were regulatory ramifications from

8   Molina's platform issues including issues with pulling data for CMS audits.

9   According to CW-5, because Molina kept patching its QNXT system, it did not

10   have a system that could report useable data to CMS. CW-5 participated in two

11   CMS audits and annual CMS reviews during his tenure. CW-5 explained that the

12   QNXT system was "so old" that his team (made up of six directors and 10

13   managers that all reported to CW-5) was forced to manually "scrub and clean" the

14   data for weeks in advance of these audits. CW-5 was informed by Kelly Giardina,

15   Associate Vice President of Case Management, and CW-5's counterpart on the

16   Case Management team, that the Case Management team failed their CMS audit in

17   2015 because they pulled the data from QNXT and did not take the time to clean

18   the data. CW-5 explained that because of how antiquated QNXT's reporting

19   function was at that time, the data that the Case Management team gave to CMS

20   was not in a form that could be reviewed by CMS.

21          106.   According to CW-5, COO Bayer, CFO John Molina, and CEO Mario

22   Molina were aware of the problems with the data as it related to the CMS audits.

23   In fact, CW-5 stated that COO Bayer, CFO John Molina, and CEO Mario Molina

24   met with CMS during the audit and were aware of what was happening in the lead

25   up to the audit and during the audit.  CW-5 advised that there was a real concern at

26   Molina that the Company "couldn't afford to fail the audit" because it could result

27   in CMS taking business away from Molina.  CW-5 confirmed that COO Bayer,

28   CFO John Molina, and CEO Mario Molina informed CW-5 and his counterparts in

Case Management to "do whatever you have to do" to pass the CMS audits which meant manually scrubbing the data case-by-case to make it useable for CMS.

107.   During the Company's May 31, 2018 Investor Day, CEO Zubretsky admitted that the Company had problems in the past paying claims on a timely basis, sorting out its membership data, and properly implementing network contracts which cost the Company at least $135 million in provider settlements and $30 million in late payment penalties to states.  Zubretsky stated:

> If you can't pay claims timely and correctly in this business, you can't be in the business. Whether it's member experience, provider abrasion, or not being able to look into your actuarial data with a degree of precision and confidence, you have to pay claims correctly. **And the company is growing so quickly and implementing contracts in networks so quickly, that we misstep. It's all being corrected.**  .  .  . If I look at some of these stats, $135 million in provider settlements. Why? Because the providers were right. **We had underpaid certain providers. And they presented the data that proved that they were right**. **$30 million in late payment penalties to states.** These are self-inspected wounds that are avoidable.  .  .

### 3.     Problems with Provider Data Maintenance and Payment

108.   According to CW-4, for Molina California, QNXT complicated every detail regarding its providers. CW-4 explained that California had at least 100 hospitals and 20,000 providers in its network. Each time there was a change with any of the providers, the change of address needed to be loaded into three separate QNXT platforms for Molina California.

109.   CW-4 explained that providers in California and Washington are typically reimbursed on a "capitated" basis, meaning that they get a flat rate per member per month requiring the provider to submit all encounters (as opposed to

"claims") to demonstrate they provided a service.[15] According to CW-4, the only way that Molina could demonstrate to the state that it was managing care appropriately was to send all of the encounters to the state. According to CW-4, California also had Fee-For-Service counties (i.e., San Diego). San Diego went from 90,000 Molina members to over 200,000 Molina members. The significant growth in San Diego's membership base coupled with QNXT's deficiencies made it very difficult to manage the claims issues that ultimately resulted.

110.   CW-4 confirmed that the encounters that were needed for Molina to submit to the state were not getting appropriately counted because to be considered valid, the encounters require accurate Provider Data in QNXT. Thus, providers often did not get credit for their encounters.  According to CW-4, this required CW-4's team to spend significant time doing investigative work to find out where the breakdown was on the encounter submissions from the providers. CW-4 described it as a "nightmare" to manually reconcile all of the provider information in the QNXT system against what provider information was on the encounter. This is just one example of QNXT's lack of functionality in the ACA Marketplace.

111.   CW-4 confirmed that QNXT lacked automation. He explained that ideally, you would want "claim in, claim out," but that QNXT could not auto-adjudicate a lot of claims.  QNXT forced claims to be "stopped for someone" to review and force it through by resolving claim edits. CW-4 also explained that QNXT's functions were limited and the system could not handle the unique contracts that Molina California had with its participating providers. CW-4 often had to re-write contracts to conform with the system which was time consuming and inefficient for his team. CW-4 found it ridiculous how the providers were expected to conform to Molina's QNXT system instead of Molina getting a system

---

[15] Capitation and fee-for-service ("FFS") are different modes of payment for healthcare providers. In capitation, doctors are paid a set amount per member per month,  FFS pays providers based on the service provided to a patient.

1   that could actually manage Managed Care operations.  CW-4 stated that the
2   problems with QNXT were compounded by the fact that QNXT had old data and
3   no one was remediating the system.

### 4. Lack of Integrity of Data Causes Miscalculation of Risk Scores

6   112.   CW-3 reported that inaccuracies in enrollment data affected
7   calculation of Molina's Risk Scores and, thus, the risk adjustments Molina
8   received from CMS.  CW-3 suggested an IT project (putting in front-end analytical
9   research) to identify instances of mismatched enrollment data, which CW-3
10  thought would have saved Molina significant money in Risk Adjustment penalties
11  the Company was paying CMS, but the IT project was rejected by Molina
12  corporate.

13  113.   Indeed, CW-2 estimated, based on data from Molina's internal EDGE
14  server, that the Company lost more than $200 million in risk assessments due to
15  the Company's inability to timely process claims.

16  114.   During the Company's May 31, 2018 Investor Day, Molina's new
17  management admitted that the Company's risk scores (used for determination of
18  risk adjustment liabilities/payments) were miscalculated by the Company and cost
19  Molina money.  New CEO Joseph Zubretsky revealed that the Company routinely
20  underestimated its risk scores both in Medicare and ACA Marketplace which
21  affected the amount of the Company's risk transfer payments  – a key cause of the
22  Company's lower than expected results for fiscal 2016.

23  115.   In fact, Zubretsky admitted that Molina's risk score calculation pre-
24  August 2017 was akin to throwing "a dart at a dartboard" and that the Company
25  left money on the table with its inaccurate risk scores:

26          There is significant amounts of revenue that are at risk for some
27          level of performance, whether it's a quality withhold, whether
28          it's a risk score, whether it's other forms of producing quality

1    measures that allow you to keep a percentage of your revenue.

2    **Our risk scores are not where they need to be. An amateur**

3    **can come in and look at our risk scores in certain populations**

4    **and know they're too low. And it's not because we have a**

5    **better population in the market, it's because our risk scores**

6    **are too low relative to the competitors. We're not chasing the**

7    **charts and we're not aiming at the right direction**. . .**Our risk**

8    **scores, both in Marketplace and in Medicare, are far too low.**

9    **. . This needs to change**. So there's tremendous value  . . . and

10   quality withholds and in risk adjustment sitting inside our

11   company.

12       116.   During the 2018 Investor Day, Pamela Sedmak, Molina's Executive

13   Vice President of Health Plan Operations, effective February 2018, reiterated that

14   the Company's risk scores were both inaccurate and unacceptable relative to

15   Molina's peers. "[W]e just weren't getting the level of risk adjustment and STARs

16   captures that we needed to and expect relative to the peers in this space."  Sedmak

17   also confirmed what the Company  disclosed on August 2, 2017 – that Molina had

18   insufficient capabilities for its Marketplace business:

19       Marketplace, you guys know the Marketplace story for Molina.

20       Very difficult one. And last year, it grew too fast, too aggressive,

21       beyond our capacity to manage.  . . **We had insufficient**

22       **capabilities relative to the level of risk transfer that we have**

23       **within the organization. Our risk scores, that Joe already**

24       **mentioned, clearly don't feel that they're nearly at the**

25       **accuracy and completeness that they need to be**, given the

26       level of risk transfer that we have as a percent of our book -- of

27       our premium. **We also had very suboptimal processes,**

28       **premium collection, enrollment and eligibility, deductibles,**

1  **accumulators**, all those things that become very big pain points

2  for members and providers.

3         **5.**      **Lack of Integrity of Data Causes Mispricing of ACA Plans**

4      117.    According to CW-3, when Molina expanded into the ACA

5  marketplace, it lacked adequate historical data to properly price its ACA

6  Marketplace plans.  CW-3 confirmed that by 2015 it was apparent to Molina that

7  its ACA plans were not being priced properly, based in part on its monthly tracking

8  of reimbursements and risk adjustments from CMS. CW-3 reported that in 2017,

9  Molina raised its Marketplace premiums significantly to compensate for its

10  consistent losses in ACA.

11         **6.**      **Molina's Refusal to Upgrade to a More Robust Platform**

12      118.    CW-1 confirmed that throughout his tenure, there were no plans for

13  the Company to migrate to a platform like TriZetto's FACETS platform, which

14  was more sophisticated, because it was much more expensive than QNXT.

15  According to CW-1, QNXT was definitely a "step below" FACETS: "FACETS

16  was like a Cadillac and QNXT was like a Chevy."

17      119.    CW-2 also confirmed that Molina did not migrate to FACETS or

18  another system that was more appropriate for ACA business because of costs.

19  According to CW-2, CIO Hopfer convinced Molina's Steering Committee to stay

20  with QNXT.

21      120.    CW-3 reported that Molina met with TriZetto about utilizing Trizetto

22  to process EDGE server data, but it was determined by Molina senior management

23  that such a migration was an unnecessary cost since Molina would still be

24  responsible for submitting the data to Trizetto's EDGE server solution and assuring

25  the quality of the data submitted.

26      121.    CW-4 also recalled discussions of "blowing up" the entire system

27  because it was a "giant mess." CW-4 often asked why Molina could not upgrade

28  QNXT.  The response CW-4 received was that it was too expensive and that

1    Molina corporate had chosen to "bolt on" or "retrofit" the QNXT system instead of

2    migrating the system. CW-4 also recalled hearing that Molina corporate

3    "acknowledged the angst of the health plans" with QNXT but CW-4 was

4    repeatedly told that a new system was not feasible from a cost perspective.

5    Instead, according to CW-4, Molina "limped along" with a very inefficient system

6    that could not manage claims which was made significantly worse by the rapid

7    expansion into the ACA Marketplace, resulting in a flood of claims on a system

8    that "already wasn't operating properly."

9              **7.    The Individual Defendants and Other Members of Molina**

10                     **Senior Management Are Informed of the Serious**

11                     **Limitations and Lack of Scalability of the Company's**

12                     **Administrative Infrastructure**

13        122.   CW-1 confirmed that CEO Mario Molina was made aware of many of

14   the IT issues at Molina.  CW-1 noted that it was his job to "marshal info," and

15   "bring light to problems" within Molina regarding the Company's IT issues. CW-1

16   created strategic plans that identified IT issues and processes in IT to address those

17   issues and planned investments in IT infrastructure. CW-1 presented the strategic

18   plans to his boss in the Office of the CIO, who then passed the strategic plans onto

19   other Molina senior executives, including CEO Mario Molina. CW-1 also

20   communicated directly with CEO Mario Molina on many occasions about the IT

21   concerns described herein.

22        123.   CW-2 confirmed that CIO Hopfer and COO Bayer, among other

23   senior Molina executives, were made aware of the IT issues at Molina.  CW-2

24   prepared "weekly status reports" that broke down IT issues by state. CW-2

25   described the weekly status reports as PowerPoint presentations that he presented

26   at weekly Steering Committee Meetings related to Molina's ACA business held in

27   the Molina executive tower in Long Beach, CA.  In March 2016, the Steering

28   Committee consisted of COO Bayer, CIO Hopfer, and other executives including

1   the VP of Health Insurances/Marketplace, the VP of Information Systems, and
2   CW-2's boss, Sanjay Bhat VP of Projects.  The reports prepared by CW-2, and
3   circulated to the attendees by email – including COO Bayer and CIO Hopfer –
4   identified problems with the QNXT system and color-coded those problems as:
5   Critical (red), At-Risk (yellow) or Stable (green). CW-3 also prepared materials for
6   his boss, Vish Nath, for inclusion in presentations for the weekly status meetings in
7   which CW-3 highlighted the enrollment data challenges Molina was facing.

8      124.   Reports prepared for Molina's Steering Committee, and dated March
9   31, 2016 and April 14, 2016, confirm that while the Defendants were touting the
10   scalability of the Company's administrative infrastructure, the Company's Steering
11   Committee was discussing "critical" problems with "Enrollment & Billing"
12   (including "Gaps in the design and processing logic lead[ing] to mismatch in
13   enrollment status between Molina and Exchange, causing significant downstream
14   issues and exceptions") and Molina's "Contact Center" (responsible for responding
15   to member inquiries) and "At-Risk" problems with "Customer Experience",
16   Brokers (including the inability to "receive payments from insurance premium
17   support groups") and "Member Communications."

18      125.   These reports, prepared for Molina's Steering Committee and dated
19   March 31, 2016 and April 14, 2016, identify serious system problems, including
20   but not limited to:

21          •   more than 650 ongoing "current projects" for Molina's
22              administrative infrastructure including "logic corrections and
23              operational controls implementation";
24          •   "No Marketplace O&M [operating and maintenance] process
25              due to production instability; production defects are managed
26              through portfolio projects";

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- "changes in processing logic and system triggers are needed to alleviate current manual resolution and enable required capabilities";

- "Resource gaps have prevented project start-up and execution";

- "Redesign of select business and IT logic";

- "The Billing and Payment deep dive has identified key pain points that will require process and technology fixes";

- "Processing logic gaps" and "Capability Gaps";

- "Technical Deficiencies and System Limitations" ;

- "Upstream Eligibility Issues" including "inaccuracies with rate calculations"; and

- "Lack of prioritization framework for issue and project intake".

126.   These problems had serious implications for Molina (as indicated in the Steering Committee presentations) including "Significant manual workarounds to maintain process integrity", "Lack of visibility and transparency into fallout", "Reactive corrections and fixes built into normal processes to handle fallout" , and "Member abrasions due to access to care issues."  The Steering Committee, along with outside vendor Deloitte, also determined that twelve major projects were required before going live in the ACA Marketplace in 2017 and several projects required a deeper assessment to inform project scoping, including whether "there will be a rebuild of [QNXT] 5.3 for Marketplace."

127.   CW-3, also prepared materials for inclusion in presentations for the weekly status meetings which were circulated to COO Bayer, CIO Hopfer, Sanjay Bhat, and others from the executive team at Molina corporate, in which CW-3 highlighted the enrollment data challenges QNXT could not handle adequately as observed during EDGE server processing.

128.   CW-4 discussed quarterly meetings with Molina's National Contracting and Services department. Overall system problems resulting in

1   provider issues, including claims problems, were reported in this meeting to,

2   among others, Kim Sweers, Vice President, Network Strategy and Services at

3   Molina.

4        129.   CW-4 also participated in Monthly Network Strategy calls held on

5   Thursdays and led by Sweers and periodically attended by COO Bayer, who was

6   Sweers' boss at the time, and Nico Pagone, Corporate Director of National

7   Contracts. According to CW-4, he and his counterparts in the other states would

8   call into this Web-ex meeting. CW-4 confirmed there was an agenda circulated by

9   email prior to the call, as well as minutes circulated after the meeting. CW-4

10  recalled they frequently would discuss "huge problems" with QNXT on these calls.

11  CW-4 also attended Annual Network Strategy Summits where the "biggest topic"

12  was always "data remediation." CW-4 recalled repeated conversations about how

13  "QNXT sucks" and the need to fix the system.

14       130.   CW-5 also confirmed that system scalability and capacity issues were

15  brought to the attention of his boss, Karen Warren, Vice President of Clinical

16  Program Operations, and Molina's CMO Keith Wilson, at regularly scheduled

17  meetings that CW-5 participated in telephonically and which CIO Hopfer and

18  COO Bayer also attended periodically.  According to CW-5, minutes were taken

19  during these meetings and were circulated to all of the attendees including CIO

20  Hopfer and COO Bayer when they attended the meetings.

21       131.   CW-5 confirmed that capacity problems also were brought up in

22  meetings in 2015 held at Molina's headquarters in Long Beach, California attended

23  by Warren, Wilson and their "right hand people."  CW-5 stated that at these

24  meetings, it was communicated to management that the QNXT platform could not

25  handle the integration of ACA and Medicaid expansions in such a short period of

26  time, but management's response was just to give the platform "patch jobs."

27       132.   CW-5 confirmed that senior management including CEO Mario

28  Molina, CFO John, and COO Bayer also routinely would have been informed of

1   system issues by Wilson who attended the meetings described herein.  In addition,

2   CW-5's boss, Warren, was meeting with COO Bayer regularly and CW-5 reported

3   the concerns of the Utilization Management team to Warren. CW-5 would

4   sometimes receive feedback from Warren from the meetings he had with COO

5   Bayer, which led CW-5 to believe that COO Bayer was keenly aware of the QNXT

6   problems.  CW-5 also informed CFO John Molina of CW-5's concerns with the

7   deficiencies in Molina's utilization management system and repeatedly requested a

8   new utilization management system which was not approved until approximately

9   the beginning of 2017.

10          133.   CW-5 also participated in quarterly meetings with CIO Hopfer, COO

11   Bayer, Wilson and Warren, during which a host of system issues were discussed

12   including problems with QNXT, how problems with Molina's QNXT system were

13   negatively impacting the Utilization Management part of Molina's business,

14   overall concerns with Molina's systems including patching the QNXT system, and

15   concerns about reporting to regulators such as the CMS.

16  **VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING**

17           **STATEMENTS AND OMISSIONS**

18          **A.   Third Quarter Fiscal 2014 Results**

19          134.   On October 30, 2014, after the market closed, Molina issued a press

20   release announcing financial results for the third quarter ended September 30,

21   2014.  During the related earnings call that same night, CEO Mario Molina stated,

22   "Administrative costs are also tracking just as we expected.  ***We continue to reap***

23   ***the benefit of the investments in infrastructure that we made last year***."[16]  CFO

24

25   _____

26   [16] Plaintiff alleges that the statements highlighted in bold and italics within this
     section were materially false and misleading and/or omitted to disclose material
     information as detailed herein. As alleged herein, such statements artificially
27   inflated and/or artificially maintained the price of Molina publicly traded common
     stock and operated as a fraud or deceit on purchasers of Molina common stock
28   during the Class Period.

1  John Molina also remarked on the Company's improving "administrative cost
2  leverage" and margins:

3          *We continue to achieve greater administrative cost leverage. At*
4          *our investor day events in 2013, we communicated how we are*
5          *investing in the infrastructure to support our growth, driving*
6          *administrative costs as a percentage of revenue up*. . . At our
7          investor day in 2012, we embarked on an ambitious plan to
8          double our revenue, decrease our administrative ratio and
9          increase our margin.  We are well on our way to accomplishing
10         the first two of these goals.

11         135.   CFO John Molina also represented that while 2014 and 2015 would
12  be years of rapid growth, 2016 would be a year of stabilization. "*Stabilization and*
13  *margin expansion will come as we integrate new members into our care models*."

14         136.   CFO John Molina's statements about administrative cost leverage,
15  stabilization through membership growth, and the Company's investments in its
16  infrastructure, contained in ¶¶134-135, were materially false and/or misleading
17  when made in that they failed to disclose that:

18         (a)   Molina's administrative infrastructure was designed for a much
19  smaller, simpler business and was never designed to handle the size, complexity,
20  and unique demands of the Company's growth in the ACA Marketplace (i.e,
21  Molina's existing infrastructure was not scalable to handle the influx of business
22  without significant modification and increased expenditures);

23         (b)   Molina did not adjust its business or administrative
24  infrastructure to absorb the rapid growth that resulted from the Company's
25  expansion into the ACA Marketplace, which the Company has admitted was very
26  different from its traditional Medicaid business;

27         (c)   Molina failed, or was unable due to system limitations, to add
28  necessary functionalities to its existing administrative infrastructure to:

1               (i)     accurately and timely process enrollment data and bill

2  members on ACA-leveled plans;

3               (ii)    adequately and timely handle utilization management and

4  claims processing;

5               (iii)   adequately and timely pay providers;

6               (iv)   accurately calculate the Company's "risk scores", which

7  were used to determine Molina's risk adjustment liabilities in the ACA and

8  Medicare markets; and

9               (v)    appropriately price its ACA plans;

10      (d)    Molina failed to properly remediate systemic issues and costly

11  disruptions to its administrative infrastructure;

12      (e)    Molina failed to rebuild, or migrate, the administrative

13  infrastructure of the business, and instead "doubl[ed]- down" on existing

14  insufficient processes and methods;

15      (f)    Molina's system problems were compounded by the

16  Company's inability to successfully integrate data and systems from acquisitions it

17  had completed during the Class Period into Molina's existing administrative

18  infrastructure. These challenges gave rise to significant intangible assets (such as

19  goodwill), increased costs, and an inability to adequately monitor and control its

20  operations;

21      (g)    Due to administrative infrastructure limitations, Molina

22  experienced systematic breakdowns in enrollment and claims processing,

23  utilization management, provider payment, and state and federal reimbursement,

24  resulting in, among other things:

25               (i)     member coverage disruptions;

26               (ii)    frequent payment disputes with healthcare providers

27  ultimately resulting in significant provider settlements and state penalties in 2018;

28               (iii)   increased risk adjustment liabilities; and

1   (iv)   ballooning operating costs driven primarily by increased
2   medical care costs and increased administrative expenses.

3   (h)   Molina's failure to remediate the Company's administrative
4   infrastructure problems made it extremely difficult for the Company to quickly
5   react to emerging trends in the ACA Marketplace.

6   137.   Following the earnings release and conference call with management,
7   on October 31, 2014, Joshua R. Raskin of Barclays, issued an analyst report on
8   Molina entitled, "Molina Healthcare Operating Pressure and Timing Issues Temper
9   Guidance," in which Raskin wrote: "the company noted that the rate of G&A
10  growth should slow down over the next few years as the company has already
11  invested in the infrastructure required to support top line growth." Similarly, in a
12  report by Peter Costa, Senior Analyst, at Wells Fargo Securities, also dated
13  October 31, 2014, and entitled, "MOH: Q3 No Treat As MLR Haunts Earnings,"
14  Costa wrote: "Management noted that its investments in its infrastructure last year
15  are paying off and providing a benefit to its SG&A."

16  **B.   Fourth Quarter and Full Year 2014 Results and Investor Day**

17  138.   On February 9, 2015, after the market closed, Molina issued a press
18  release announcing financial results for the fourth quarter and full-year ended
19  December 31, 2014.  During the related earnings call, CEO Mario Molina stated
20  that Molina "achieved greater economies of scale" compared to 2013, "evidenced
21  by the consistent decline in [the] administrative cost ratio throughout the year."
22  CEO Molina added that the Company was "very excited" about 2014 growth and
23  the Company's "successes in lowering the percentage of revenue spent on
24  administrative costs."  While the Company "did not meet [its] earnings
25  expectations in 2014," CFO Molina reassured investors that the Company "***did***
26  ***make good on many of [its] commitments to revenue growth and a greater***
27  ***administrative efficiency***."

28

139.   For several quarters prior to February 2015, investors and analysts expressed concern over Molina's CapEx related to administrative infrastructure. Despite Molina's lackluster 2014 financial performance, CFO John Molina explained that CapEx directed to administrative infrastructure was the key to future growth: "*As we discussed last year, we devoted significant resources to infrastructure and human capital investments that were necessary to fuel our anticipated growth.  As our new growth businesses came online during the year, we were able to finally realize the benefits of those investments*."

140.   On February 12, 2015, during the trading day, Molina held its 2015 Investor Day in New York in which CEO Mario Molina, CFO John Molina, COO Bayer and Joseph W. White, then Chief Accounting Officer, participated. During the meeting, CEO Mario Molina stressed that the Company could leverage its "*[s]calable admin infrastructure*" to spur rapid growth and improve margins: "*[B]ecause of the things that we have done in terms of our IT and in terms of some of the other infrastructure things, we do have the ability to grow and I think leverage that administrative infrastructure*."  CEO Mario Molina also addressed the Company's capacity to sustain rapid growth: "*So one of the questions is, we will show you there is going to be more growth in 2015.  Can [we] handle that [growth]?  And from an IT standpoint, absolutely.  We have built the systems to do that*."  CFO John Molina added that the Company would "improve [its] model of care, enhance [its] systems, and *improve margins*." During the same call on February 14, 2015, CEO Mario Molina also stated: "So big investments that were made back in 2013, and *we are starting to reap the benefits of those as we move forward and have the ability to scale up and grow*."  The Company's slide deck for the February 2015 Investor Day unequivocally states: "Scalable administrative infrastructure."[17]

---

[17]   Molina Healthcare, Current Report (Form 8-K) (Feb. 12, 2015).

141.   On February 26, 2015, Molina filed its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Annual Report").  In the "Business Operations" section of its 2014 Annual Report, Molina listed the Company's administrative infrastructure as one of several strategic strengths.  Under the subheading "Administrative Efficiency" the Company claims, "*Operationally, our two business segments share a common systems platform, which allows for economies of scale. . . .  [W]e have designed our administrative and operational infrastructure to be scalable for cost-effective expansion into new and existing markets.*"

142.   The 2014 Annual Report contained SOX certifications signed by Defendants CEO Mario Molina and CFO John Molina, who certified the following:

1.   I have reviewed this annual report on Form 10-K for the fiscal year ended December 31, 2014, of Molina Healthcare, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period for which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

1   procedures, as of the end of the period covered

2   by this report based on such evaluation; and

3   (d)   Disclosed in this report any change in the

4   registrant's internal control over financial

5   reporting that occurred during the registrant's

6   most recent fiscal quarter (the registrant's fourth

7   fiscal quarter in the case of an annual report)

8   that has materially affected, or is reasonably

9   likely to materially affect, the registrant's

10   internal control over financial reporting; and

11   5.   The registrant's other certifying officer and I have

12   disclosed, based on our most recent evaluation of

13   internal control over financial reporting, to the

14   registrant's auditors and the audit committee of the

15   registrant's board of directors (or persons performing

16   the equivalent functions):

17   (a)   All significant deficiencies and material

18   weaknesses in the design or operation of internal

19   control over financial reporting which are

20   reasonably likely to adversely affect the

21   registrant's ability to record, process, summarize

22   and report information; and

23   (b)   Any fraud, whether or not material, that

24   involves management or other employees who

25   have a significant role in the registrant's internal

26   control over financial reporting.

27   143.   Defendants' statements concerning Molina's scalable administrative

28   and operational infrastructure, cost-effective expansion and investments in

1  infrastructure, ability to grow and leverage that administrative infrastructure and its

2  economies of scale, contained in ¶¶138-141, were materially false and/or

3  misleading for the reasons described in ¶136. Additionally, the Company's SOX

4  certifications were materially false and/or misleading in that they failed to disclose

5  internal controls issues the Company was experiencing throughout the Class

6  Period.

7    **C. First Quarter Fiscal 2015 Results**

8    144. On May 7, 2015, Molina issued a press release announcing financial

9  results for the first quarter ended March 31, 2015.  During the related earnings call,

10  after the market closed, Company executives continued to tout the Company's

11  rapid growth strategy, underpinned by its administrative infrastructure.  CEO

12  Mario Molina commented, "We delivered 38% enrollment growth and 53%

13  revenue growth. . . .  This success underscores the current growth opportunities of

14  our business and validates our strategic push to diversify into new markets and new

15  programs . . . ***and to leverage our administrative infrastructure***."  CFO John

16  Molina added, **"*[A]dministrative cost leverage is improving our profitability.*"**

17    145. Molina's stock price increased approximately 12% on the

18  announcement and discussion of the Company's financial results for the first

19  quarter ended March 31, 2015, including  the above false statements, from a close

20  on May 7, 2015 of  $58.23 per share to a close on May 8, 2015 of $65.12 per share.

21    146. Defendants' statements concerning Molina's administrative

22  infrastructure and administrative cost leverage, contained in ¶144, were materially

23  false and/or misleading for the reasons described in ¶136.

24    **D. Second Quarter Fiscal 2015 Results and Investor Day**

25    147. On July 30, 2015, Molina issued a press release announcing financial

26  results for the second quarter ended June 30, 2015.  During the related earnings

27  call, after the market closed, CEO Mario Molina stated, "***In-market acquisitions***

28  ***are an important part of our growth strategy and highly accretive, helping us to***

1  ***expand margins in the future. . . .  For the most part, speed to integration . . .,***
2  ***coupled with our existing infrastructure, result in significant accretion value.***"
3  In finance, accretion refers to growth, or increase by gradual addition.  Here again,
4  CEO Mario Molina was invoking the strategy of "leveraging" the Company's
5  administrative infrastructure to improve Molina's profitability.

6      148.   Molina's stock price increased approximately 11% on the
7  announcement and discussion of the Company's financial results for the second
8  quarter ended June 30, 2015, including  the above false statements, from a close on
9  July 30, 2015 of  $68.00 per share to a close on July 31, 2015 of $75.43 per share.

10     149.   On September 17, 2015, during the trading day, Molina held its
11  second Investor Day in New York in which CEO Mario Molina, CFO John
12  Molina, COO Bayer and Joseph W. White, then Chief Accounting Officer,
13  participated. During the meeting, CEO Mario Molina stressed, "***Scalable***
14  ***administrative infrastructure, this is important too because as we get bigger, a lot***
15  ***of these services can be shared.  It will help us to continue to drive down the***
16  ***administrative cost***."  CEO Mario Molina also commented on the Company's
17  recently announced acquisitions, stating: "***Here are some of the recent***
18  ***acquisitions that we have done. These are in-market acquisitions and these are***
19  ***generally asset purchases. They provide additional scale in existing markets***."

20     150.   In addition, CEO Mario Molina responded to an analyst who asked a
21  question about investment in technology.  The  analyst asked, "you talked about
22  the increasing value of data and technology.  Are you happy where, you know,
23  technology stands now or are you thinking about an investment phase going
24  forward?"  CEO Mario Molina responded, "[w]e have invested a lot of money and
25  I think we're in pretty good shape. We have a-currently, we've talked about this,
26  we've got a contract with [Palantir]. They're doing a lot of work with us to help us
27  better mine our data and find patterns that we can use.  We've got a lot of things

28

1    that are coming.  I'm not sure that we're going to invest more but we'll probably

2    continue, you know, the current rate of investment."

3         151.   Defendants' statements concerning Molina's scalable administrative

4    infrastructure, shared services, and "highly accretive" in-market acquisitions,

5    contained in ¶¶147, 149, were materially false and/or misleading for the reasons

6    described in ¶136.

7    **E.    Third Quarter Fiscal 2015 Results**

8         152.   On October 29, 2015, Molina issued a press release announcing

9    financial results for the third quarter ended September 30, 2015.  During the related

10   earnings call, after the market closed, CEO Mario Molina elaborated on the

11   Company's high-growth strategy for new markets: "When we target a new market,

12   our goal is to continue to diversify our geographic footprint by increasing the

13   number of state contracts that we hold.  Over the long-term, this allows us to

14   ***leverage our administrative infrastructure across a broader revenue base and***

15   ***drive down costs*****.**"  With respect to existing markets, CEO Mario Molina claimed,

16   "[T]he integration process for in-market acquisitions benefits from our existing

17   infrastructure and local presence."  CFO John Molina added, "***We continue to***

18   ***benefit from administrative cost leverage***. . . ."

19        153.   Defendants' statements concerning Molina's administrative cost

20   leverage, contained in ¶152, were materially false and/or misleading for the

21   reasons described in ¶136.

22   **F.    J.P. Morgan Healthcare Conference – January 11, 2016**

23        154.   On January 11, 2016, during a J.P. Morgan-sponsored healthcare

24   conference at which CEO Mario Molina and CFO John Molina participated, CEO

25   Mario Molina commented that the Company liked existing market acquisitions

26   "***because the integration risk is very small.  We already have the infrastructure***

27   ***in place.***  Oftentimes we already have the provider contracts in place, and ***we're***

28   ***just adding more members to an existing platform***."  CEO Mario Molina also

boasted of the Company's "scalable administration structure. As we grow, our admin costs on a per member per month basis should decline and we have seen that in the past year."

155.   CEO Mario Molina's statements concerning Molina's existing administrative infrastructure being scalable and able to handle additional members, contained in ¶154, were materially false and/or misleading for the reasons described in ¶136.

**G.   Fourth Quarter and Full Year 2015 Results and Investor Day**

156.   On February 8, 2016, Molina issued a press release announcing financial results for the fourth quarter and full-year ended December 31, 2015.  For Q4 2015, the Company reported higher costs and lower revenues than expected, but it claimed that existing admin infrastructure would support rapid growth. During the related earnings call, after the market closed, CEO Mario Molina deflected concerns about disappointing fourth quarter results by highlighting the Company's 2016 prospects and focusing on the Company's rapid growth strategy: "Of the nine acquisitions we announced in 2015, eight were in-market or tuck-in acquisitions in four of our existing states. ***These acquisitions alone will add about [$1.2] billion in premium revenue in 2016 . . . and allow us to spread existing administrative overhead costs over a larger membership***." (alteration in original).

157.   On February 11, 2016, during the trading day, Molina held its 2016 Investor Day in which CEO Mario Molina, CFO John Molina, COO Bayer and Joseph W. White, then Chief Accounting Officer, participated.  During the meeting, CEO Mario Molina  explained that the Company benefited from sharing one "scalable administrative infrastructure" that services Molina's various segments:

> [O]ur Medicaid portfolio . . . is the primary driver of our business.  As you know, we operate 12 health plans in 11 states and in Puerto Rico.  We also provide information management

1    services for five states and for the US Virgin Islands,

2    complementary to our Medicaid business, *because the IT*

3    *systems that we use in our health plans and the IT systems that*

4    *we're using to help the states manage their Medicaid*

5    *information are primarily the same.*

6    158.   CAO Joseph W. White provided the same false message, stating that:

7    *[W]e've leveraged our Medicaid network*.  I know we've talked

8    about this a lot, but it bears repeating.  *Our [ACA] Marketplace*

9    *members essentially access the same network as our Medicaid*

10   *members.  We're proud of that network.  That network delivers*

11   *high quality healthcare at reasonable cost and we're building*

12   *on that network to serve our Marketplace members*.

13   The Company's slide deck for the February 2016 Investor Day unequivocally

14   claims: "Scalable administrative infrastructure."[18]

15   159.   Molina's stock price increased approximately 6% from a close on

16   February 10, 2016 of $51.48 per share to a close on February 11, 2016 of $54.55

17   per share.

18   160.   On February 26, 2016, Molina filed its 2015 Annual Report.  In the

19   "Overview" section of its 2015 Annual Report, Molina lists the Company's

20   administrative infrastructure as one of several strategic strengths.  While its related

21   statement appears under a new subheading ("Scalable Administrative

22   Infrastructure" versus "Administrative Efficiency"), Molina's claims are

23   substantially similar to those that appear in the Company's 2014 Annual Report:

24   "*Our operations share common systems platforms, which allow for economies of*

25   *scale. . . .  [W]e have designed our administrative and operational infrastructure*

26   *to be scalable for cost-effective expansion into new and existing markets.*"

27   _____

28   [18] Molina Healthcare, Current Report (Form 8-K) (Feb. 11, 2016).

1    161.   The 2015 Annual Report also contained certifications signed by

2    Defendants CEO Mario Molina and CFO John Molina pursuant to SOX

3    substantially similar in all material respects to those set forth in ¶142.

4    162.   Defendants' statements concerning Molina's existing administrative

5    infrastructure's scalability for its growing ACA Marketplace business, economies

6    of scale, and administrative cost leverage, contained in ¶¶156-168, 160, were

7    materially false and/or misleading for the reasons described in ¶136.  Additionally,

8    the Company's SOX certifications were materially false and/or misleading in that

9    they failed to disclose internal controls issues the Company was experiencing

10   throughout the Class Period.

11   **H.    The Truth Begins To Emerge, But Defendants Continue to**

12   **Mislead Investors**

13   163.   The truth regarding Molina's failed growth strategy and severely

14   deficient administrative infrastructure was revealed through a series of partial

15   disclosures beginning on April 28, 2016 and ending on August 2, 2017.

16   **1.    First Quarter Fiscal 2016 Results (First Partial Corrective**

17   **Disclosure)**

18   164.   On April 28, 2016, *after the market closed*, in a partial corrective

19   disclosure of the truth regarding the Company's deficient administrative systems,

20   Molina issued a press release announcing financial results for the first quarter

21   ended March 31, 2016.  Molina shocked investors by delivering a 37 percent

22   earnings miss for the first quarter and a 30 percent earnings guidance cut for full-

23   year 2016.  Molina blamed the poor results on higher costs related to

24   administrative capacity issues.  This was the first glimpse into Molina's

25   overburdened administrative infrastructure, but the Company continued to defend

26   its rapid growth strategy.

27

28

165.   During the related earnings call the same day, CEO Mario Molina described the issues facing the Company including growth exceeding the Company's expectations and  problems with claims and enrollment processing:

> You may recall that back in 2013, in preparation for the anticipated growth in Medicaid expansion, the duals demonstration programs, and marketplace, we invested in operations and systems. <u>The of growth exceeded even our optimistic expectations and we need once again think about administrative capacity</u>.
>
> \*   \*   \*
>
> <u>[W]e anticipated enrollment growth, but our results exceeded even our own projections.  Assimilating this membership stretched our operational resources.</u>  ***Accordingly, we redoubled our efforts around member and provider services, care and utilization management, provider payment, and information technology, all areas that felt the strain of rapid growth***. . . At our Ohio and Texas health plans, higher than anticipated costs were largely the result of utilization issues that we expect to resolve [through] a number of ongoing care management initiatives.[19]
>
> \*   \*   \*
>
> ***After period of extremely rapid growth over the past two years, we expect the remainder of 2016 to be more stable***. It should give us a chance to catch our breath as an organization while we continue to build on our current infrastructure.
>
> \*   \*   \*

_____

[19] Corrective information is underlined.

1   I mentioned we've had a tidal wave of membership that affected

2   the systems, and <u>so we had increased system downtime as a</u>

3   <u>result</u>. ***That's been corrected*** but those things in combination

4   created problems and it was especially a problem in Ohio.

5                                   *   *   *

6   [T]here are certain key issues around claims and processing of

7   <u>enrollment and premiums, reconciliation, and so forth where we</u>

8   <u>could probably strengthen things a little bit</u>.

9       166.   CFO John Molina also admitted that due to its rapid growth, the

10  Company had increased it auto-approval levels, as CW-5 confirmed, costing the

11  Company additional money, but that now auto-approvals were under control:

12      [W]e talked about the surge in enrollment that we experienced

13      across the board in the company and I think it was a little bit

14      overwhelming. <u>In order to process all of the prior authorizations,</u>

15      <u>we had relaxed our standards a little bit in the first quarter</u>, but

16      we have added additional bandwidth, both in terms of the IT

17      system and personnel, so, we think that, that has played out.

18      167.   CEO Mario Molina added:

19      <u>There were some IT issues</u> ***which we have corrected in terms of***

20      ***adding more bandwidth, so that we can process more***

21      ***authorizations***.  <u>But as a result some of these things . . . we did</u>

22      <u>loosen our prior authorization requirements. And so we probably</u>

23      <u>authorized things we might not have authorized in the past</u>, but

24      we felt that, it was better to err on the side of the patient.  So, that

25      accounts for some of the increased utilization you're seeing

26      there.

27      168.   CEO Mario Molina also sought to shift the blame for the Company's

28  poor administrative infrastructure onto the Company's staff, claiming that new

1    nurses the Company had hired were "inexperienced and some of them are not very

2    fast with the computer systems." He further falsely repeated that the Company's

3    nurses were "not comfortable with the systems; they are not comfortable with the

4    guidelines; they are not as effective as they otherwise would be. We think that over

5    time, over the course of the year, the staff will become more effective; the systems

6    will become more effective." CEO Mario Molina also represented that the

7    Company had made "some system changes" and was updating its Utilization

8    Management Guidelines "which we think will lead to lower utilization."

9         169.   CFO John Molina also represented that the Company's growth had

10   compounded its problems integrating the Company's prior acquisitions:

11             We have done a lot of acquisitions in the past. I think that the

12             first quarter, we got hit with two things: number one, we did

13             have the integrations of a number of acquisitions, especially in

14             Illinois, I think we brought on three plans in the first quarter in

15             Illinois. Then on top of that, as someone else noted earlier, we

16             increased our marketplace membership by more than 200%, I

17             believe.

18             If it had just been dealing with integrating the acquisitions,

19             probably not an issue but we had on top of that a large increase

20             in the marketplace that put an additional strain on the systems

21             and on the people . . .

22        170.   In reaction to these disclosures, Molina's common stock price fell

23   $12.46 per share, **or 19.40 percent,** to close at $51.76 per share on April 29, 2016,

24   on unusually high trading volume of 9.5 million shares.

25        171.   Despite revealing part of the truth regarding that fact that the

26   Company's rapid growth caused strain to Molina's administrative infrastructure,

27   Defendants continued to mislead the market by falsely reassuring investors that the

28   Company had redoubled its efforts around member and provider services, care and

1   utilization management, provider payment, and information technology, and now

2   had the capacity to increase its enrollment without any more big glitches.  CFO

3   John Molina falsely represented:

4      *We've also added to the IT infrastructure so that now we've got*

5      *the bandwidth or the pipes to allow us to maintain and increase*

6      *this enrollment without having big glitches or stopgaps.*

7                              \* \* \*

8      *[W]e have built a capacity that we need for the next several*

9      *years, and we're confident that we're not going to have another*

10     *strain like we just experienced in the first quarter of this year*.

11        172.   In response to a question from Chris Rigg of Susquehanna Financial

12   Group, CEO Mario Molina echoed John Molina's representations about the fact

13   that the system's IT bandwidth had been corrected:

14     **Q - Chris Rigg**: Okay. Just to flush out, sort of what I would

15     describe as infrastructure issues, it's not abundantly clear to me

16     whether this was more of like a human error problem, and they

17     were just not – error may not be the wrong word, but more of

18     people problem versus an actual systems problem? Were the

19     systems adequate to handle the new members?

20     **A - Joseph Mario Molina**: This is Mario. Let me say both. I

21     think that additional personnel, new on the job, perhaps a little

22     less effective than they will be when they are a little bit more

23     experienced, increased pressure on the system, the system was a

24     little slower, again, slowing people's work down.  I think it was a

25     combination of both. **The bandwidth in the IT system has been**

26     **addressed.** I think the experience will come with time for the

27     personnel.

28

173.   With respect to increased costs in Ohio and Texas, CEO Mario Molina falsely represented that all issues were fixed: "***Right now we think we have worked through the major issues*** and we would anticipate the cost to come down over time. As a result, the profitability should increase towards the back half of the year."

174.   Defendants' statements concerning the Company having already corrected the major issues experienced with its administrative infrastructure and having sufficient capacity to further increase Molina's enrollment for the next several years "without having big glitches or stopgaps" or "another strain," contained in ¶¶171-173, were materially false and/or misleading when made in that they failed to disclose that:

(a)     Molina's administrative infrastructure was designed for a much smaller, simpler business and was never designed to handle the size, complexity, and unique demands of the Company's growth in the ACA Marketplace (i.e, Molina's existing infrastructure was not scalable to handle the influx of business without significant modification and increased expenditures);

(b)     Molina did not adjust its business or administrative infrastructure to absorb the rapid growth that resulted from the Company's expansion into the ACA Marketplace, which the Company has admitted was very different from its traditional Medicaid business;

(c)     Molina failed, or was unable due to system limitations, to add necessary functionalities to its existing administrative infrastructure to:

(i)     accurately and timely process enrollment data and bill members on ACA-leveled plans;

(ii)    adequately and timely handle utilization management and claims processing;

(iii)   adequately and timely pay providers;

1     (iv) accurately calculate the Company's "risk scores", which

2 were used to determine Molina's risk adjustment liabilities in the ACA and

3 Medicare markets; and

4     (v) appropriately price its ACA plans;

5    (d) Molina failed to properly remediate systemic issues and costly

6 disruptions to its administrative infrastructure;

7    (e) Molina failed to rebuild, or migrate, the administrative

8 infrastructure of the business and instead "doubl[ed]- down" on existing

9 insufficient processes and methods;

10    (f) Molina's system problems were compounded by the

11 Company's inability to successfully integrate data and systems from acquisitions it

12 had completed during the Class Period into Molina's existing administrative

13 infrastructure. These challenges gave rise to significant intangible assets (such as

14 goodwill), increased costs, and an inability to adequately monitor and control its

15 operations;

16    (g) Due to administrative infrastructure limitations, Molina

17 experienced systematic breakdowns in enrollment and claims processing,

18 utilization management, provider payment, and state and federal reimbursement,

19 resulting in, among other things:

20     (i) member coverage disruptions;

21     (ii) frequent payment disputes with healthcare providers

22 ultimately resulting in significant provider settlements and state penalties in 2018;

23     (iii) increased risk adjustment liabilities; and

24     (iv) ballooning operating costs driven primarily by increased

25 medical care costs and increased administrative expenses.

26    (h) Molina's failure to remediate the Company's administrative

27 infrastructure problems made it extremely difficult for the Company to quickly

28 react to emerging trends in the ACA Marketplace.

1    175.   Following the earnings release and conference call with management,

2  on April 28, 2016, A.J. Rice of UBS issued an analyst report on Molina entitled,

3  "Molina Healthcare Growing Pains Move Us to the Sidelines."  In the report, Rice

4  wrote:

5    **1Q16 Earnings Shortfall Seems To be Driven by System and**

6    **Operational Issue.** MOH reported 1Q16 adj EPS of $0.51,

7    $0.29/$0.30 below UBSe/Cons. . . [S]**ystems overload from the**

8    **rapid growth the company has experienced has led to some**

9    **growing pains, as has executive turnover in some markets.**

10   **These factors have led to a slower ramp-up in care**

11   **management programs the company has been implementing**

12   **and an unexpected easing of patient prior authorizations for**

13   **inpatient hospital care in certain key markets.** The silver

14   lining is that top line growth has been strong, and the issue is

15   how quickly management can address a series of problems that

16   seem company-specific.

17   176.   In a more comprehensive report issued by Rice the next day, entitled,

18  "Molina Healthcare Let's Play Q&A: Growth Proves to be Too Much of a Good

19  Thing," Rice wrote:

20   **Management Discusses 1Q16 Issues in Our Follow-up Q&A**

21   **Call.** In our follow-up post earnings call conversation, **MOH**

22   **management said that it felt that the majority of the issues**

23   **which drove its 1Q16 earnings shortfall were not indicative**

24   **of a negative industry trend, but rather were largely specific**

25   **to the company and its recent rapid growth. For example, the**

26   **strong company-wide enrollment growth in 1Q16**

27   **overwhelmed the capacity of MOH's computer systems,**

28   **creating issues with prior authorizations for care and**

**productivity challenges. These systems issues have reportedly been resolved.**

\* \* \*

What MOH said was that, this quarter, the company saw a lot of enrollment growth across the board. As a result of this enrollment growth, the company's computer systems were overwhelmed and went down at times. **The company didn't have the bandwidth to put the amount of data through this system that was required. It did not really matter which state the membership growth was coming from or which program. MOH has been able to correct that now, and the systems are up and running as it should be.** The company was just overwhelmed by the sheer volume of data coming through the system; that was a big part of it.

177.   On April 29, 2016, David Windley of Jefferies issued an analyst report on Molina entitled, "MOH 4 Key Insights from MOH 1Q16."  In the report, Windley wrote:

1. **Bandwidth.** IT and telecom systems became overburdened with the growth from core business, acquisitions, and a tripling of HIX membership (which became the tipping point). The systems were part of the problem, while hiring and training of utilization and medical management review nurses were a rate limiter as well. These investments were in the budget and planned for later in the year. Management clearly cut this too close, underlining that execution is an investment risk. **Capacity expansion investments have now been made**.

178.   On April 29, 2016, Sarah James of Wedbush issued an analyst report on Molina entitled "Operational Misstep, But Fixable in 6 Months; Thesis Intact;

Reiterate OUTPERFORM."  In the report, James wrote: "We see potential for acquisitions to add $0.23-0.89 in run rate earnings. We see potential for many of the in-state acquisitions to run at below average SG&A **as the company leverages in-state existing infrastructure**."

### 2. Barclays Conference - June 9, 2016

179.   On June 9, 2016, during a Barclays-sponsored conference, CFO John Molina reiterated the Company's commitment to rapid growth and continuing to rely on Molina's existing administrative infrastructure: "***We have a scalable administrative infrastructure***."

180.   CFO John Molina's statement concerning the scalability of Molina's administrative infrastructure, contained in ¶179, was materially false and/or misleading for the reasons described in ¶174.

### 3. Press Release - July 13, 2016

181.   On July 13, 2016, Molina issued a press release entitled "Molina Healthcare Selects VCE Vblock All-Flash for Rapid Scale and Growth."  In the press release, Molina touted that it was "updating its data center with VCE Vblock system 740s converged infrastructure and the added power of all-flash[,]" which the Company claimed would "***improve several critical areas including service deployment and the infrastructure that supports its high-volume call center***." Molina emphasized that, "[o]ver the past five years," the Company had "experienced rapid growth," and, with the new technology, the Company gained "***critical agility and speed for the IT organization to quickly respond to increasing business demands as the company prepares for its next phase of growth***."

182.   CIO Hopfer stressed how the new "converged infrastructure" would help the Company's administrative infrastructure "scale" reliably for sustained rapid growth:

1    During the past three years Molina has added over 2.3 million

2    members.  ***Supporting this kind of growth demands an***

3    ***infrastructure that scales, is reliable and cost effective.***

4    ***Through VCE converged infrastructure with all-flash***

5    ***technology, we are able to leverage a high workload demanding***

6    ***application*** that can run mission-critical data with a faster

7    processing time.  This can save time, resources and prevents

8    outages that result from data overload.

9    183.   CIO Hopfer's statement concerning the scalability of Molina's

10   administrative infrastructure, contained in ¶¶181-182 was materially false and/or

11   misleading for the reasons described in ¶174.

12          **4.     Second Quarter Fiscal 2016 Results**

13   184.   On July 27, 2016, Molina issued a press release announcing financial

14   results for the second quarter ended June 30, 2016.  During the related earnings

15   call, after the market closed, Molina stressed improvements to existing

16   administrative infrastructure and commitments to rapid growth.  CEO Mario

17   Molina stated:

18          Last quarter, we shared with you some specific improvements

19          that we needed to make to our operations. The results we have

20          reported today speak to the progress we have made. . . .***We***

21          ***continue to improve our information technology and medical***

22          ***management infrastructure***.  .  . .During the first quarter, we

23          discussed the substantial growth in our enrollment and the

24          stresses that this growth place upon our information technology

25          and medical management infrastructure. ***In order to avoid a***

26          ***repeat of what happened in the first quarter, we have re-***

27          ***prioritized and accelerated improvements that were already***

28          ***planned and budgeted for 2016***.  .  . .Two improvements are

worth specific mention.  In the area of information technology, we have supplemented our systems with a hyperconverged infrastructure.  ***This software-centric architecture enables us to achieve a greater level of scalability, improved operational efficiency,*** shorter deployment times, and enhanced security by tightly integrating our computing, storage, and virtualization resources. . . .We are pleased with our progress to date. This quarter has given us added confidence that we are making use of the right tools and getting the right results.

185.   CFO John Molina confirmed resolution of the Company's first quarter 2016 issues: "***Operationally, we have addressed the infrastructure problems that contributed to our first-quarter difficulties***."  In addition, when CEO Mario Molina was specifically asked by Ana Gupte, analyst at Leerink Partners, whether the "systems capacity issues" in certain states had been addressed and whether he was "confident that there won't be something like this again," he responded affirmatively, stating: "***yes, those are the things that we talk about.  Those are the things that  we did, and we have applied this across the enterprise*** . . ."

186.   Molina's stock price increased approximately 13% on the announcement and discussion of the Company's financial results for the second quarter ended June 30, 2016, including the above false statements, from a close on July 27, 2016 of  $ 50.59 per share to a close on July 28, 2016 of $ 57.21 per share.

187.   Defendants' statements concerning already having addressed the Company's infrastructure problems that contributed to Molina's first-quarter 2016 difficulties, expressing confidence that system capacity issues would not reoccur, and statements about improvements in information technology and medical management infrastructure, contained in ¶¶184, 185, were materially false and/or misleading for the reasons described in ¶174.

### 5.    Third Quarter Fiscal 2016 Results

188.   On October 27, 2016, Molina issued a press release announcing financial results for the third quarter ended September 30, 2016.  During the related earnings call, after the market closed, Molina continued to tout the Company's updated administrative infrastructure, rapid growth plan, and improving margins. CEO Mario Molina claimed, "*[W]e continue to upgrade our technology. During the third quarter, we upgraded the newer version of our existing enterprise core administration platform across 12 health plans.  The upgrade allows us to continue to accommodate growth and increase administrative efficiency*. . . ." CFO John Molina also stated, "*[W]e continued to benefit from greater administrative costs efficiency*."

189.   CFO John Molina also stated that he expected the Company's Marketplace business to break even for fiscal 2016: "[*W]e believe that marketplace performance for the full-year 2016 will be approximately break-even*. That is for 2016 dates of service."[20]

190.   Defendants' statements concerning completed system upgrades supposedly designed to accommodate Molina's growth and increase administrative efficiency and Defendants' statements regarding marketplace performance for full year 2016 (which was more than three quarters complete when the statement was made), contained in ¶¶188-189, were materially false and/or misleading for the reasons described in ¶174.

### 6.    J.P. Morgan Healthcare Conference – January 9, 2017

191.   On January 9, 2017, during a J.P. Morgan-sponsored healthcare conference held during the trading day, CEO Mario Molina reiterated, "*We have a scalable administrative infrastructure*, a consistent national brand, an experienced

---

[20] Although Defendants may claim this is a forward-looking statement, Plaintiff alleges that it was made with actual knowledge of its falsity.

1    management team, and a mission-driven culture."  During the questions and

2    answers segment, CFO John Molina emphasized that the Company was continuing

3    to spend money on building out its administrative infrastructure ("***we'll continue to***

4    ***build out our infrastructure on Medicare*. . .**").

5        192.   Defendants' statements concerning Molina's scalable administrative

6    infrastructure and additional infrastructure build-outs, contained in ¶191, were

7    materially false and/or misleading for the reasons described in ¶174.

8            **7.    Fourth Quarter and Full Year 2016 Results and February**

9                    **16, 2017 Investor Day (Second Partial Corrective**

10                   **Disclosure)**

11       193.   On February 15, 2017, *after the market closed*, in a second partial

12   corrective disclosure of the truth regarding the problems the Company was facing

13   with its ACA business caused by a deficient administrative infrastructure, Molina

14   issued a press release announcing financial results for the fourth quarter and full-

15   year ended December 31, 2016 reporting a 4Q16 adjusted EPS loss of ($1.54)

16   versus street estimates of $0.75 - driven by a sharp acceleration in losses on the

17   public exchanges.  Despite Molina's prior expressions of commitment to a rapid

18   growth strategy, Molina executives now cautioned that the Company could not

19   commit to ACA Health Exchange participation beyond 2017 and would evaluate

20   its Marketplace participation on state by state basis.

21       194.   During the related earnings call the same day, CEO Mario Molina

22   addressed the Company's new position regarding ACA Health Exchange growth:

23   "[W]e believe there are simply too many unknowns with the marketplace program

24   to commit to our participation beyond 2017.  We will wait and see how the new

25   administration and Congress will adjust the program and we plan to evaluate our

26   participation on a state-by-state basis."  CEO Mario Molina attempted to shift

27   investors' focus to margin improvements and administrative cost leverage, but the

28   concern over ACA Health Exchange participation was paramount: "We also

1   lowered medical costs . . . and we continue to reduce our administrative costs. . . .

2   [H]owever, <u>ongoing issues related to the Affordable Care Act's insurance</u>

3   <u>marketplace have continued and have had a significant adverse impact on our</u>

4   <u>financial results during the fourth quarter</u>."

5       195.   Despite revealing part of the truth regarding the ongoing issues related

6   to the ACA's Marketplace that had a significant adverse impact on the Company's

7   financial results during the fourth quarter, Defendants continued to mislead the

8   market by falsely blaming losses for the fourth quarter of 2016 on "additional

9   challenges in the marketplace" and "increase[ed] utilization as members become

10  more engaged with our care networks."  In fact, this subterfuge was designed to

11  defer attention from the real problem which was that the Company did not have the

12  proper infrastructure for expansion into the ACA Marketplace and the increased

13  membership and complexities of the Exchange plans were causing crippling

14  QNXT issues including, among other things, critical enrollment and billing

15  problems, increased auto-approval of claims, massive delays in provider payments

16  and claims administration, miscalculation of Molina's risk scores (used by CMS

17  for risk adjustment liabilities) and reserves, and mispricing of Molina's ACA

18  plans.

19      196.   Defendants also falsely reassuring investors that any administrative

20  infrastructure issues were under control and that any mispricing in the ACA

21  Marketplace was the result of "state and the state tax lawyers" – without disclosing

22  that the integrity of the Company's historical enrollment and claims data was so

23  flawed that the Company itself was to blame for mispricing its ACA Marketplace

24  plans.  Moreover, CEO Mario Molina claimed that Molina's poor financial results

25  belied the Company's overall growth story: "I want to emphasize that while the

26  losses that we incurred in the marketplace program are likely to capture headlines

27  and overshadow the operational progress we have made during 2016, ***it has not***

28  ***changed the positive trajectory in our core business***."

197.   On February 16, 2017, *during the trading day*, Molina held its 2017 Investor Day, where Molina executives including CEO Mario Molina, CFO John Molina and COO Bayer continued to point to improving margins, and re-committed to leveraging existing administrative infrastructure to spur additional growth.   CFO John Molina also represented that "***[t]he acquisitions that we did in 2015 that we're able to absorb in 2016 were accretive and they're turning out for us and performing very well, just as we had thought they would***."

198.   CEO Mario Molina claimed, "[T]here are a number of ongoing operational improvements that we will continue that were begun last year[,]" including "leveraging our technology, integrating behavioral health and care coordination."   COO Bayer added:

> [A]lthough we've had issues with Marketplace, I'll share with you how ***some of the capability that we developed actually can be leveraged as we move into Medicare Advantage, which is more of an individual sale. And finally, quality and how that translates into improving profitability***.
>
> * * *
>
> One of the ways we leverage technology is to monitor unit costs, tie that to position provider costs, and we direct members to those markets.  Reducing hospitalizations, because it is such a significant contributor to overall medical costs. . . . ***We're leveraging technology in our analytics and also in improving our internal business processes***.  So the processes of utilization management and care coordination as you can imagine, involve coordinating vast amounts of data and lots of different employees.  We have underway now, the implementation of a workflow tool that will integrate our case management, our utilization management and bring together a holistic picture of

1        the patient.  We expect that to result and not only reduce

2        administrative cost, because we're leveraging technology, but

3        better outcomes. . . .

4        199.   During the question and answer portion of the Investor Day meeting,

5    Joseph W. White discussed how some of the complexities of the ACA Marketplace

6    affected Molina's administrative costs:

7        [T]here are incremental admin components to Marketplace that

8        simply don't exist in the rest of our business. Specifically, large

9        number of broker fees and a large number of exchange fees. So

10        even back in 2014 and 2015, when we were looking at the

11        Marketplace, I was talking to people about -- you just can't take

12        that MLR at face value, because there's incremental cost around

13        on the rest of the business. So that's what we're demonstrating

14        here, is that whatever [medical loss ratio] you take, you've got to

15        throw in another 10% to 12%, or when you look at Marketplace,

16        just for broker commissions and exchange fees.

17        200.   During the Q&A, CEO Mario Molina cautioned that the Company

18    could not commit to ACA Health Exchange participation going forward.

19        ***Sarah James - Piper Jaffray - Analyst***

20        And then for Mario, just trying to understand a little bit more of

21        the health insurance exchange comments. So, you've talked

22        about margins being different in different geographies. So, do

23        you think about exit is potentially staged where you look at how

24        the margin profile is in different geographies, or is this more of a

25        structural issue, where if you get no change on risk adjusters, it's

26        more of like a hard line, this market as a whole doesn't work.

27

28

*Mario Molina - Molina Healthcare, Inc. - President & CEO*

It's probably more the latter. There are programmatic issues that need to be addressed. We will do an analysis on a state by state basis, but there are some fundamental issues that need to be fixed. Some of those are in the proposed regulations. I think the proposed regulations are a nice start, they don't go far enough and this needs to be done very soon.

201.   CFO John Molina concurred, stating: "There are some places, some geographies in the Marketplace where we have done fairly well. So as Mario said, we're going to look at this on a state by state basis to see if there's any place that we want to continue in 2018, absent any wholesale changes."

202.   On these disclosures, Molina's common stock price fell $10.71 per share, **or 17.88 percent**, to close at $49.18 per share on February 16, 2017, on unusually high trading volume of 12.8 million shares.

203.   Defendants' statements concerning the positive trajectory of the Company's core business, accretive nature of its 2015 acquisitions, and improvement in leveraging technology and internal business processes, contained in ¶¶196-198, were materially false and/or misleading when made in that they failed to disclose that:

(a)   Molina's administrative infrastructure was designed for a much smaller, simpler business and was never designed to handle the size, complexity, and unique demands of the Company's growth in the ACA Marketplace (i.e, Molina's existing infrastructure was not scalable to handle the influx of business without significant modification and increased expenditures);

(b)   Molina did not adjust its business or administrative infrastructure to absorb the rapid growth that resulted from the Company's expansion into the ACA Marketplace, which the Company has admitted was very different from its traditional Medicaid business;

1          (c)     Molina failed, or was unable due to system limitations, to add

2   necessary functionalities to its existing administrative infrastructure to:

3                (i)     accurately and timely process enrollment data and bill

4   members on ACA-leveled plans;

5                (ii)    adequately and timely handle utilization management and

6   claims processing;

7                (iii)   adequately and timely pay providers;

8                (iv)   accurately calculate the Company's "risk scores", which

9   were used to determine Molina's risk adjustment liabilities in the ACA and

10  Medicare markets; and

11               (v)    appropriately price its ACA plans;

12         (d)     Molina failed to properly remediate systemic issues and costly

13  disruptions to its administrative infrastructure;

14         (e)     Molina failed to rebuild, or migrate, the administrative

15  infrastructure of the business, and instead "doubl[ed]- down" on existing

16  insufficient processes and methods;

17         (f)     Molina's system problems were compounded by the

18  Company's inability to successfully integrate data and systems from acquisitions it

19  had completed during the Class Period into Molina's existing administrative

20  infrastructure. These challenges gave rise to significant intangible assets (such as

21  goodwill), increased costs, and an inability to adequately monitor and control its

22  operations;

23         (g)     Due to administrative infrastructure limitations, Molina

24  experienced systematic breakdowns in enrollment and claims processing,

25  utilization management, provider payment, and state and federal reimbursement,

26  resulting in, among other things:

27               (i)     member coverage disruptions;

28

1                    (ii)     frequent payment disputes with healthcare providers

2  ultimately resulting in significant provider settlements and state penalties in 2018;

3                 (iii)    increased risk adjustment liabilities; and

4                 (iv)    ballooning operating costs driven primarily by increased

5  medical care costs and increased administrative expenses.

6            (h)     Molina's failure to remediate the Company's administrative

7  infrastructure problems made it extremely difficult for the Company to quickly

8  react to emerging trends in the ACA Marketplace.

9       204.   Indeed, at the end of the Class Period, Joseph W. White admitted that:

10  "As a result of trying to manage our rapid growth within an infrastructure designed

11  for a much smaller, simpler business, we experienced breakdowns in areas like

12  provider payment, utilization management, risk adjustment and information

13  management.  .  .  . In retrospect, a better approach would have been to undertake a

14  full review of the organization in anticipation of the potential growth resulting

15  from the Affordable Care Act. Instead of increasing investment in existing

16  processes, we should have conducted the full redesign of our business that we are

17  doing now."

18       205.   Following the earnings release and conference call with management,

19  on February 15, 2017, Scott Fidel of Credit Suisse issued an analyst report on

20  Molina entitled, "Sharp 4Q16 Miss; 2017 Adjusted EPS Guidance 43% Below

21  Street; Reiterate UP."  In the report, Fidel echoed the Company's disclosure that

22  "the magnitude of the 4Q losses was certainly driven by the exchanges. . ."  Fidel

23  also noted that Molina had publicly represented that it expected its public exchange

24  business to operate at break-even for 2016.

25       206.   A February 15, 2017 report by Ana Gupte of Leerink reiterated the

26  same thing: "Losses in [Health Insurance Exchange] business and unfavorable

27  prior period development were the primary drivers of miss."  Similarly, Gary P.

28  Taylor, of J.P. Morgan noted, in a February 15, 2017 report that, "This evening

1  MOH announced a sizable EPS miss, with a deteriorating [Health Insurance

2  Exchange] book overwhelming the still disappointing core business performance."

3  According to Taylor's report, Molina's (-$1.21) 2016 EPS loss came in against

4  original expectations for $0.68/share profit and "MOH suggests it will evaluate its

5  ongoing HIX participation for 2018."

6      207.   In a February 16, 2017 report by Sarah E. James at Piper Jaffray

7  entitled, "Buy the Dip Following Disappointing 4Q16 Results," James wrote:

8         **We were surprised by the number and scale of issues in**

9         **Molina's quarter, following a strong performance by peers**

10        **CNC and WCG.**

11                                  \*   \*   \*

12        **[Health Insurance Exchange]  is a $1.21 drag mostly going**

13        **away in 2017, potential 2018 exits.**  .  .  . Management indicated

14        they are considering exits in 2018, no specifics on how much but

15        they did bifurcate some markets where the product was working

16        well vs ones where it was not so we see a more limited offering

17        as more likely than a full exit. They put out a wish list of 4 items

18        to fix the HIX market, 2 of which are getting better in 2018 but

19        none of which are resolved. The main issue being MOH was one

20        of the biggest net payers into the risk transfer system, payouts

21        factor in premiums not just risk scores creating a perverse

22        scenario where low priced plans (MOH) lose $3 in revenue for

23        every $1 saved medical expense.

24      **8.      2016 Annual Report Disclosing A Material Weakness in**

25           **Molina's Internal Control Over Financial Reporting**

26      208.   On March 1, 2017, Molina filed its Annual Report with the SEC on

27  Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Annual

28  Report").  Unlike the 2014 Annual Report and the 2015 Annual Report, Molina's

1  prior positive statements regarding its "scalable administrative infrastructure" were

2  conspicuously absent, and the Company did not describe its existing administrative

3  infrastructure as a "strategic strength."

4        209.   Indeed, the 2016 Annual Report disclosed, under the section entitled

5  "Management's Evaluation of Disclosure Controls and Procedures," a material

6  weakness in Molina's internal control over financial reporting:

> Under the supervision and with the participation of our
> management, including our chief executive officer and our chief
> financial officer, we carried out an evaluation of the
> effectiveness of our disclosure controls and procedures as of the
> end of the period covered by this report pursuant to Rule 13a-
> 15(b) and Rule 15d-15(b) of the Exchange Act. **Based on this**
> **evaluation, our chief executive officer and our chief financial**
> **officer concluded that, as of December 31, 2016, our**
> **disclosure controls and procedures were not effective at the**
> **reasonable assurance level because of the material weakness**
> **in our internal control over financial reporting described**
> **below. . . .The Company determined that a material**
> **weakness existed in its internal control over financial**
> **reporting relating to the operation of an element of its**
> **process for calculating the amount owed to California by its**
> **California health plan.** More specifically, a Medicaid
> Expansion contract amendment executed in the fourth quarter of
> 2016 changed the medical loss ratio corridor formula and such
> amendment was not initially considered in determining the
> liability. As a result, we understated net income by $44 million
> for the year ended December 31, 2016, which is material to our
> consolidated results for the year ended December 31, 2016. This

1   amount was corrected prior to the issuance of our consolidated

2   financial statements as of and for the year ended December 31,

3   2016. **Because of this material weakness, management**

4   **concluded that we did not maintain effective internal control**

5   **over financial reporting as of December 31, 2016**, based on

6   criteria described in Internal Control - Integrated Framework

7   (2013) issued by COSO.[21]

8   210.   The 2016 Annual Report also contained certifications signed by

9   Defendants CEO Mario Molina and CFO John Molina pursuant to SOX

10  substantially similar in all material respects to those set forth in ¶142.

11  211.   The Company's SOX certifications were materially false and/or

12  misleading in that they failed to disclose internal controls issues the Company was

13  experiencing throughout the Class Period.

14  **9.      Firing of the Molina Brothers – May 2, 2017**

15  212.   On May 2, 2017, during the trading day, Molina issued a press release

16  announcing the sudden firing of both CEO Mario Molina and CFO John Molina.

17  Joseph W. White was named Interim President and CEO, replacing J. Mario

18  Molina, and CFO, replacing John C. Molina.  While Mario Molina and John

19  Molina would retain their positions on the Board of Directors, they were both

20  excluded from a new executive committee consisting of solely independent

21  directors.  Dale B. Wolf, the Chairman of the Board of Directors stated, "In light of

22  the Company's disappointing financial performance, the Board has determined to

23  change leadership in order to drive profitability through operational improvements.

24  These changes represent targeted and deliberate actions to enhance the Company's

25  focus and improve its competitive position within the healthcare industry."

26

27  ――――――――――――――――

28  [21] The Committee of Sponsoring Organizations of the Treadway Commission
("COSO") is a joint initiative to combat corporate fraud.

213.   The market reacted favorably to this news, driving up Molina's stock price by 17.61% from a close on May 1, 2017 of $50.80 per share to a close on May 2, 2017 of $59.75 per share on unusually high trading volume of 10.8 million shares.

214.   In a May 2, 2017 report by Scott Fidel at Credit Suisse entitled, "Board Announces Management Shake-Up; Both Mario and John Molina Out," Fidel wrote:

> In a dramatic move today, the Board of Directors has announced that it will be replacing both its CEO Mario Molina and its CFO John Molina, effective immediately. The Board is citing the company's disappointing financial performance and the need to enhance the company's focus and improve its competitive position in the HC industry. In the interim, Chief Accounting Office Joe White has been named Interim President, CEO, and CFO.
>
> *   *   *
>
> Shares are responding favorably to the news: After being halted mid-day, the stock is trading up +16% this afternoon (vs. flat S&P) as investors are likely hoping that the mgmt. changes could lead to either future improved operational performance and/or a change in the Board's views on strategic directions.

215.   A May 2, 2017 report by Sarah James of PiperJaffray also noted surprise at the terminations:

> In a surprise announcement the day before CEO Dr. Mario Molina was up for reelection to the board of directors the company announced they will be seeking external candidates for the CEO and CFO roles. We believe this will be viewed

1    favorably by investors who see the growth opportunity of

2    MOH's assets, but have been disappointed by recent execution.

3    216.   Similarly, a May 2, 2017 report by A.J. Rice of UBS also reported

4 that the Company had initiated a search for new management:

5    The leadership changes are effective immediately, and the Board

6    will commence the search for a permanent CEO. . . .We

7    believe the family involvement in MOH was traditionally viewed

8    as an impediment to the company's participation in large scale

9    Managed Care transactions. It remains to be seen if the

10    leadership changes announced today have any implications for

11    MOH's involvement in future M&A prospects. With MOH

12    shares trading 15-16% higher post today's announcement, the

13    market seems to believe that the management changes may open

14    the door for strategic discussions with third parties.

15    **10.    First Quarter 2017 Results – May 2, 2017**

16    217.   On May 2, 2017, *after the market closed*, Molina issued a press

17 release announcing financial results for the first quarter ended March 31, 2017.

18 Adjusted EPS was $0.63 versus consensus estimates of $0.58 and operating

19 metrics were mostly in line with expectations. During the related earnings call,

20 Molina announced financial results which were consistent with market

21 expectations. The Company also addressed the recent firing of the Molina brothers

22 and the fact that the Company had initiated the search for a permanent CEO.

23 Interim CEO Joseph W. White also represented that the Company was attempting

24 to "improve data capture on risk adjustment. . . member targeting and member risk

25 assessment" to increase the Company's "ability to better estimate [its] risk scores"

26 which had been a challenge for the Company.

27

28

## VII.   THE FULL TRUTH IS REVEALED

218.   The full truth about the Company's deficient administrative infrastructure and its effects on the Company's revenues was not revealed until August 2, 2017, *after the market closed*, when Molina issued a press release announcing its financial results for the second quarter ended June 30, 2017.  The Company reported a net loss of $230 million for the quarter, termination of its ACA Health Exchange participation in Utah and Wisconsin, an impairment charge of $72 million primarily related to the goodwill and intangible assets of Molina's Pathways subsidiary, and a charge of $43 million for restructuring and separation costs.

219.   During the related earnings call the same day, Interim CEO White admitted that contrary to Defendants' prior representations that Molina's administrative infrastructure was "scalable" for its rapid growth strategy, in fact, Molina's existing infrastructure was "designed for a much smaller, simpler business, and with its rapid growth [it] experienced breakdowns in areas like provider payment, utilization management, risk adjustment and information management:

> [L]et's talk about how we got here. . . .  First, we did not properly adjust our business to absorb the growth that resulted from the Affordable Care Act.  Second, we did not fully appreciate that growth in the ACA Marketplace required robust development of new capabilities that we did not have. And finally, our direct delivery network is simply not competitive with other care delivery channels available to the company. . . .  The implementation of the Affordable Care Act brought a sudden growth.  We prepared for that growth by spending more on existing processes, procedures, capabilities and technologies.  In hindsight, this was a mistake.  As a result of trying to manage

1         our rapid growth within an infrastructure designed for a much

2         smaller, simpler business, we experienced breakdowns in areas

3         like provider payment, utilization management, risk adjustment

4         and information management.

5 In fact, White's statement reveals that Molina's existing administrative

6 infrastructure never had the capacity to support the Company's rapid

7 growth strategy.

8         220.   During the same earnings call, White also revealed that Molina had

9 known about serious issues with its existing administrative infrastructure since at

10 least as early as January 2016:

11         The utilization management issues we saw last year, in the first

12         quarter of 2016, and the out-of-period claims expenses occurred

13         in this quarter were emblematic of these difficulties, as are the

14         challenges we have faced in adequately measuring our exposure

15         to Marketplace risk adjustment liabilities.  In retrospect, a better

16         approach would have been to undertake a full review of the

17         organization in anticipation of the potential growth resulting

18         from the Affordable Care Act.  Instead of increasing investment

19         in existing processes, we should have conducted the full redesign

20         of our business that we are doing now.

21         221.   White further revealed that its Medicaid-based administrative

22 infrastructure was incompatible with planned growth in ACA Health Exchanges:

23         Our challenges in the [ACA] Marketplace point to the second

24         source of our current difficulties: the failure to fully appreciate

25         the unique demands of the [ACA] Marketplace product. . . .

26         [T]he [ACA] Marketplace is fundamentally an individual

27         insurance market and, in some respects, very different form the

28         Medicaid market. . . .  [T]here were . . . aspects of the [ACA]

1          Marketplace business for which we were not as well prepared:

2          member billing, risk adjustment and pricing, to name a few.

3                                    *   *   *

4          We are redesigning core operating processes such as provider

5          payment, utilization management, Marketplace risk

6          adjustment, and quality monitoring and improvement to achieve

7          more effective and cost-efficient outcomes.  .  .  .We are

8          remediating high-cost provider contracts and building around

9          high-quality, cost-effective networks.  .  .  .We are restructuring

10         our direct delivery operations.

11         222.    White also described how Molina's previous massive CapEx spend

12   into Molina's existing administrative infrastructure was misdirected:

13         A lot of the build we've done in the company in 2012, in 2013,

14         into 2014, when we were talking to you all about the way we

15         were spending more money on admin.  Honestly, I think we

16         directed it -- we placed it in the wrong direction.  And I think we

17         were doubling down on existing processes, existing methods of

18         doing things when we actually needed to just essentially strip

19         down to the fundamentals and rebuild the chassis of the business.

20         That's something we've been spending a lot of time with our --

21         among ourselves as a leadership team and with our consultants

22         over the last 6 months or so."

23   Thus, no later than January 2017 (six month prior), Molina executives were taking

24   active measures, including hiring outside consultants, to remediate major

25   undisclosed problems with the Company's administrative infrastructure.

26         223.    In addition, the Company disclosed pressure from out-of-period claim

27   payments and legal settlements with providers due to the Company's inadequate

28

1   systems, and a "thorough and comprehensive redesign of our provider payment

2   process":

3         [W]e adjusted our medical cost estimates for 2016 dates of

4         service. <u>As a result, we recognized in the second quarter, about</u>

5         <u>$85 million worth of medical costs that were actually related to</u>

6         <u>2016.  Some of these adjustments to our prior period estimates</u>

7         <u>resulted from claims payments, others resulted from legal</u>

8         <u>settlements with providers.</u>

9

10        As part of the broader restructuring program that I will discuss

11        later in the call, <u>we are undertaking a thorough and</u>

12        <u>comprehensive redesign of our provider payment process. This</u>

13        <u>will address issues that extend from the design of our provider</u>

14        <u>contracts to the actual payment of providers. We expect this</u>

15        <u>process redesign to result in greater transparency and improved</u>

16        <u>administrative cost efficiency</u>.

17      224.   The Company also disclosed a write-down associated with the

18  Pathways acquisition and costs associated with its restructuring plans:

19        We recorded an impairment charge of $72 million, primarily

20        related to the goodwill and intangible assets of our Pathways

21        subsidiary. As part of the comprehensive review of our entire

22        business, <u>we have determined that the anticipated benefits from</u>

23        <u>Pathways, including its integration with our health plans, will be</u>

24        <u>less than originally anticipated</u> when we closed on the

25        acquisition 2 years ago.

26

27        We also took a charge of $43 million in the second quarter for

28        restructuring and separation costs. This charge is primarily for

1  the termination benefits for our former Chief Executive and

2  Chief Financial Officers and represents the contractual

3  obligations under their employment agreements.  .  .  .This line

4  item also includes consulting costs incurred through June 30 for

5  the implementation of our restructuring plan.

6  225.   On this shocking news, Molina's common stock price fell $3.92 per

7 share, **or 5.92 percent**, to close at $62.32 per share on August 3, 2017 on

8 unusually high trading volume of 5.8 million shares.

9  226.   Following the Company's disclosure of the whole truth, on August 2,

10 2017, Scott Fidel of Credit Suisse issued an analyst report on Molina entitled,

11 "Margin Pressures Intensify Across the Business; Reiterate Underperform."  In the

12 report, Fidel wrote:

13  **Molina reports large adjusted EPS loss on severe margin**

14  **pressure**: MOH reported a 2Q17 adjusted EPS loss of ($4.01)

15  vs. CS $0.70 / Street $0.85. The immensely unfavorable results

16  have prompted MOH to withdraw its guidance for 2017. MOH is

17  facing rising margin pressures across its businesses, but **mostly**

18  **acutely in its public exchange** and core Medicaid business.

19  227.   On August 3, 2017, Peter Costa of Wells Fargo issued a research

20 report on Molina entitled, "MOH: The Road Back Starts From A Bigger Than

21 Expected Hole," making the following observations:

22  **Medicaid**: Molina cited ongoing poor operating performance in

23  its FL, IL, NM and Puerto Rico health plans, which combined

24  accounted for about 28% of Molina's total premiums. Combined,

25  these four Medicaid health plans had a medical loss ratio (MLR)

26  of 104.1% in Q2, up from 91.8% in Q1 and 92.3% in Q2 2016.

27  **The deterioration partly reflects significant out-of-period**

28

**claims development that Molina indicated was $85 million higher than expected**.

228.   On August 4, 2017, Moody's Investor Services downgraded the senior unsecured debt ratings of Molina from Ba3 to B2 and the insurance financial strength ("IFS") ratings of six of Molina's regulated operating subsidiaries from Baa3 to to Ba1.  According to the Moody's report: "These actions reflect Moody's assessment of a broadly weaker credit profile at Molina based on poor financial results, as well as the potential for operational challenges as the company undertakes a company-wide restructuring an expense-cutting program. "  The report also states: "The company's restructuring plan is wide-ranging and includes a review of its contract design and payment processes for providers, medical utilization management, and information technology."

229.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## VIII.  POST-CLASS PERIOD EVENTS

230.   In October 2017, CIO Hopfer was forced to resign from Molina.

231.   On October 10, 2017, Molina announced that Joseph M. Zubretsky would replace Joseph White as the Company's President and CEO, effective November 6, 2017.  Zubretsky also would join Molina's Board of Directors at that time.

232.   On November 2, 2017, Molina announced its financial results for the third quarter ended September 30, 2017.  During the related earnings call the same day, Joseph White revealed the Company was "redesigning core operating processes, such as provider payment, utilization management and quality improvement" which was purportedly, among other things, increasing the accuracy of Molina's provider payments.  The Company also revealed that it was in the process of installing a new utilization management system, but that it was still

1    experiencing adverse development related to claims payable roll-forward from

2    December 2016.

3        233.   On January 8, 2018, the Company participated in the J.P. Morgan

4    Health Care Conference.  During that conference, Joseph Zubretsky admitted that

5    Molina's claims processing operation was still "mediocre" and the Company's

6    administrative infrastructure was incredibly fragmented and needed to be

7    conformed: "[O]ur IT platforms are very fragmented, very disparate. We have a lot

8    of incredibly complex workarounds and this is being conformed."  Zubretsky also

9    reiterated that the Company had made investments in technology related to

10   utilization management and had exited its direct delivery business.

11       234.   On January 11, 2018, Molina announced that COO Bayer also was

12   leaving the Company effective February 2, 2018. According to Molina's 2018

13   proxy, Bayer's retirement was deemed a "termination without cause."

14       235.   On February 12, 2018, Molina announced its financial results for the

15   fourth quarter and full year ended December 31, 2017, reporting a net loss of $512

16   million with earnings per share dropping by $4.59 per diluted share for the quarter

17   and $9.07 per share for the full year due to significant impairment and

18   restructuring costs, substantial unfavorable out-of-period or nonrecurring items

19   (including approximately $150 million of unfavorable prior period claims

20   development experienced in 2017 and recorded a charge of $50 million for

21   Marketplace risk adjustment related to the first three quarters of 2017 as a result of

22   updated third-party data the Company received during the fourth quarter of 2017).

23       236.   The Company also announced, on February 13, 2018, significantly

24   increased premium rates on its ACA Marketplace plans.  Joseph Zubretsky,

25   Molina's new President and CEO also revealed that the Company's risk adjustment

26   scores were not keeping pace with its peers and that Molina was giving away too

27

28

1   much money on quality withholds.[22]  Because of Molina's deficient enrollment and

2   claims processing capabilities during the Class Period, Molina was forfeiting these

3   "quality withholds" and not getting its money back from CMS.

4         237.   Zubretsky also admitted, on February 13, 2018, that Molina's inability

5   to rely on the Company's data (from its IT systems) made it difficult to identify

6   and react in a real-time basis to emerging trends in the marketplace: "[A]s part of

7   our margin recovery plan, we contemplate getting better information on a real time

8   basis and reacting to the trends that are emerging in the Marketplace more quickly

9   than this company has reacted in the past. . . we're going to make sure that we

10  discern the emerging trends more quickly and react to them on a more real time

11  basis."

12        238.   On April 30, 2018, Molina announced its financial results for the first

13  quarter ended March 31, 2018.  The Company represented that its Medicaid and

14  Medicare products performed well due, in part, to medical cost management

15  initiatives, better-than-expected retention of at-risk revenue, and the effects of the

16  Company's restructuring efforts announced at the end of the Class Period. Molina

17  also: 1) recorded $25 million in charges primarily related to the write-down of

18  capitalized costs for a software implementation the Company no longer needed

19  (the software platform being implemented "was misaligned with our goals and

20  objectives");  and 2) "continue[d] to refine [its] procedure for estimating risk

21  adjustment liability."

22

23

24  _____

25  [22] According to the CMS website, Medicare-Medicaid Plans participating in the
    "capitated model" will have a portion of its rates withheld; payment of these
    withheld amounts is subject to performance consistent with established quality
26  requirements. These amounts withheld are called "quality withholds."
    https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-
27  Coordination/Medicare-Medicaid-Coordination-
    Office/FinancialAlignmentInitiative/MMPInformationandGuidance/MMPQuality
28  WithholdMethodologyandTechnicalNotes.html

239.   On May 24, 2018, Molina announced that Thomas L. Tran had been appointed as Molina's new CFO and treasurer effective June 4, 2018 and that Joseph W. White, then CFO, would retire after 15 years with Molina.

240.   On May 31, 2018, the Company hosted its 2018 Investor Day.[23] During the Investor Day, the Company admitted that in 2017, Molina experienced, among other things, "inaccurate and inconsistent claims processing," "[h]igh volume of provider settlements," and "[u]nfavorable 2016 claims run-out exacerbated poor 2017 performance." [24]  The Company also reiterated during its 2018 Investor Day that its utilization management was "inconsistent and sporadic" and "not very effective in certain places" and that the Company had not been "screening enough cost," i.e. they had been "paying too high in unit cost."  The Company also revealed that it was reexamining how to fix utilization management including its claim processing and claim payment, call centers, and provider networks.

241.   During its 2018 Investor Day, CEO Zubretsky admitted that the Company had problems in the past paying claims on a timely basis, sorting out its membership data, and properly implementing network contracts.  Zubretsky stated:

>   If you can't pay claims timely and correctly in this business, you can't be in the business. Whether it's member experience, provider abrasion, or not being able to look into your actuarial data with a degree of precision and confidence, you have to pay claims correctly. **And the company is growing so quickly and implementing contracts in networks so quickly, that we misstep. It's all being corrected.**  . . . If I look at some of these stats, $135 million in provider settlements. Why? Because the

---

[23] Slides from the Investor Day were filed as an attachment to a May 31, 2018 Report on Form 8-K.

[24] *See* Molina's website under "Molina Healthcare, Inc. 2018 Investor Day"

providers were right. **We had underpaid certain providers. And they presented the data that proved that they were right**. $30 million in late payment penalties to states. These are self-inspected wounds that are avoidable. . . .We believe there's at a minimum, $20 million to $30 million of value sitting inside better processing of claims and claim payment integrity.

Pamela Sedmak, Molina's new Executive Vice President of Health Plan Operations reiterated that Molina's "utilization management, complex care management and so forth, and in the Marketplace" were underperforming, and that there were "gaps in their provider network side."

242.   Zubretsky also revealed that the Company's past troubles extended to routinely underestimating its risk scores both in Medicare and ACA Marketplace which affect the amount of the Company's risk transfer payments – a key cause of the Company's lower than expected results for fiscal 2016.   Indeed, Zubretsky admitted that Molina's risk score calculation pre August 2017 was akin to "almost throw a dart at a dartboard" and that the Company left money on the table with its underestimated risk scores:

There is significant amounts of revenue that are at risk for some level of performance, whether it's a quality withhold, whether it's a risk score, whether it's other forms of producing quality measures that allow you to keep a percentage of your revenue. **Our risk scores are not where they need to be. An amateur can come in and look at our risk scores in certain populations and know they're too low. And it's not because we have a better population in the market, it's because our risk scores are too low relative to the competitors. We're not chasing the charts and we're not aiming at the right direction**. . . .**Our risk scores, both in Marketplace and in Medicare, are far too**

1          **low. . . This needs to change**. So there's tremendous value  . . .

2          and quality withholds and in risk adjustment sitting inside our

3          company.

4  Zubretsky confirmed that Molina's poor data quality, in part, caused the

5  miscalculation of its risk scores.

6        243.   Pamela Sedmak reiterated Zubretsky's sentiments that the Company's

7  risk scores were both inaccurate and unacceptable relative to its peers. "[W]e just

8  weren't getting the level of risk adjustment and STARs captures that we needed to

9  and expect relative to the peers in this space." Sedmak also confirmed what the

10  Company had disclosed on August 2, 2017 – that Molina had insufficient

11  capabilities for its Marketplace business:

12          Marketplace, you guys know the Marketplace story for Molina.

13          Very difficult one. And last year, it grew too fast, too aggressive,

14          beyond our capacity to manage. . . .**We had insufficient**

15          **capabilities relative to the level of risk transfer that we have**

16          **within the organization. Our risk scores, that Joe already**

17          **mentioned, clearly don't feel that they're nearly at the**

18          **accuracy and completeness that they need to be**, given the

19          level of risk transfer that we have as a percent of our book -- of

20          our premium. **We also had very suboptimal processes,**

21          **premium collection, enrollment and eligibility, deductibles,**

22          **accumulators, all those things that become very big pain**

23          **points for members and providers**.

24  Joseph W. White echoed that Molina's risk adjustment results in 2015 and 2016

25  were negatively affected by "out-of-period development[s] from the previous

26  year."

27        244.   During the 2018 Investor Day, Zubretsky also represented that Molina

28  was considering re-entering, and had filed rates in, the ACA Marketplace for Utah

1    and Wisconsin - two states the Company had withdrawn from effective January 1,

2    2018.

3        245.   However, Zubretsky also acknowledged that Molina still had much

4    work to do to recover from the effects of prior management's damage to the

5    Company:

6            •"After you restore margins, you just try to build your credibility

7            back into growing revenue, it's going to take some time to build

8            the portfolio."

9            •"[W]e have to build the financial and operational infrastructure

10           to both restore our margins and sustain them through operating

11           improvements and executing our managed care fundamentals."

12   **IX.    ADDITIONAL EVIDENCE OF SCIENTER**

13       246.   As alleged herein, Defendants acted with scienter in that Defendants

14   knew, or recklessly disregarded, that the public documents and statements issued

15   or disseminated in the name of the Company, or in their own name, were

16   materially false and misleading; knew or recklessly disregarded that such

17   statements or documents would be issued or disseminated to the investing public;

18   and knowingly and substantially participated or acquiesced in the issuance or

19   dissemination of such statements or documents as primary violations of the federal

20   securities laws. Defendants, by virtue of their receipt and/or access to information

21   reflecting the true facts regarding Molina, their control over, and/or receipt and/or

22   modification of Molina's allegedly materially misleading misstatements, were

23   active and culpable participants in the fraudulent scheme alleged herein.

24       247.   Defendants knew and/or recklessly disregarded the false and

25   misleading nature of the information which they caused to be disseminated to the

26   investing public. The ongoing fraudulent scheme described herein could not have

27   been perpetrated during the Class Period without the knowledge and complicity, or

28

1    at least, the reckless disregard, of Molina personnel at the highest levels of the

2    Company.

3         248.   The following allegations all support a strong inference of scienter:

4              • The Individual Defendants' stock sales during the Class Period

5                were highly unusual and suspicious in timing and amount;

6              • Statements by former Molina employees corroborate that

7                Defendants knew or were reckless in not knowing that the

8                Company's administrative infrastructure was not scalable and

9                could not handle the growth in Molina's business;

10             • Defendants' admissions, at the end of, and after, the Class Period

11               regarding the Company's failed infrastructure build-out;

12             • The wholesale replacement of Molina's senior management team,

13               including the Individual Defendants, during or immediately

14               following the Class Period; and

15             • Growth in Health Plan membership was extremely important to the

16               Company's success and Defendants spoke frequently about

17               Molina's growth strategy and reliance on its administrative

18               infrastructure to support that growth.

19    A.    **Certain Defendants' Stock Sales During the Class**

20          **Period Were Highly Unusual and Suspicious**

21        249.   Defendants Mario Molina, John Molina, and Terry Bayer engaged in

22    stock sales during the Class Period that were suspiciously timed and dramatically

23    out of line with their prior trading practices.  As a result of these Class Period

24    trades, these Defendants profited from the artificial inflation embedded in the

25    trading price of Molina stock caused by their false and misleading statements and

26    omissions to investors during the Class Period.  Many of these insider sales

27    occurred before the first corrective disclosure and before substantial declines in the

28    price of Molina's stock.

1

2

### 1.    The Value and Amount of Trading by these Defendants Was Highly Unusual

3    250.   The Class Period sales of Molina stock by CEO Mario Molina, CFO

4  John Molina and COO Bayer were highly unusual and suspicious as measured by

5  (i) the total amount of shares sold, (ii) the percentage of shares sold compared to

6  the number of total shares available for sale during the Class Period, (iii) the

7  contrast with these Individual Defendants' own prior trading history, and (iv) the

8  timing of the sales.  Such sales therefore raise a strong inference of scienter.

9    251.   To evaluate the Individual Defendants' selling activity, Plaintiff used

10  the publicly-available trading data that the Individual Defendants are required to

11  report to the SEC on Form 4.  Plaintiff analyzed the trading by the Individual

12  Defendants during the Class Period and during the equal-length period

13  immediately preceding the Class Period beginning January 28, 2012 and ending

14  October 30, 2014 (the "Control Period").  The Forms 4 filed during the Class

15  Period and Control Period are hereby incorporated by reference, and a summary of

16  the relevant transactions are set forth in Exhibit A, annexed hereto.

17    252.   To analyze the Individual Defendants' sales, Plaintiff calculated the

18  total sales by each of the Individual Defendants, together with the cash proceeds

19  from such sales, during the Control and Class Periods.  Those totals were then

20  compared to identify whether Individual Defendant's sales during the Class Period

21  were consistent with their sales during the Control Period.  The Individual

22  Defendants' specific trading dates also were evaluated compared to the corrective

23  disclosure dates.  All of these analyses reveal that CEO Mario Molina, CFO John

24  Molina and COO Bayer's Class Period sales were extremely large, highly unusual,

25  and suspicious.

26

27

28

## CLASS PERIOD AND CONTROL PERIOD TRADING BY
## MARIO MOLINA, JOHN MOLINA, AND TERRY BAYER

### CLASS PERIOD

| | | |
|---|---|---|
| Molina (J. Mario) | 509,000 | $31,568,911.55 |
| Molina (John C) | 231,367 | $14,255,372.09 |
| Bayer (Terry P) | 149,211 | $9,308,232.54 |
| **Total Shares Sold During Class Period and Proceeds** | **889,578** | **$55,132,516.18** |

### CONTROL PERIOD

| | | |
|---|---|---|
| Molina (J. Mario) | 233,300 | $8,526,179.00 |
| Molina (John C) | 282,723 | $8,694,257.00 |
| Bayer (Terry P) | 63,003 | $2,062,288.51 |
| **Total Shares Sold During Control Period and Proceeds** | **579,026** | **$19,282,724.51** |

    (a)    **The Nominal Amount and Percentage of Molina Holdings Sold During the Class Period Were Extremely Large**

253.   The proceeds from shares sold during the Class Period by CEO Mario Molina, CFO John Molina and COO Bayer were extremely large.

254.   CEO Mario Molina sold 509,000 shares of Molina stock during the Class Period for proceeds of **$31,568,911.**  In addition, during the Class Period, 306,495 shares of CEO Mario Molina's Company stock worth $18,592,561 were withheld by the Company to pay for his personal taxes in connection with Company-issued stock. ***Through these transactions, CEO Mario Molina disposed of approximately 36.3% of the total shares, including options, he had available for sale during the Class Period***.

255.   CFO John Molina sold 231,367 shares of Molina stock during the Class Period for proceeds of **$14,255,372.**   In addition, during the Class Period, 110,673 shares of CFO John Molina's Company stock worth $6,642,310 were withheld by the Company to pay for his personal taxes in connection with Company-issued stock. ***Through these transactions, CFO John Molina disposed of approximately 12.7%  of the total shares, including options, he had available for sale during the Class Period.***

256.   COO Bayer sold 149,211 shares of Molina stock during the Class Period for proceeds of **$9,308,232.**  In addition, during the Class Period, 31,000 shares of COO Bayer's Company stock worth $1,769,686 were withheld by the Company to pay for her personal taxes in connection with Company-issued stock. ***Through these transactions, COO Bayer disposed of approximately 49.6% of the total shares, including options, she had available for sale during the Class Period.***

257.   In an equity research report dated May 2, 2017, a Piper Jaffray analyst noted that the Molina brothers had significantly decreased their Molina holdings since the Company went public in 2003, noting: "The Molina Family currently owns ~20-25% of MOH, ***down from 51% at the IPO***. "

**(b)   These Defendants' Stock Sales Were Inconsistent With Prior Trading Practices**

258.   CEO Mario Molina, CFO John Molina and COO Bayer's Class Period stock sales were not only large in terms of proceeds, but also inconsistent with these Defendants' own prior selling activity during the Control Period.

259.   Collectively, Defendants Mario Molina, John Molina and Terry Bayer increased their total stock sales by approximately **65%** from 579,026 shares sold during the Control Period to 889,578 shares sold during the Class Period. Individually, Defendants Mario Molina and Terry Bayer's sales also increased sharply during the Class Period.  The contrast between sales during the Control Period and the Class Period also is striking when measured in dollars.  ***Collectively, proceeds from these Defendants' sales increased almost three-fold during the Class Period, from approximately $19.2 million during the Control Period to $55.1 million during the Class Period.***

260.   Separately, during the Class Period, Defendants Mario Molina and Terry Bayer ***more than doubled the number of Molina shares they sold***: Mario Molina sold 233,300 shares during the Control Period and 509,000 shares during the Class Period. Terry Bayer sold 63,003 shares during the Control Period and 149,211 shares during the Class Period.

261.   CEO Mario Molina, CFO John Molina and COO Bayer's sales, as measured in dollars, also increased dramatically.  ***Defendant Mario Molina's proceeds from Molina sales increased by 270 % during the Class Period*** – from $8.5 million during the Control Period to $31.5 million during the Class Period. Terry Bayer's trading also increased exponentially, more than ***quadrupling*** from $2 million during the Control Period to $9.3 million during the Class Period.  And proceeds from Defendant John Molina's sales increased approximately 60% during the Class Period, from $8.7 million during the Control Period to more than $14.2 million during the Class Period.

**(c)     The Timing of the Stock Sales Was Suspicious**

262.   CEO Mario Molina, CFO John Molina and COO Bayer's sales of Molina stock were suspiciously timed in that these defendants sold a vast number of shares *after* learning of materially non-public information about the critical deficiencies in Molina's administrative infrastructure that made scaling the Company's existing IT systems for Molina's new Medicaid and ACA Health Exchange business both cost-prohibitive and technologically unfeasible, ***but before*** the public disclosure of that same adverse information.

263.    Indeed, during the Class Period, CEO Mario Molina, CFO John Molina and COO Bayer sold the majority of their Molina stock ***before*** the corrective disclosures which start on April 28, 2016.

264.   Moreover, COO Bayer also suspiciously timed one-third (1/3) of her Class Period sales *after* the second corrective disclosure on February 15, 2017, ***but before*** the final corrective disclosure on August 2, 2017.

**2.     The Presence of 10b5-1 Trading Plans Adopted by the Individual Defendants Does Not Absolve Them of Liability**

265.   Rule 10b5-1, 17 C.F.R. § 240.10b5-1 provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.  To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans" or "Plans").  *See Selective Disclosure and Insider Trading,* 65 Fed. Reg. 51,716, at 51,727-28 (Aug. 24, 2000).  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability **only** if it is entered into by an insider "**[b]efore becoming aware**" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

266.   Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith."  Thomson Reuters, *Corporate Counsel's Guide to Insider Trading and Reporting,* Ch. 12:26 (2018).  Conversely, the adoption and/or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

267.   Based on Form 144 filings with the SEC, it appears that CFO John Molina and COO Bayer entered into new Molina trading plans *during* the Class Period and/or modified or cancelled existing Molina trading plans *during* the Class Period no fewer than three (3) times at irregular intervals (i.e., not every 12 months).[25]  Indeed:

    (a)   CFO John Molina reported trading plans with effective dates of

        (i)    August 21, 2015;

        (ii)   June 15, 2016;

        (iii)  November 15, 2016 (five months later); and

        (iv)  June 15, 2017.

    (b)   COO Bayer reported trading plans with effective dates of

        (i)    May 27, 2016;

        (ii)   March 15, 2017; and

        (iii)  May 12, 2017 (two months later).

268.   Further, although some of the Individual Defendants' stock sales may have been made pursuant to 10b5-1 Plans, the circumstances of those sales are sufficiently suspicious to overwhelm any exculpatory inference that might

---

[25]   Defendants' Form 144s and/or Form 4s list the effective date of relevant trading plans.  No Form 144s were found online for CEO Mario Molina for the Class Period.  Thus, the effective dates of his trading plans, if any, are not included herein.

1   otherwise have been available to pre-planned sales based on such Plans. Indeed,

2   even if the Individual Defendants had entered into 10b5-1 Plans prior to the Class

3   Period and traded within those same plans throughout the Class Period (which

4   COO Bayer and CFO John Molina did not), such plans are under heavy SEC

5   scrutiny in light of a *Wall Street Journal* investigation that found that insiders who

6   were trading pursuant to 10b5-1 Plans were still trading at opportune times and

7   reaping better-than-expected results.  According to the November 27, 2012 *Wall*

8   *Street Journal* article entitled "Executives' Good Luck in Trading Own Stock,"

9   executives trading pursuant to 10b5-1 Plans are still able to time their trades to

10  avoid losses and increase earnings because trading plans are not public and can be

11  canceled or amended at any time without disclosure.

12      269.   Accordingly, CEO Mario Molina, CFO John Molina and COO

13  Bayer's trading behavior during the Class Period raises a strong inference of

14  suspicious and unusual trading activity and their trading plans do not provide these

15  Defendants with a safe harbor.

16  **B.    Statements by Former Molina Employees Corroborate that**

17  **Defendants Knew or Were Reckless in Not Knowing That the**

18  **Company's Administrative Infrastructure Was Not Scalable and**

19  **Could Not Handle the Growth in Molina's Business During the**

20  **Class Period**

21      270.   The CWs make clear that it was not simply a mistake or a case of

22  mismanagement, but that the Defendants knew or recklessly disregarded that the

23  Company's administrative infrastructure was simply incapable of sustaining the

24  growth from the Company's Medicaid and ACA Marketplace business.

25      271.   CW-1 confirmed that CEO Mario Molina was made aware of many of

26  the IT issues at Molina.  CW-1 noted that it was his job to "marshal info" and

27  "bring light to problems" within Molina regarding the Company's IT issues. CW-1

28  created strategic plans that identified IT issues and processes in IT to address those

1    issues and planned investments in IT infrastructure. CW-1 presented the strategic

2    plans to his boss in the Office of the CIO, who then passed the strategic plans onto

3    other Molina senior executives, including CEO Mario Molina. CW-1 also

4    communicated directly with CEO Mario Molina on many occasions about the IT

5    concerns described herein.

6        272.   CW-2 also confirmed that CIO Hopfer and COO Bayer, among other

7    senior Molina executives, were made aware of the IT issues at Molina.  CW-2

8    prepared "weekly status reports" that broke down IT issues by state. CW-2

9    described the weekly status reports as PowerPoint presentations that he presented

10   at weekly Steering Committee Meetings related to Molina's ACA business held in

11   the Molina executive tower in Long Beach, CA.  In March 2016, the Steering

12   Committee consisted of COO Bayer, CIO Hopfer, and other executives including

13   the VP of Health Insurances/Marketplace, the VP of Information Systems, and

14   CW-2's boss, Sanjay Bhat VP of Projects).  The reports prepared by CW-2, and

15   circulated to the attendees by email – including COO Bayer and CIO Hopfer –

16   identified enrollment data problems by state.

17       273.   CW-3, also prepared materials for inclusion in presentations for the

18   weekly status meetings which were circulated to COO Bayer, CIO Hopfer, Sanjay

19   Bhat, and others from the executive team at Molina corporate, in which CW-3

20   highlighted the enrollment data challenges QNXT could not handle adequately as

21   observed during EDGE server processing.

22       274.   CW-4 discussed quarterly meetings with Molina's National

23   Contracting and Services department. Overall system problems resulting in

24   provider issues, including claims problems, were reported in this meeting to,

25   among others, Kim Sweers, Vice President, Network Strategy and Services at

26   Molina.

27       275.   CW-4 also participated in Monthly Network Strategy calls held on

28   Thursdays and led by Sweers and periodically attended by COO Bayer, who was

1    Sweers' boss at the time, and Nico Pagone, Corporate Director of National
2    Contracts. According to CW-4, he and his counterparts in the other states would
3    call into this Web-ex meeting. CW-4 confirmed there was an agenda circulated by
4    email prior to the call, as well as minutes circulated after the meeting. CW-4
5    recalled how they frequently would discuss "huge problems" with QNXT on these
6    calls. CW-4 also attended Annual Network Strategy Summits where the "biggest
7    topic" was always "data remediation." CW-4 recalled repeated conversations about
8    how "QNXT sucks" and the need to fix the system.

9         276.   CW-5 also confirmed that system scalability and capacity issues were
10   brought to the attention of his boss, Karen Warren, Vice President of Clinical
11   Program Operations, and Molina's CMO Keith Wilson, at regularly scheduled
12   meetings that CW-5 participated in telephonically and which CIO Hopfer and
13   COO Bayer also attended periodically.  According to CW-5, minutes were taken
14   during these meetings and were circulated to all of the attendees including CIO
15   Hopfer and COO Bayer when they attended the meetings.

16        277.   CW-5 confirmed that capacity problems also were brought up in
17   meetings in 2015 held at Molina's headquarters in Long Beach, California attended
18   by Warren, Wilson and their "right hand people."  CW-5 stated that at these
19   meetings, it was communicated to management that the QNXT platform could not
20   handle the integration of ACA and Medicaid expansions in such a short period of
21   time, but management's response was just to give the platform "patch jobs."

22        278.   CW-5 confirmed that senior management including CEO Mario
23   Molina, CFO John, and COO Bayer also routinely would have been informed of
24   system issues by Wilson who attended the meetings described herein.  In addition,
25   CW-5's boss, Warren, was meeting with COO Bayer regularly and CW-5 reported
26   the concerns of the Utilization Management team to Warren and CW-5 would
27   sometimes receive feedback from Warren from the meetings he had with COO
28   Bayer, which led CW-5 to believe that COO Bayer was keenly aware of the QNXT

1   problems.  CW-5 also informed CFO John Molina of CW-5's concerns with the

2   deficiencies in Molina's utilization management system and repeatedly requested a

3   new utilization management system which was not approved until approximately

4   the beginning of 2017.

5       279.   CW-5 also participated in quarterly meetings with CIO Hopfer, COO

6   Bayer, Wilson and Warren, during which a host of system issues were discussed

7   including problems with QNXT, how problems with Molina's QNXT system were

8   negatively impacting the Utilization Management part of Molina's business,

9   overall concerns with Molina's systems including patching the QNXT system, and

10   concerns about reporting to regulators such as the CMS.

11   **C.**   **Defendants' Admissions Regarding the Company's Failed**

12   **Infrastructure Build-Out Also Provide Strong Evidence of**

13   **Scienter**

14       280.   On August 2, 2017, the Company, under new management, admitted

15   that despite earlier representations, its existing system (QNXT) could not handle

16   the explosive growth resulting from the ACA business and Molina should have

17   migrated to a new more robust system for the expansion of its business caused, in

18   part by entry into the ACA Marketplace.  According to Joseph W. White, Interim

19   CEO:

20           Now that we have discussed our second quarter results, let's talk

21           about how we got here. I believe that our current situation is a

22           result of 3 key factors. **First, we did not properly adjust our**

23           **business to absorb the growth that resulted from the**

24           **Affordable Care Act. Second, we did not fully appreciate that**

25           **growth in the ACA Marketplace required robust**

26           **development of new capabilities that we did not have. And**

27           **finally, our direct delivery network is simply not competitive**

28           **with other care delivery channels available to the company.**

1    Fortunately, we are well on our way to remediating these issues.

2    Let me talk about them one at a time. The implementation of the

3    Affordable Care Act brought a sudden growth. We prepared for

4    that growth by spending more on existing processes, procedures,

5    capabilities and technologies. In hindsight, this was a mistake.

6    **As a result of trying to manage our rapid growth within an**

7    **infrastructure designed for a much smaller, simpler business,**

8    **we experienced breakdowns in areas like provider payment,**

9    **utilization management, risk adjustment and information**

10   **management. The utilization management issues we saw last**

11   **year, in the first quarter of 2016, and the out-of-period**

12   **claims expenses occurred in this quarter were emblematic of**

13   **these difficulties, as are the challenges we have faced in**

14   **adequately measuring our exposure to Marketplace risk**

15   **adjustment liabilities.** In retrospect, a better approach would

16   have been to undertake a full review of the organization in

17   anticipation of the potential growth resulting from the Affordable

18   Care Act. **Instead of increasing investment in existing**

19   **processes, we should have conducted the full redesign of our**

20   **business that we are doing now.**

21

22   Our challenges in the Marketplace point to the second source of

23   our current difficulties: **the failure to fully appreciate the**

24   **unique demands of the Marketplace product.** While our

25   Marketplace members share many characteristics with our

26   Medicaid members, **the Marketplace is fundamentally an**

27   **individual insurance market and, in some respects, very**

28   **different from the Medicaid market.** To be clear, our

1    Medicaid-based provider network is an important competitive

2    strength in the Marketplace. **However, there were other aspects**

3    **of the Marketplace business for which we were not as well**

4    **prepared: member billing, risk adjustment and pricing, to**

5    **name a few.** We have learned much about these activities, but

6    we have paid a price for that learning. We continue to monitor

7    our Marketplace business and remain committed to making

8    tough decisions should they be necessary.

9

10   Finally, our direct delivery network is simply not competitive

11   with other care delivery channels available to the company. . .

12                          *   *   *

13   A lot of the build we've done in this company in 2012, in 2013,

14   into 2014, when we were talking to you all about the way we

15   were spending more money on admin. **Honestly, I think we**

16   **directed it -- we placed it in the wrong direction. And I think**

17   **we were doubling down on existing processes, existing**

18   **methods of doing things when we actually needed to just**

19   **essentially strip down to the fundamentals and rebuild the**

20   **chassis of the business.** That's something we've been spending

21   a lot of time with our -- among ourselves as a leadership team

22   and with our consultants over the last 6 months or so.

23        281.   Thus, Defendants conceded that Molina did not properly adjust

24   Molina's business systems to absorb the growth that resulted from its ACA

25   business and that growth in the ACA Marketplace required development of new

26   system capabilities beyond those it had. White's admission also strongly implies

27   that the Company knew during the Class Period that what it really needed to do to

28

1    support Molina's explosive growth was to scrap the Company's existing

2    administrative infrastructure and rebuild it instead of continually patching it up.

3    New Molina management hired after the end of the Class Period (see discussion

4    below) made additional admissions about the Company's past data integrity issues

5    during the May 31, 2018 Investor Day

6          282.   During the 2018 Investor Day, the Company admitted that in 2017,

7    Molina experienced, among other things, "inaccurate and inconsistent claims

8    processing," which caused, among other things, "high volume of provider

9    settlements," of at least $130 million. The Company also reiterated that its

10   utilization management was "inconsistent and sporadic" and "not very effective in

11   certain places" and that the Company was still reexamining how to fix utilization

12   management including Molina's claim processing and claim payment and  its call

13   centers and provider networks.  CEO Zubretsky also admitted that the Company

14   hadn't been paying claims on a timely basis and had been improperly

15   implementing network contracts because the Molina's *data was inaccurate.* "**We**

16   **had underpaid certain providers. And they presented the data that proved**

17   **that they were right**. **$30 million in late payment penalties to states. These are**

18   **self-inspected wounds that are avoidable**."

19         283.   During the 2018 Investor Day, Zubretsky also revealed that the

20   Company's past troubles extended to routinely underestimating its risk scores both

21   in Medicare and ACA Marketplace which affect the amount of the Company's risk

22   transfer payments  – a key cause of the Company's lower than expected results for

23   fiscal 2016.   Indeed, Zubretsky admitted that Molina's risk score calculation pre

24   August 2017 was akin to throwing "a dart at a dartboard" and that the Company

25   left money on the table with its underestimated risk scores. Zubretsky also

26   confirmed that Molina's poor data quality, in part, caused the miscalculation of its

27   risk scores.

28

284.   During the 2018 Investor Day, Pamela Sedmak reiterated Zubretsky's sentiments that the Company's risk scores were both inaccurate and unacceptable relative to its peers and that the Company's insufficient capabilities caused Molina's risk scores to be inaccurate and incomplete:

> Marketplace, you guys know the Marketplace story for Molina. Very difficult one. And last year, it grew too fast, too aggressive, beyond our capacity to manage. . . .**We had insufficient capabilities relative to the level of risk transfer that we have within the organization. Our risk scores, that Joe already mentioned, clearly don't feel that they're nearly at the accuracy and completeness that they need to be**, given the level of risk transfer that we have as a percent of our book -- of our premium. **We also had very suboptimal processes, premium collection, enrollment and eligibility, deductibles, accumulators,** all those things that become very big pain points for members and providers.

**D.   The Wholesale Replacement of Molina's Senior Management, Including the Sudden Departure of the Individual Defendants During or Immediately Following the Class Period, Also Provides Strong Evidence of Scienter**

285.   On May 2, 2017, *without any succession plan in place*, Molina announced the termination of both CEO J. Mario Molina and CFO John C. Molina, just three months before the Company revealed that its administrative infrastructure had failed to support the Company's growth in the ACA Health Exchanges.  The Molina brothers were the architects of the Company's rapid growth strategy, as well as the 2012 through 2014 investments into administrative infrastructure.  Dale B. Wolf, the Chairman of the Board of Directors stated, "In light of the Company's disappointing financial performance, the Board has

1    determined to change leadership in order to drive profitability through operational

2    improvements. These changes represent targeted and deliberate actions to enhance

3    the Company's focus and improve its competitive position within the healthcare

4    industry." Without any replacement management structure in place, the Company

5    appointed Joseph W. White, formerly CAO of the Company, as President, CEO

6    and CFO.

7         286.   Deutsche Bank published an equity research report on May 2, 2017

8    that noted the departure of the Molina Brothers. "The Board cited the company's

9    poor financial performance as of late and determined that a change of leadership

10   was needed in order to drive operational improvements."

11        287.   Credit Suisse also published an equity research report on May 2, 2017

12   which stated:

13            ***Molina's Board sacks both Mario Molina and John Molina***: In

14            a dramatic move today, the Board of Directors has announced

15            that it will be replacing both its CEO Mario Molina and its CFO

16            John Molina, effective immediately. The Board is citing the

17            company's disappointing financial performance and the need to

18            enhance the company's focus and improve its competitive

19            position in the HC industry. In the interim, Chief Accounting

20            Office Joe White has been named Interim President, CEO, and

21            CFO. . . .Shares are responding favorably to the news: After

22            being halted mid-day, the stock is trading up +16% this

23            afternoon (vs. flat S&P) as investors are likely hoping that the

24            mgmt. changes could lead to either future improved operational

25            performance and/or a change in the Board's views on strategic

26            directions.

27        288.   In August 2017, the Company revealed that it had "doubl[ed] down on

28   existing processes" under the Molina brothers' leadership, when it should have

1   instead "strip[ped] down to the fundamentals and rebuil[t] the chassis of the

2   business."

3       289.   In Molina's supplemental proxy materials dated April 25, 2018, in

4   connection with advocating for passage of a "say-on-pay proposal," the Company

5   stated the following with respect to the Molina brothers termination: "Joseph

6   [Mario] Molina and John C. Molina were terminated by the Board of Directors

7   specifically because of the Company's poor financial performance.   .   .   .The

8   Board, the compensation committee, and Mr. Schapiro acted in the best interests of

9   the Company and our stockholders by terminating Joseph [Mario] Molina and John

10  C. Molina, notwithstanding the significant severance payments incidentally

11  triggered thereby."

12      290.   CIO Hopfer was forced to resign from Molina in October 2017,

13  shortly before COO Bayer's "retirement" on February 2, 2018.  According to

14  Molina's 2018 proxy, Bayer's retirement was deemed "a termination without

15  cause."

16      291.   Joseph White, then interim CFO, also announced his "retirement" in

17  May 2018 after 15 years at Molina.

18      292.   The fact that Molina replaced all of its senior-most executives at the

19  Company, firing the Molina brothers on May 2, 2017, three months before the end

20  of the Class Period, and forcing CIO Hopfer into "resigning" and COO Bayer into

21  "retiring" after the end of the Class Period, provides additional evidence of

22  scienter.

23      **E.   Growth in Health Plan Membership Was Extremely Important to**

24          **the Company's Success and Defendants Spoke Frequently About**

25          **Molina's Growth Strategy and Reliance on its Administrative**

26          **Infrastructure to Support that Growth**

27      293.   The Company has three reportable segments: (1) Health Plans,

28  including Molina's various HMOs; (2) Molina Medicaid Solutions ("MMS"),

1    which provides business processing, information technology development, and

2    administrative services solutions to state Medicaid agencies; and (3) Other, which

3    consists primarily of Molina's behavioral health and social services subsidiary,

4    Pathways.  The Health Plans segment accounted for 97 percent of the Company's

5    revenue in 2016 and was to be the source of the Company's growth – fueled by

6    expenditures on the Company's administrative infrastructure.   By Molina's own

7    admission, the Company's administrative infrastructure serviced all of its health

8    plans and was the "chassis of the business."

9         294.   Expansion of the Company's administrative infrastructure was of

10   critical importance to Molina's growth before and during the Class Period. From

11   2012 through 2014, Molina made significant investments to update its

12   administrative infrastructure and expansion into the ACA Marketplace.  Although

13   investors were concerned about the Company's ballooning administrative cost

14   structure, Molina executives promised that its upgraded system would underpin

15   future growth and improved profitability.  For example, in the "Business

16   Operations" section of Molina's 2014 Annual Report, Molina listed the Company's

17   administrative infrastructure as one of several strategic strengths.   Under the

18   subheading "Administrative Efficiency" the Company claimed, "Operationally, our

19   two business segments share a common systems platform, which allows for

20   economies of scale . . . . [W]e have designed our administrative and operational

21   infrastructure to be scalable for cost-effective expansion into new and existing

22   markets." From 2015 until 2017, while Molina aggressively expanded its Medicaid

23   business and extended its reach into ACA Health Exchanges, Molina executives

24   lauded the Company's "scalable admin infrastructure," which the Company

25   claimed had the capacity to support this sustained growth strategy.

26         295.   Moreover, the Individual Defendants were especially knowledgeable

27   about and intensely focused on the expansion and scalability of the infrastructure

28   as a means of supporting the Company's growth and the Individual Defendants

spoke of it frequently. For example, on May 7, 2015, in connection with the
Company's announcement of its Q1 2015 financial results, Molina executives
touted the Company's growth strategy, underpinned by its administrative
infrastructure.   CEO Mario Molina highlighted, "[the Company] delivered 38%
enrollment growth and 53% revenue growth . . . .   This success underscores the
current growth opportunities of our business and validates our strategic push to
diversify into new markets and new programs . . . and to leverage our
administrative infrastructure."   CFO Molina added, "administrative cost leverage
is improving our profitability."

296.   Similarly, on July 30, 2015, Molina announced its Q2 2015 financial
results.   During the related earnings call, CEO Mario Molina reiterated that the
Company's rapid growth, built on the foundation of Molina's administrative
infrastructure, was driving margin improvements.   CEO Mario Molina stated, "In-
market acquisitions are an important part of our growth strategy and highly
accretive, helping us to expand margins in the future . . . .   For the most part, speed
to integration . . ., coupled with our existing infrastructure, result in significant
accretion value."

297.   During an investor conference in September 2015, CEO Mario Molina
emphasized the importance of a strong administrative infrastructure in growing the
Company's business and stated that "the increasing role of data and technology . . .
is really key for managed care program[s] . . . .   [A] lot of our initiatives to
improve our margins are really about identifying who are our high-cost members."
Because Molina's administrative infrastructure could purportedly support rapid
growth, CEO Mario Molina reasoned that administrative costs would continue to
decline.   CEO Mario Molina stressed this point: "Scalable administrative
infrastructure, this is important too because as we get bigger, a lot of these services
can be shared.   It will help us to continue to drive down the administrative cost."
During the conference, one analyst queried, "Are you happy where . . . technology

1    stands now or are you thinking about an investment phase going forward?"   CEO

2    Mario Molina replied, "We have invested a lot of money and I think we're in

3    pretty good shape.   We have a . . . contract with [Palantir].   They're doing a lot of

4    work with us to help us better mine our data . . . .   I'm not sure that we're going to

5    invest more . . . ."

6         298.   On October 29, 2015, Molina announced its Q3 2015 financial results.

7    Despite a revenue miss and disappointing guidance, Molina insisted that existing

8    administrative infrastructure would support rapid growth. During the related

9    earnings call, with a focus on the Company's administrative infrastructure, CEO

10   Mario Molina elaborated on the Company's high-growth strategy for new markets:

11   "When we target a new market, our goal is to continue to diversify our geographic

12   footprint by increasing the number of state contracts that we hold.   Over the long-

13   term, this allows us to leverage our administrative infrastructure across a broader

14   revenue base and drive down costs."   With respect to existing markets, CEO

15   Mario Molina claimed, "the integration process for in-market acquisitions benefits

16   from our existing infrastructure . . . ."   CFO John Molina echoed his brother's

17   remarks: "We continue to benefit from administrative cost leverage . . . ."

18        299.   Because Molina's existing admin infrastructure was supposed to be

19   able to accommodate rapid growth, the Company could avoid additional costs.  As

20   Molina continued to grow, this would drive down G&A expenses, because G&A

21   costs could be stretched further.  Analysts largely believed the Company's repeated

22   claims regarding its infrastructure support its growth.  For example, one analyst

23   report claimed, "We should expect that the rate of G&A growth should continue to

24   slow down over the next few years as the company has already invested in the

25   infrastructure required to support top-line growth."

26        300.   On January 11, 2016, the Company presented at the JPMorgan

27   Healthcare Conference.   There, CEO Mario Molina reiterated the logic of the

28   Company's growth strategy: "It helps lower our risk the more states that we are in

1  and it gives us some administrative cost leverage as we can spread some of our

2  administrative costs over more membership."   CEO Mario Molina also

3  commented that the Company likes existing market acquisitions "because the

4  integration risk is very small.  We already have the infrastructure in place . . . .

5  [W]e're just adding more members to an existing platform."

6        301.   On February 8, 2016, Molina announced its 2015 financial results.

7  For Q4 2015, the Company reported higher costs and lower revenues than

8  expected, but it claimed that existing admin infrastructure would support rapid

9  growth. During the related earnings call, CEO Mario Molina deflected concerns

10  about disappointing fourth quarter results by highlighting the Company's 2016

11  prospects.   Specifically, CEO Mario Molina focused on the Company's rapid

12  growth strategy: "Of the nine acquisitions we announced in 2015, eight were in-

13  market or tuck-in acquisitions in four of our existing states.  These acquisitions

14  alone will add about [$1.2] billion in premium revenue . . . and allow us to spread

15  existing administrative overhead costs over a larger membership."  (alteration in

16  original).

17        302.   On February 11, 2016, the Company held its 2016 Investor Day.   The

18  Company maintained its position that existing infrastructure would support

19  continued rapid growth.  Indeed, CEO Mario Molina explained, "[O]ur Medicaid

20  portfolio . . . is the primary driver of our business . . . .  We also provide

21  information management services . . . complementary to our Medicaid business,

22  because the IT systems that we use in our health plans and the IT systems that

23  we're using to help the states manage their Medicaid information are primarily the

24  same."

25        303.   Just like it did for 2014, Molina's 2015 Annual Report itemizes the

26  Company's existing administrative infrastructure as one of its strategic strengths.

27  While it appears under a new subheading ("Scalable Administrative Infrastructure"

28  versus "Administrative Efficiency"), the Company's statement is virtually

1  identical: "Our operations share common systems platforms, which allow for

2  economies of scale . . . . [W]e have designed our administrative and operational

3  infrastructure to be scalable for cost-effective expansion into new and existing

4  markets." In the face of higher administrative costs and lower than expected

5  revenues, the Company continued to claim its administrative infrastructure was

6  "scalable" to accommodate growth into existing and new markets, including ACA

7  Health Exchanges.

8      304.   Given the foregoing statements about the expansion of the Company's

9  administrative infrastructure, as well as the importance of the infrastructure to the

10  Company's growth plans, it is unreasonable to think that the Individual

11  Defendants, who were responsible for generating, tracking, and/or reporting the

12  Company's revenue would be unaware of the financial significance of the growth

13  in the Health Plan segment and the accompanying problems in the Company's

14  administrative infrastructure due to that growth.

15      305.   Indeed, given the extent to which the Defendants spoke about the

16  issue in specific detail, they undoubtedly knew the true state of the Company's

17  administrative infrastructure.  Moreover,  given the size of the Health Plan

18  Segment and its critical importance to Molina's overall business, the problems

19  detailed herein regarding the Company's administrative infrastructure could

20  neither have occurred, nor continued without significant remediation, without the

21  Individual Defendants' knowledge and approval.

22      306.   Both the statements made in the wake of the termination of the Molina

23  brothers and the admissions made during the 2018 Investor Day demonstrate that

24  the Company's administrative infrastructure failures, pervasive throughout the

25  Company and the Class Period, negatively affected a critical aspect of Molina's

26  business.  This, coupled with Defendants' repeated and specific statements

27  regarding Molina's administrative infrastructure, support both falsity and a strong

28  inference of scienter.

## X.     LOSS CAUSATION/ECONOMIC LOSS

307.   During the Class Period, as detailed herein, Molina and the Individual Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of Molina common stock and operated as a fraud or deceit on the Class Period purchasers of Molina common stock by making the materially false and misleading statements and omissions recited above.

308.   When the truth was disclosed and became known to the market, the price of Molina common stock declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of Molina common stock at artificially inflated prices during the Class Period, Plaintiff and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in Molina common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

309.   The truth about Molina's business was disclosed through a series of corrective disclosures regarding issues with the Company's administrative infrastructure beginning after the market closed on April 28, 2016 with the release of the Company's first quarter 2016 results and concluding on August 2, 2017, with the announcement of the Company's results for the second quarter 2017 in which Defendants acknowledged a major restructuring plan due to massive challenges with the Company's administrative infrastructure which was unable to handle the Company's rapid growth.

(a)     ***April 28, 2016 – First Partial Disclosure***

(i)     The release of the Company's financial results for the first quarter ended March 31, 2016 on April 28, 2016, after the market closed, was a partial corrective disclosure in which the Company disclosed a 37% earnings

1   miss for the quarter and a 30 percent earnings guidance cut for full-year 2016,

2   blaming the poor results on higher costs related to administrative capacity issues.

3   During the Company's earnings call, CEO Mario Molina described the issues

4   facing the Company: "[W]e anticipated enrollment growth, but our results

5   exceeded even our own projections. Assimilating this membership stretched our

6   operational resources. Accordingly, we redoubled our efforts around member and

7   provider services, care and utilization management, provider payment, and

8   information technology, all areas that felt the strain of rapid growth."

9         (ii)    In reaction to these disclosures, Molina's stock price fell

10   from a close on April 28, 2016 of $64.22 per share to a close on April 29, 2016 of

11   $51.76 per share, or approximately 19.40%, on unusually high trading volume.

12   However, the Company's stock price remained artificially inflated after this partial

13   disclosure as Defendants led the market to believe that the administrative

14   infrastructure issues were under control and that the Company had sufficiently

15   added to its administrative infrastructure such that it now had the capacity to

16   increase enrollment without having "big glitches or stopgaps."

17         (b)    ***February 15, 2017 - Second Partial Disclosure***

18         (i)    The release of the Company's financial results for the

19   fourth quarter and year ended December 31, 2016 on February 15, 2017, after the

20   market closed, was a partial corrective disclosure in which the Company disclosed

21   a 4Q16 adjusted EPS loss of ($1.54) versus consensus estimates of $0.75 per share

22   driven by a sharp acceleration in losses on the public exchanges. Notwithstanding

23   Molina's prior expressions of the technical capability and commitment for a rapid

24   growth strategy in the ACA Marketplace, and assurances that the Company's

25   existing IT administrative infrastructure was sufficient, Molina executives

26   cautioned that the Company could not commit to ACA Marketplace participation

27   beyond 2017.

28         (ii)    In reaction to these disclosures, on February 16, 2017,

1  Molina's stock price fell from its close on February 15, 2017 of $59.89 per share to

2  a close of $49.18 per share on February 16, 2017, or approximately 17.88%, on

3  unusually high trading volume. However, the Company's stock price remained

4  artificially inflated after this partial disclosure.

5  (c)  ***August 2, 2017 – Final Corrective Disclosure***

6  (i)  The release of the Company's financial results for the

7  second quarter ended June 30, 2017, on August 2, 2017, after the market closed,

8  was the final corrective disclosure in which the Company disclosed a net loss of

9  $230 million for the quarter, termination of its ACA Health Exchange participation

10  in Utah and Wisconsin, and a major restructuring plan.  In addition, the Company

11  withdrew its earnings guidance for the year and admitted that its existing

12  administrative infrastructure could not handle the explosive growth resulting from

13  its ACA business and that the Company should have migrated to a new, more

14  robust system.  Indeed, Interim CEO Joseph White admitted that contrary to

15  Defendants' prior representations that Molina's administrative infrastructure was

16  "scalable" for its rapid growth strategy, in fact, Molina's existing infrastructure

17  was "designed for a much smaller, simpler business, and with its rapid growth [it]

18  experienced breakdowns in areas like provider payment, utilization management,

19  risk adjustment and information management. White also revealed that Molina had

20  known about serious issues with its existing administrative infrastructure since at

21  least as early as January 2016, and that instead of increasing the Company's

22  investments in Molina's existing administrative infrastructure, the Company

23  should have conducted a "full redesign" of its systems.

24  (ii)  The market reaction was swift and negative. On August

25  3, 2017, Molina's stock price fell from a close on August 2, 2017 of $66.24 per

26  share to a close on August 3, 2017 of $62.32 per share, a decline of approximately

27  5.92% on unusually high trading volume.

28

## XI.   CLASS ACTION ALLEGATIONS

310.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired Molina publicly traded common stock during the period from October 31, 2014 through August 2, 2017, inclusive (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Molina during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Molina's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

311.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   Throughout the Class Period, Molina stock actively traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "MOL." As of the Company's Report on Form 10-Q for the quarter ended September 30, 2016, filed on October 27, 2016, Molina had 56,821,000 shares of common stock outstanding owned by thousands of persons.

312.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)   Whether the Exchange Act was violated by Defendants;
>
> (b)   Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Molina common stock was artificially inflated or artificially maintained; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

313.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

314.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

315.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   PRESUMPTION OF RELIANCE

316.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

1          (d)    the misrepresentations alleged would tend to induce a

2    reasonable investor to misjudge the value of the Company's common stock; and

3          (e)    Plaintiff and other members of the Class purchased Molina

4    common stock between the time Defendants misrepresented or failed to disclose

5    material facts and the time the true facts were disclosed, without knowledge of the

6    misrepresented or omitted facts.

7        317.   At all relevant times, the market for Molina common stock was

8    efficient for the following reasons, among others:

9          (a)    as a regulated issuer, Molina filed periodic public reports with

10   the SEC;

11         (b)    Molina regularly communicated with public investors via

12   established market communication mechanisms, including through regular

13   disseminations of press releases on the major news wire services and through other

14   wide-ranging public disclosures, such as communications with the financial press,

15   securities analysts, and other similar reporting services;

16         (c)    Molina was followed by several securities analysts employed

17   by major brokerage firm(s) including (1) UBS; (2) Piper Jaffray; (3) Credit Suisse;

18   (4) Leerink; (5) J.P. Morgan; (6) Jefferies LLC, which wrote reports that were

19   distributed to the sales force and certain customers of their respective brokerage

20   firm(s) and that were publicly available and entered the public marketplace; and

21         (d)    Molina common stock was actively traded in an efficient

22   market, the NYSE, under the ticker symbol "MOH."

23       318.   As a result of the foregoing, the market for Molina common stock

24   promptly digested current information regarding Molina from publicly available

25   sources and reflected such information in Molina's common stock price(s).  Under

26   these circumstances, all purchasers of Molina common stock during the Class

27   Period suffered similar injury through their purchase of Molina common stock at

28   artificially inflated prices and the presumption of reliance applies.

319.   Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XIII.  NO SAFE HARBOR

320.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Molina who knew that the statement was false when made.

## XIV.  CLAIMS FOR RELIEF

### COUNT I

### For Violation of Section 10(b) of the Exchange Act

### and Rule 10b-5 Against All Defendants

321.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

322.   This Count is asserted against Molina and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

323.   During the Class Period, Molina and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

324.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and artificially maintain the market price of Molina common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Molina common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

325.   Pursuant to the above plan, scheme, conspiracy and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the Defendants made statements in quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Molina common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Molina's business, including the serious problems with the Company's administrative infrastructure.

326.   As described above, Molina and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

327.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Molina.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Molina's businesses, operations, financial condition and prospects.

328.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Molina common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Molina's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased Molina common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the securities and/or upon statements disseminated by Molina and the Individual Defendants, and were damaged thereby.

329.   During the Class Period, Molina common stock was traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Molina and the Individual Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Molina common stock at prices artificially inflated and/or artificially maintained by Defendants' wrongful conduct.

330.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Molina common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Molina common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

331.   By reason of the conduct alleged herein, Molina and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

332.   As a direct and proximate result of the wrongful conduct of Molina and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their purchases and sales of the Company's common stock during the Class Period.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

333.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

334.   During the Class Period, the Individual Defendants participated in the operation and management of Molina, and conducted and participated, directly and indirectly, in the conduct of Molina's business affairs.  Because of their senior positions, they knew the adverse non-public information about Molina's business, including the serious problems plaguing the Company's administrative infrastructure.

335.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

1    with respect to Molina's financial condition and results of operations, and to

2    correct promptly any public statements issued by Molina which had become

3    materially false or misleading.

4         336.    Because of their positions of control and authority as senior officers of

5    Molina, the Individual Defendants were able to, and did, control the contents of the

6    various reports, press releases, public filings, and other statements which Molina

7    made and disseminated in the marketplace during the Class Period concerning the

8    Company's results of operations.  In their capacities as senior officers of Molina,

9    the Individual Defendants had direct involvement in the day-to-day operations of

10   the Company and reviewing and approving the Company's public statements.

11   Throughout the Class Period, the Individual Defendants exercised their power and

12   authority to cause Molina to engage in the wrongful acts complained of herein.

13   The Individual Defendants therefore, were "controlling persons" of Molina within

14   the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

15   participated in the unlawful conduct alleged which artificially inflated and/or

16   artificially maintained the market price of Molina common stock.

17        337.    Each of the Individual Defendants, therefore, acted as a controlling

18   person of Molina.  By reason of their senior management positions and/or being

19   directors of Molina, each of the Individual Defendants had the power to direct the

20   actions of, and exercised the same to cause, Molina to engage in the unlawful acts

21   and conduct complained of herein.  Each of the Individual Defendants exercised

22   control over the general operations of Molina and possessed the power to control

23   the specific activities which comprise the primary violations about which Plaintiff

24   and the other members of the Class complain.

25        338.    By reason of the above conduct, the Individual Defendants are liable

26   pursuant to Section 20(a) of the Exchange Act for the violations committed by

27   Molina.

28

1

## PRAYER FOR RELIEF

2        WHEREFORE, Plaintiff prays for judgment as follows:

3        A.     Declaring this action to be a proper class action pursuant to Federal

4    Rule of Civil Procedure 23;

5        B.     Awarding Plaintiff and the members of the Class damages and

6    interest;

7        C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

8        D.     Awarding such equitable, injunctive or other relief as the Court may

9    deem just and proper.

10

## JURY DEMAND

11        Plaintiff demands a trial by jury.

12   DATED:  October 5, 2018                Respectfully submitted,
                                            By:   /s/ Christine M. Fox
13

14                                          Jonathan Gardner (*pro hac vice*)
                                            Michael P. Canty (*pro hac vice application*
15                                          *filed*)
                                            Christine M. Fox (*pro hac vice*)
16                                          Theodore J. Hawkins (*pro hac vice*)
17                                          **LABATON SUCHAROW LLP**
18                                          140 Broadway
                                            New York, New York 10005
19                                          Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
20                                          Emails: jgardner@labaton.com
21                                                   mcanty@labaton.com
                                                     cfox@labaton.com
22                                                   thawkins@labaton.com
23

24                                          *Counsel for Lead Plaintiff Steamfitters*
                                            *Local 449 Pension Plan and the Proposed*
25                                          *Class*

26

27

28

Robert V. Prongay (#270796)
Lesley F. Portnoy (#304851)
**GLANCY PRONGAY & MURRAY
LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Liaison Counsel for Plaintiff Steamfitters
Local 449 Pension Plan*

**EXHIBIT A:**

**CLASS PERIOD TRADING BY DEFENDANTS**

**(10/31/14 – 8/2/14)**

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Molina (J. Mario) | 60,000 | $48.67 | $2,920,200.00 | 05-Nov-2014 |
| Molina (J. Mario) | 60,000 | $51.11 | $3,066,600.00 | 03-Dec-2014 |
| Molina (J. Mario) | 10,000 | $60.87 | $608,700.00 | 19-Feb-2015 |
| Molina (J. Mario) | 10,000 | $60.87 | $608,700.00 | 19-Feb-2015 |
| Molina (J. Mario) | 10,000 | $60.87 | $608,700.00 | 19-Feb-2015 |
| Molina (J. Mario) | 34,000 | $61.89 | $2,104,260.00 | 04-Mar-2015 |
| Molina (J. Mario) | 34,000 | $67.20 | $2,284,800.00 | 06-Apr-2015 |
| Molina (J. Mario) | 34,000 | $58.46 | $1,987,640.00 | 05-May-2015 |
| Molina (J. Mario) | 34,000 | $69.17 | $2,351,780.00 | 03-Jun-2015 |
| Molina (J. Mario) | 34,000 | $69.60 | $2,366,400.00 | 06-Jul-2015 |
| Molina (J. Mario) | 20,000 | $77.32 | $1,546,400.00 | 05-Aug-2015 |
| Molina (J. Mario) | 20,000 | $74.04 | $1,480,800.00 | 03-Sep-2015 |
| Molina (J. Mario) | 20,000 | $68.62 | $1,372,400.00 | 05-Oct-2015 |
| Molina (J. Mario) | 27,000 | $65.12 | $1,758,240.00 | 05-Nov-2015 |
| Molina (J. Mario) | 22,831 | $60.40 | $1,378,992.40 | 03-Dec-2015 |
| Molina (J. Mario) | 4,169 | $60.35 | $251,599.15 | 04-Dec-2015 |
| Molina (J. Mario) | 10,000 | $60.83 | $608,300.00 | 05-Jan-2016 |
| Molina (J. Mario) | 10,000 | $60.00 | $600,000.00 | 18-Feb-2016 |
| Molina (J. Mario) | 10,000 | $64.43 | $644,300.00 | 03-Mar-2016 |
| Molina (J. Mario) | 15,000 | $66.09 | $991,350.00 | 12-Jun-2017 |
| Molina (J. Mario) | 15,000 | $68.58 | $1,028,700.00 | 03-Jul-2017 |
| Molina (J. Mario) | 15,000 | $66.67 | $1,000,050.00 | 02-Aug-2017 |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| **Total Shares Sold and Proceeds** | **509,000** | | **$31,568,911.55** | |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Molina (John C) | 15,000 | $48.80 | $732,000.00 | 05-Nov-2014 |
| Molina (John C) | 5,550 | $48.29 | $268,009.50 | 06-Nov-2014 |
| Molina (John C) | 15,000 | $52.49 | $787,350.00 | 05-Feb-2015 |
| Molina (John C) | 4,070 | $52.28 | $212,779.60 | 06-Feb-2015 |
| Molina (John C) | 15,000 | $58.54 | $878,100.00 | 05-May-2015 |
| Molina (John C) | 2,077 | $58.70 | $121,919.90 | 06-May-2015 |
| Molina (John C) | 15,000 | $70.34 | $1,055,100.00 | 19-May-2015 |
| Molina (John C) | 6,332 | $70.29 | $445,076.28 | 20-May-2015 |
| Molina (John C) | 15,933 | $78.45 | $1,249,943.85 | 21-Sep-2015 |
| Molina (John C) | 20,570 | $60.80 | $1,250,656.00 | 21-Dec-2015 |
| Molina (John C) | 19,678 | $63.56 | $1,250,733.68 | 21-Mar-2016 |
| Molina (John C) | 25,014 | $60.00 | $1,500,840.00 | 24-Oct-2016 |
| Molina (John C) | 9 | $60.00 | $540.00 | 20-Jan-2017 |
| Molina (John C) | 20,341 | $49.19 | $1,000,573.79 | 06-Mar-2017 |
| Molina (John C) | 15,393 | $65.00 | $1,000,545.00 | 03-May-2017 |
| Molina (John C) | 15,123 | $66.16 | $1,000,537.68 | 12-Jun-2017 |
| Molina (John C) | 21,277 | $70.53 | $1,500,666.81 | 18-Jul-2017 |
| **Total Shares Sold and Proceeds** | **231,367** | | **$14,255,372.09** | |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Bayer (Terry P) | 11,250 | $48.75 | $548,437.50 | 05-Nov-2014 |
| Bayer (Terry P) | 31,500 | $48.76 | $1,535,940.00 | 05-Nov-2014 |
| Bayer (Terry P) | 7,446 | $61.85 | $460,535.10 | 05-Mar-2015 |
| Bayer (Terry P) | 21,000 | $69.01 | $1,449,210.00 | 15-May-2015 |
| Bayer (Terry P) | 3,183 | $81.60 | $259,732.80 | 17-Aug-2015 |
| Bayer (Terry P) | 8,250 | $81.59 | $673,117.50 | 17-Aug-2015 |
| Bayer (Terry P) | 8,250 | $58.00 | $478,500.00 | 02-Aug-2016 |
| Bayer (Terry P) | 7,825 | $60.00 | $469,500.00 | 24-Oct-2016 |
| Bayer (Terry P) | 7,952 | $67.79 | $539,066.08 | 09-May-2017 |
| Bayer (Terry P) | 17,096 | $66.97 | $1,144,919.12 | 10-May-2017 |
| Bayer (Terry P) | 9,673 | $66.71 | $645,285.83 | 11-May-2017 |
| Bayer (Terry P) | 283 | $67.47 | $19,094.01 | 13-Jun-2017 |
| Bayer (Terry P) | 15,088 | $70.00 | $1,056,160.00 | 14-Jun-2017 |
| Bayer (Terry P) | 415 | $69.24 | $28,734.60 | 03-Jul-2017 |
| **Total Shares Sold and Proceeds** | **149,211** | | **$9,308,232.54** | |

## CONTROL PERIOD TRADING BY DEFENDANTS

### (1/28/12 – 10/30/14)

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Molina (J. Mario) | 14,800 | $33.68 | $498,464.00 | 01-Mar-2012 |
| Molina (J. Mario) | 15,200 | $33.08 | $502,816.00 | 08-Mar-2012 |
| Molina (J. Mario) | 30,000 | $32.88 | $986,400.00 | 13-Mar-2012 |
| Molina (J. Mario) | 20,300 | $32.83 | $666,449.00 | 13-Mar-2012 |
| Molina (J. Mario) | 60,000 | $27.83 | $1,669,800.00 | 27-Nov-2012 |
| Molina (J. Mario) | 25,000 | $27.33 | $683,250.00 | 28-Nov-2012 |
| Molina (J. Mario) | 34,000 | $51.87 | $1,763,580.00 | 05-Jan-2014 |
| Molina (J. Mario) | 34,000 | $51.63 | $1,755,420.00 | 04-Feb-2014 |
| **Total Shares Sold and Proceeds** | **233,300** | | **$8,526,179.00** | |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Molina (John C) | 30,000 | $33.50 | $1,005,000.00 | 01-Mar-2012 |
| Molina (John C) | 20,000 | $33.61 | $672,200.00 | 01-Mar-2012 |
| Molina (John C) | 15,000 | $24.91 | $373,650.00 | 01-Jun-2012 |
| Molina (John C) | 30,000 | $24.91 | $747,300.00 | 01-Jun-2012 |
| Molina (John C) | 15,000 | $24.84 | $372,600.00 | 15-Aug-2012 |
| Molina (John C) | 15,000 | $24.83 | $372,450.00 | 15-Aug-2012 |
| Molina (John C) | 7,500 | $28.83 | $216,225.00 | 30-Jan-2013 |
| Molina (John C) | 7,500 | $28.65 | $214,875.00 | 31-Jan-2013 |
| Molina (John C) | 5,000 | $28.74 | $143,700.00 | 01-Feb-2013 |
| Molina (John C) | 7,500 | $28.63 | $214,725.00 | 04-Feb-2013 |
| Molina (John C) | 7,500 | $28.53 | $213,975.00 | 05-Feb-2013 |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Molina (John C) | 5,000 | $28.63 | $143,150.00 | 06-Feb-2013 |
| Molina (John C) | 7,500 | $31.11 | $233,325.00 | 11-Feb-2013 |
| Molina (John C) | 7,500 | $31.24 | $234,300.00 | 12-Feb-2013 |
| Molina (John C) | 5,000 | $33.48 | $167,400.00 | 13-Feb-2013 |
| Molina (John C) | 7,500 | $32.60 | $244,500.00 | 19-Feb-2013 |
| Molina (John C) | 7,500 | $32.99 | $247,425.00 | 20-Feb-2013 |
| Molina (John C) | 5,000 | $32.86 | $164,300.00 | 21-Feb-2013 |
| Molina (John C) | 7,500 | $32.78 | $245,850.00 | 25-Feb-2013 |
| Molina (John C) | 7,500 | $32.07 | $240,525.00 | 26-Feb-2013 |
| Molina (John C) | 5,000 | $31.95 | $159,750.00 | 27-Feb-2013 |
| Molina (John C) | 10,000 | $36.04 | $360,400.00 | 24-Jun-2013 |
| Molina (John C) | 10,000 | $36.05 | $360,500.00 | 25-Jun-2013 |
| Molina (John C) | 7,723 | $36.13 | $279,031.99 | 26-Jun-2013 |
| Molina (John C) | 15,000 | $35.49 | $532,350.00 | 09-Sep-2013 |
| Molina (John C) | 15,000 | $35.65 | $534,750.00 | 10-Sep-2013 |
| **Total Shares Sold and Proceeds** | **282,723** | | **$8,694,256.99** | |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Bayer (Terry P) | 5,000 | $34.00 | $170,000.00 | 28-Feb-2012 |
| Bayer (Terry P) | 5,000 | $33.31 | $166,550.00 | 09-Mar-2012 |
| Bayer (Terry P) | 1,270 | $24.50 | $31,115.00 | 01-Aug-2012 |
| Bayer (Terry P) | 426 | $24.50 | $10,437.00 | 07-Aug-2012 |
| Bayer (Terry P) | 9,071 | $25.08 | $227,500.68 | 09-Aug-2012 |
| Bayer (Terry P) | 3,228 | $25.48 | $82,249.44 | 17-Aug-2012 |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Bayer (Terry P) | 3,228 | $23.96 | $77,342.88 | 13-Sep-2012 |
| Bayer (Terry P) | 4,526 | $29.66 | $134,241.16 | 13-Dec-2012 |
| Bayer (Terry P) | 8,439 | $37.90 | $319,838.10 | 17-May-2013 |
| Bayer (Terry P) | 22,815 | $36.95 | $843,014.25 | 20-Feb-2014 |
| **Total Shares Sold and Proceeds** | **63,003** | | **$2,062,288.51** | |

1

**PROOF OF SERVICE BY ELECTRONIC POSTING**

2

I, the undersigned say:

3

I am not a party to the above case, and am over eighteen years old. On

4

October 5, 2018, I served true and correct copies of the foregoing document, by

5

posting the document electronically to the ECF website of the United States

6

District Court for the Central District of California, for receipt electronically by the

7

parties listed on the Court's Service List.

8

I affirm under penalty of perjury under the laws of the United States of

9

America that the foregoing is true and correct. Executed on October 5, 2018, at

10

New York, New York.

11

12

13

*s/ Christine M. Fox*

14

Christine M. Fox

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case**

**2:18-cv-03579-R-JC**

***Steamfitters Local 449 Pension Plan v. Molina Healthcare, Inc. et al***

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Manuel A Abascal**
  manny.abascal@lw.com,manuel-abascal-7112@ecf.pacerpro.com

- **Anthony P Alden**
  anthonyalden@quinnemanuel.com,
  marjannassiri@quinnemanuel.com,calendar@quinnemanuel.com

- **Michael P Canty**
  mcanty@labaton.com

- **John C Dwyer**
  jdwyer@cooley.com,bgiovannoni@cooley.com

- **Christine M Fox**
  cfox@labaton.com,kgutierrez@labaton.com,
  fmalonzo@labaton.com,acarpio@labaton.com,
  electroniccasefiling@labaton.com

- **Jonathan Gardner**
  jgardner@labaton.com,kgutierrez@labaton.com,
  4027988420@filings.docketbird.com

- **Theodore J Hawkins**
  thawkins@labaton.com

- **Kendall Madison Howes**
  kendall.howes@lw.com

- **Jeffrey David Lombard**
  jlombard@cooley.com,jdouglas@cooley.com,
  kpeterson@cooley.com,jsimpsonlagoy@cooley.com

- **Francis P McConville**
  fmcconville@labaton.com,kgutierrez@labaton.com,
  drogers@labaton.com,9849246420@filings.docketbird.com,
  electroniccasefiling@labaton.com

- **Robert W Perrin**
  robert.perrin@lw.com,robert-perrin-9328@ecf.pacerpro.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,
  info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **James N. Rotstein**
  james.rotstein@lw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing).

- (No manual recipients)