LATHAM & WATKINS LLP
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
  Robert W. Perrin (Bar No. 194485)
  *robert.perrin@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  +1.213.485.1234
Facsimile:  +1.213.891.8763

  Attorneys for Molina Healthcare, Inc.,
  Terry P. Bayer, and Rick Hopfer

COOLEY LLP
  John C. Dwyer (136533)
  *dwyerjc@cooley.com*
  Shannon M. Eagan (212830)
  *seagan@cooley.com*
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:  (650) 843-5000
Facsimile:   (650) 849-7400

  Attorneys for Defendants J. Mario Molina and
  John C. Molina

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION PLAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MOLINA HEALTHCARE, INC., J. MARIO MOLINA, JOHN C. MOLINA, TERRY P. BAYER, and RICK HOPFER <br><br> Defendants. | Case No.: 2:18-cv-03579-R-JC <br><br> **<u>CLASS ACTION</u>** <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS** <br><br> Date:     December 3, 2018 <br> Time:     10:00 a.m. <br> Ctrm.:    880 <br> Judge:    Hon. Manuel L. Real |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 3, 2018 at 10:00 a.m., or at such later date and time as the Court may order, in the Courtroom of the Honorable Manuel L. Real, located at 255 East Temple Street, Los Angeles, California 90012, Defendants Molina Healthcare, Inc., ("Molina" or the "Company" J. Mario Molina, John Molina, Terry P. Bayer, and Rick Hopfer ("Individual Defendants"; together with the Company, "Defendants") will and hereby do move for an Order dismissing with prejudice the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "FAC") that Plaintiff Steamfitters Local 449 Pension Plan ("Plaintiff") filed on October 5, 2018.  (Dkt. No. 47.)  This Motion is made pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

Defendants' Motion is made on the following grounds:

(1)    Plaintiff's FAC fails to state a claim for relief against Defendants for violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78 *et seq.* ("Section 10(b)"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), because Plaintiff does not plead with particularity any false or misleading statement or omission by Defendants.  *See* Fed. R. Civ. P. 12(b)(6) & 9(b).

(2)    Plaintiff's FAC fails to state a claim for relief against Defendants for violation of Section 10(b) and Rule 10b-5 because Plaintiff does not plead detailed facts establishing a strong inference of scienter as to Defendants.  *See id.*

(3)    Plaintiff's FAC fails to state a claim for relief against the Individual Defendants for violation of Section 20(a) of the Securities Exchange Act because Plaintiff fails to allege a primary violation of Section 10(b).  *See id.*

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Robert W. Perrin and exhibits thereto, Defendants' Request for Judicial Notice and for Incorporation of Documents By Reference, the FAC, the Court's record on this

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

matter, the arguments of counsel, and other evidence and argument that may be presented prior to the Court's decision on this Motion.


Dated:  October 19, 2018

Respectfully submitted,

By /s/ *Robert W. Perrin*
    Robert W. Perrin

Attorneys for Defendants Molina Healthcare, Inc., Terry P. Bayer, and Rick Hopfer


Dated:  October 19, 2018

Respectfully submitted,

By /s/ *John C. Dwyer*
    John C. Dwyer

Attorneys for Defendants J. Mario Molina and John C. Molina

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

ii

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................. 1

II.    FACTUAL BACKGROUND ........................................................... 3

       A.    Molina's Business ................................................................. 3

       B.    Molina's Strategic Decision To Enter The ACA Marketplace ............................................................ 4

       C.    Molina Prepares For Growth Into The ACA Marketplace ................. 4

       D.    Molina Discloses Operational Difficulties in 2016 on Account of Rapid Growth .............................. 5

       E.    Molina Makes Changes In 2017 ........................................... 6

       F.    The Current Action ............................................................... 7

III.   ARGUMENT .................................................................................. 8

       A.    Plaintiff Fails To Plead An Actionable Misrepresentation ............... 9

             1.    Plaintiff's Puzzle-Style Pleading Violates the PSLRA ..................................................... 10

             2.    The Allegedly False Statements Are Protected Under The PSLRA's Safe Harbor ................... 11

             3.    The Challenged Statements Include Non-Actionable "Puffery ........................................ 14

             4.    The Challenged Statements Include Non-Actionable Statements Of Opinion ......................... 16

             5.    The FAC Fails to Identify Any Statements that were False When Made ................................ 18

       B.    Plaintiff Fails To Establish A Strong Inference Of Scienter ............... 22

             1.    The Confidential-Witness Allegations Do Not Support An Inference Of Scienter ................... 23

             2.    The Replacement of Molina's Management Team Does Not Support An Inference Of Scienter .......... 28

             3.    The Company's "After-The-Fact" Statements Do Not Create an Inference of Scienter ............... 29

             4.    CEO Molina's, CFO Molina's, and Bayer's Stock Sales Do Not Support An Inference Of Scienter .... 30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

a.    The Amount And Percentage Of Shares Sold Are Not Suspicious ...................................................... 30

b.    The Timing Of The Stock Sales Was Not Suspicious ...................................................................... 31

c.    The Stock Sales Were Consistent With Defendants' Prior Trading Histories ........................... 32

5.    The Company's Emphasis On Strategic Growth Does Not Support An Inference Of Scienter .......................... 33

6.    Viewed Holistically, The FAC Creates No Inference of Scienter .............................................................. 34

C.    Plaintiff Fails To State A Claim Under Section 20(a) Against The Individual Defendants .................................................. 34

IV.    CONCLUSION ................................................................................. 35

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Accuray, Inc. S'holder Derivative Litig.*,
757 F. Supp. 2d 919 (N.D. Cal. 2010)................................................................29

*In re Am. Apparel, Inc. S'holder Litig.*,
855 F. Supp. 2d 1043 (C.D. Cal. 2012) ................................................. 16, 19, 30

*In re Apple Comput., Inc.*,
127 Fed. App'x 296 (9th Cir. 2005) .....................................................19, 23

*In re Apple Comput., Inc., Sec. Litig.*,
243 F. Supp. 2d 1012 (N.D. Cal. 2002)................................................................22

*Avila v. LifeLock Inc.*,
2017 WL 3669615 (D. Ariz. Aug. 21, 2017).......................................27

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (N.D. Cal. 2009)................................................................20

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009)................................................................31

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)................................................11

*by South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)................................................................30

*Callan v. Motricity Inc.*,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013), *aff'd sub nom.*
*Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) ...........................16

*City of Dearborn Heights Act 345 Police & Ret. Syst. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)................................................................17

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012)................................................................14

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017)................................................................30

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010).........................................................9, 11, 15, 16

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008) ................................................22, 26

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)................................................24

LATHAM&WATKINS␣LLP
ATTORNEYS AT LAW
LOS ANGELES

v

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................................8

*Emp'rs Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
  353 F.3d 1125 (9th Cir. 2004) ....................................................................14

*Fialkov v. Microsoft Corp.*,
  72 F. Supp. 3d 1220 (W.D. Wash. 2014) ..................................................19

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012) .......................................9, 13, 16

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir.1994) (en banc), *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011) ........................................................................................................9

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) .....................................................................23

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
  2017 WL 114401 (C.D. Cal. Jan. 9, 2017) .........................................11, 16

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ....................................................33

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 12734014 (C.D. Cal. July 28, 2015) ....................................32, 33

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 Fed. App'x 592 (9th Cir. 2015) ....................32

*Lapiner v. Camtek, Ltd.*,
  2011 WL 445849 (N.D. Cal. Feb. 2, 2011) ...............................................10

*In re Leapfrog Enter., Inc. Sec. Litig.*,
  200 F. Supp. 3d 987 (N.D. Cal. 2016) .......................................................14

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ..............................................................22, 26

*Lomingkit v. Apollo Educ. Group Inc.*,
  2017 WL 633148 (D. Ariz. Feb. 16, 2017) ...........................................11, 13

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) .........................................................32

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ......................................................32

*Markette v. XOMA Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ..........................................17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

vi

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

*McDonald v. Compellent Tech., Inc.*,
2011 WL 13228408 (D. Minn. Aug. 3, 2011) ...............................................16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)...............................................................8, 31, 33

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011) ........................................................20

*In re Nuvelo, Inc., Sec. Litig.*,
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008).................................................14

*In re Nuverra Envtl. Sols. Sec. Litig.*
(D. Ariz. Nov. 17, 2014) ..............................................................................28

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d. 871 (D. Minn. 2007) *aff'd* 527 F.3d 749 (8th Cir.
2008) ...............................................................................................................18

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th. Cir. 2014)..................................................... 8, 22, 26, 35

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ..............................................31

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund*,
135 S. Ct. 1318 (2015) ..................................................................................16

*Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*,
2013 WL 1192004 (E.D.N.C. March 22, 2013) ...........................................16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051
(9th Cir. 2014) ...............................................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)...................................................... 11, 12, 13, 15

*In re Read-Rite Corp.*,
2004 WL 2125883 (N.D. Cal. Sept. 22, 2004) .............................................18

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)....................................................................18, 24

*Rok v. Identiv, Inc.*,
2017 WL 35496, *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716
F. App'x 663 (9th Cir. 2018) ........................................................................19

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001).................................................................*passim*

*In re Sierra Wireless, Inc. Sec. Litig.*,
482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..........................................................18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999), *superseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) ..................................................................8, 26

*Solow v. Citigroup, Inc.*,
  2012 WL 1813277 (S.D.N.Y. May 18, 2012) ...............................................34

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................ 10, 14, 31

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ........................................................................20

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ..........................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................ 8, 9, 22, 34

*In re Tibco Software, Inc. Sec. Litig.*,
  2006 WL 1469654 (N.D. Cal. May 25, 2006) ...............................................23

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002) .........................................................28

*In re Vantive Corporation Securities Litigation*,
  283 F.3d 1079 (9th Cir. 2002) ................................................................30, 31

*In re Vical Inc. Sec. Litig.*,
  2015 WL 1013827 (S.D. Cal. Mar. 9, 2015) .................................................30

*Waterford Twp. Police v. Mattel, Inc.*,
  321 F. Supp. 3d 133 (C.D. Cal. 2018) .........................................................9, 22

*Wochos v. Tesla, Inc.*,
  2018 WL 4076437 (N.D. Cal. Aug. 27, 2018) ..............................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .......................................................... 22, 23, 27, 28

**STATUTES**

15 U.S.C.
  § 78u-4(b)(1) ....................................................................................................9
  § 78u-4(b)(3)(A) ...............................................................................................9
  § 78u-5(c)(1)(A)(i) ..........................................................................................11
  § 78u-5(c)(1)(B) ..............................................................................................14

Patient Protection and Affordable Care Act of 2010 .....................................*passim*

Private Securities Litigation Reform Act of 1995............................................*passim*

LATHAM&WATKINS⊔ᴘ
ATTORNEYS AT LAW
LOS ANGELES

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Securities Exchange Act of 1934
  § 10(b) ..................................................................................................*passim*
  § 20(a) ..................................................................................................8, 34

**RULES**

Fed. R. Civ. P.
  9(b) ......................................................................................................9, 22
  12(b)(6)..................................................................................................8

**REGULATIONS**

17 C.F.R. 240.10b-5................................................................................8, 20

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

ix

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

## I.   INTRODUCTION

Plaintiff's putative securities class action against Defendant Molina Healthcare, Inc. ("Molina" or the "Company") and its former officers is exactly the type of "fraud by hindsight" claim that the Private Securities Litigation Reform Act ("PSLRA") was enacted to prevent.

Since its founding in Long Beach in 1980, Molina's business has been to serve the underserved, *i.e.*, to provide managed care services to low-income and elderly individuals.  The enactment of the Patient Protection and Affordable Care Act ("ACA") in 2010 presented both a huge challenge and a huge opportunity for Molina's business.  Molina made the strategic decision to go into the new ACA healthcare marketplace with both feet, and turn its existing Medicaid and Medicare-focused business into one that could participate in newly formed ACA Health Exchanges, as well as expand its Medicaid business.  To prepare for this growth, Molina invested millions of dollars into its administrative infrastructure by hiring new employees, conducting extensive training, and improving its IT software.  It also engaged in numerous acquisitions to bolster its membership and expand into different states.

The results were initially promising.  After the ACA took effect in 2014, enrollment in Molina's managed care programs "exploded," going from approximately 2.2 million total members in 2014 to over 4.2 million members by the end of 2016—exceeding even its own "optimistic expectations."  Revenue was higher than expected throughout most 2015.  Not until early 2016 did the Company realize that despite its investment and efforts, its administrative infrastructure was struggling to keep up with this exponential growth, resulting in disappointing financial results.  The Company disclosed this fact at that time, and noted its belief that the growth would stabilize.  It didn't.  By 2017, the Company realized and candidly disclosed that it had failed to "fully appreciate" the scope of the growth it would experience and "the unique demands" of the ACA, that its

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

investments in its administrative infrastructure had likely been made in "the wrong direction," and that "[i]n hindsight, [management's strategic decision] was a mistake."

Now, Plaintiff seeks to take the Company's forthright acknowledgment of a business "mistake," and turn it into a "hindsight" admission of fraud.  To do this, Plaintiff asserts that virtually every statement the Company made over a three-year period regarding its infrastructure, its cost leverage, its investments, and its efforts to address problems as they arose, was false.  But Plaintiff fails to plead *any* facts suggesting that the Defendant officers who made those statements did not believe them to be true at the time.  This pleading failure dooms its Amended Class Action Complaint ("FAC").

As an initial matter, Plaintiff fails to plead "falsity"—the starting point of a Section 10(b) claim.  Virtually all of the statements identified by Plaintiff as "false" were non-actionable forward-looking statements, accompanied by comprehensive, meaningful cautionary language making clear that actual future results might differ.  Most of the purportedly "false" statements were also either "puffery" (*i.e.*, generic statements of corporate optimism) or statements of opinion, neither of which can support a claim.  Moreover, as to *all* of the challenged statements, Plaintiff fails to plead facts demonstrating that they were false at the time they were made, in particular, because the relevant risks were disclosed to the market.

Plaintiff's inability to plead falsity is compounded by its complete failure to plead scienter.  To meet the PSLRA's "exacting" scienter pleading requirements, Plaintiff must plead in "great detail" allegations creating a strong inference that the Defendants engaged in "conscious misconduct" or were "deliberately reckless" in making the statements at issue.  Nothing pled here approaches that standard.  To their old allegations, Plaintiff's FAC has added comments from five "Confidential Witnesses" ("CWs"), summary references to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

various internal reports and meetings at which "problems" were discussed, and descriptions of allegedly "suspicious" stock sales by some of the individual defendants during the Class Period.  None of these allegations even *suggest* that Defendants acted with an intent to defraud, much less create the cogent and compelling inference of scienter required to survive a motion to dismiss.  At worst, the FAC paints a picture of alleged strategic errors or corporate mismanagement, but nothing resembling securities fraud.

For all of these reasons, and those detailed below, the FAC should be dismissed with prejudice.

## II.   FACTUAL BACKGROUND[1]

### A.   Molina's Business

Founded in 1980, Molina is a managed care company based in Long Beach, California that provides healthcare services under Medicaid, Medicare, and other government-sponsored healthcare programs.  (¶¶ 1, 2, 28.)  Molina's Medicaid-related programs are aimed at meeting the healthcare needs of low-income families and individuals, while its "Medicare Advantage" plan "provides persons 65 and older with a variety of hospital, medical insurance and prescription drug benefits."  (¶¶ 43, 49.)  As of December 31, 2016, Molina's health plans served over 4.2 million members in California and 11 other states, as well as in the Commonwealth of Puerto Rico.  (¶ 46.)  Molina's health plans are operated by its wholly-owned subsidiaries, each of which is licensed as a health maintenance organization ("HMO").  (¶ 2.)

Defendants J. Mario Molina ("CEO Molina") and John C. Molina ("CFO Molina") are the sons of Molina's founder, Dr. C. David Molina, and until their departure in May 2017, long served as its executive leadership.  CEO Molina was President and Chief Executive Officer ("CEO") of Molina from 1996 until May

---

[1]   For the purposes of this motion only, Defendants assume the truth of the allegations in the FAC.  Hereinafter, all references to the FAC will be noted by paragraph only, as follows "(¶ __.)"

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

2, 2017.  (¶ 28.)  CFO Molina served as Chief Financial Officer ("CFO") of Molina from 2003 until May 2, 2017.  (¶ 29.)

Defendant Terry P. Bayer served as Chief Operating Officer ("COO") of Molina "during all relevant times," until her retirement on February 2, 2018.  (¶ 30.)  Defendant Rick Hopfer served as Chief Information Officer ("CIO") of Molina from January 2011 until October 2017.  (¶ 31.)

## B.  Molina's Strategic Decision To Enter The ACA Marketplace

The 2010 passage of the ACA transformed the entire domestic healthcare industry.  The ACA provided for the creation of "Marketplace" insurance exchanges ("ACA Health Exchanges") that would allow individuals and groups to purchase federally subsidized health insurance beginning January 1, 2014, and provided for an expansion of Medicaid.  (¶ 51.)  The ACA thus represented a huge business opportunity for companies like Molina to expand their managed care business into new geographies and to receive from the government new patient populations.  (*See* ¶ 52.)  As Molina disclosed to the investing public, the programmatic changes associated with the implementation of the ACA Health Exchanges—which were wholly novel creations—were completely unfamiliar to all healthcare companies.  (Robert W. Perrin Declaration ("Perrin Decl."), Ex. 2.)[2]  Thus, Molina had to make certain strategic decisions and projections even before it knew how the ACA would be implemented or the ACA Health Exchanges would work.  (*See* ¶¶ 52, 54-56.)

## C.  Molina Prepares For Growth Into The ACA Marketplace

To prepare for the ACA Health Exchanges, Molina engaged in a "massive CapEx spend into Molina's existing administrative infrastructure." (¶ 222.) These infrastructure-related expenditures included significant investment in the software platform by which Molina processed enrollments and managed its

---

[2]   Hereinafter, all references to exhibits attached to Perrin Decl. will be noted by "Ex." only.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

4

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

claims administration process, which was known as the "QNXT Enterprise Core Administration System" ("QNXT")—a commercially available product. (¶ 50, n. 8.) These expenditures also included hiring and training new and existing employees, and making acquisitions to expand its footprint and leverage its administrative costs across multiple entities. (¶¶ 3, 169, 172.)

Molina's plan of expansion initially bore fruit. The Company received hundreds of thousands of new Medicaid expansion members as a result of the ACA's focus on previously uninsured individuals. The Company also took part in nine acquisitions in 2015 intended to bring in significant revenue. (¶¶ 60, 63-64, 302.) Its membership grew dramatically, ultimately "doubl[ing] in size" in less than 3 years. (¶ 44.) It also had steady revenue growth, and increased its net income in the first three quarters of 2015. (*See* ¶¶ 144, 147, 152, 156.)

### D.    Molina Discloses Operational Difficulties in 2016 on Account of Rapid Growth

But as Molina had steadily cautioned investors, there were still significant risks and uncertainties associated with the ACA and how it would impact Molina's business and its strategy, including that Molina's systems and management might be unable to keep up the pace of its growth. (*See*, Exs. 1-2.) And, in early 2016, the Company learned and immediately disclosed that its growth was presenting such a challenge. (*See* ¶¶ 156, 164-65.) Specifically, the Company candidly informed the market that the exponential growth in its enrollment had led to some difficulties with the operation of its administrative systems, which included increased strain on QNXT and Molina's employees. (¶¶ 164-65.) These strains, coupled with other infrastructure difficulties, impacted Molina's financial performance, resulting in greater than expected losses and a miss of projected earnings by 37 percent in the first quarter of 2016. (*See* ¶ 164.) CEO Molina explained that the enrollment boom "exceeded even our optimistic expectations," and these levels of enrollment had "affected claims

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

and the processing of enrollment and premiums." (¶ 165.) CEO Molina noted, however, "[w]e expect the remainder of 2016 to be more stable." (*Id.*)

To address the difficulties, CEO Molina stated that the Company was "redoubl[ing] [its] efforts around member and provider services, care and utilization management, provider payment, and information technology, all areas that felt the strain of rapid growth." (*Id.*) Over the course of 2016, Molina announced a series of further investments in improvements to its administrative systems, including (among others) an update to its data systems infrastructure in July 2016 (¶¶ 181-82), an acceleration of "improvements that were already planned and budgeted for 2016" (¶ 184); and an upgrade to a newer version of its existing enterprise core administration platform. (¶ 188.)

But the growth did not stabilize. By December 31, 2016, Molina's Medicaid programs had over 3.2 million members (compared to 2.2 million at the end of 2014), and Molina's ACA Marketplace enrollment had grown from 15,000 members at the end of 2014 to approximately 526,000 members. (¶ 46.)

### E.   Molina Makes Changes In 2017

Despite its efforts at systems improvement (which Plaintiff variously refers to as "patches" or "retrofits" (¶¶ 4, 75, 82, 91, 97, 105, 121, 131, 277)), Molina's financial underperformance continued into 2017, as the Company continued to struggle to manage its growth and adjust to the changes in healthcare services occasioned by the ACA. (¶ 15.) In response to the financial underperformance, as well as potential changes in the ACA landscape due to the administration change, Molina made several significant operational changes.

First, the Company announced in February 2017 that it could not commit to participating in ACA Health Exchanges beyond 2017, as "there [were] simply too many unknowns with the marketplace program." (¶¶ 193-94.) Specifically, Molina stated it would "wait and see how the new administration and Congress

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

will adjust the program" and that Molina would further "evaluate [its] participation on a state-by-state basis." (¶ 194.)

Second, on account of its financial underperformance, Molina made changes in its leadership team. On May 2, 2017, Molina made the decision to replace both CEO Molina and CFO Molina—both of whom had spent most of their professional lives at the Company— and named Joseph W. White as interim President and CEO and CFO. (¶ 212.)

And finally, on August 2, 2017, as the Company announced an operating loss of $230 million for the second quarter of 2017 and the termination of its ACA Health Exchange participation in Utah and Wisconsin, it also announced a plan to restructure the Company with the goal of improving its financial performance. (¶ 218.) CEO White explained Molina's financial underperformance by acknowledging that Molina "did not properly adjust [its] business to absorb the growth that resulted from the Affordable Care Act" and that it "did not fully appreciate that growth in the ACA Marketplace required robust development of new capabilities that [Molina] did not have." (¶ 219.) Instead, Molina "had prepared for that growth by spending more on existing processes, procedures, capabilities and technologies," which White acknowledged had ultimately proved to be an ineffective strategy: "[i]n hindsight, [management's strategic decision] was a mistake." (*Id.*) White further opined that "[i]nstead of increasing investment in existing processes, we should have conducted the full redesign of our business we are doing now." (*Id.*)

### F.    The Current Action

Plaintiff filed the current putative class action on April 27, 2018. (Dkt. No. 1.) As no other Molina shareholder had filed suit or even sought to be appointed lead plaintiff, Plaintiff was appointed lead plaintiff by this Court on August 21, 2018. (Dkt. No. 42.) Plaintiff subsequently filed the FAC on October 5th, 2018 (Dkt. No. 47.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Plaintiff sues on behalf of a purported class of investors who owned Molina stock over roughly a three-year period—from October 31, 2014 to August 2, 2017 (the "Class Period"). The FAC asserts a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company, CEO Molina, CFO Molina, Bayer and Hopfer, alleging that in making various misrepresentations over the Class Period, Defendants caused Company stock to trade at artificially inflated prices. (¶ 3.) Plaintiff also asserts a claim under Section 20(a) of the Exchange Act against CEO Molina, CFO Molina, Bayer and Hopfer (collectively, the "Individual Defendants") alleging that they are liable as "controlling persons" for the Company's alleged Section 10(b) violations. (¶ 336.)

## III.   ARGUMENT

Plaintiffs in securities fraud class actions "face formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). To adequately plead a Section 10(b) claim, Plaintiff must allege: (1) a material misrepresentation or omission of fact, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) on which plaintiff justifiably relied, (5) that proximately caused alleged loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th. Cir. 2014); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA"). Accordingly, as to each element of its Section 10(b) claim, a "plaintiff must provide a list of all relevant circumstances in great detail." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999), s*uperseded by statute on other grounds as recognized in In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

8

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

2017).  Any complaint failing to satisfy these exacting pleading standards "shall" be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

### A.   Plaintiff Fails To Plead An Actionable Misrepresentation

Plaintiff's FAC fails at the threshold because Plaintiff does not and cannot plead with the requisite particularity that the Defendants made any material false statement— the most basic element of a Section 10(b) claim.

Pleading falsity is subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA.  *See Tellabs,* 551 U.S. at 313; *see also Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 133, 1145 (C.D. Cal. 2018).  Rule 9(b) requires the Plaintiff to "state with particularity the circumstances constituting fraud or mistake."  *See Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).  The PSLRA further mandates that Plaintiff "specify each statement alleged to have been misleading, [and to provide] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1);  *see also Tellabs*, 551 U.S. at 321; *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1107 (9th Cir. 2010); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1071 (C.D. Cal. 2012).  This includes pleading with particularity "why the disputed statement was untrue or misleading *when made.*"  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (emphasis added), *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011).

The statements that Plaintiff challenges fall roughly into four overlapping categories:  (1) statements concerning the "scalability" of the Company's infrastructure (¶¶ 134-35, 138, 140-41, 144, 147, 149, 152, 156-58, 160, 188, 197-98); (2) statements concerning the Company's expected "administrative cost leverage" from adding new plans and acquisitions (¶¶ 134-35, 138-41, 144, 147, 149, 152, 156-58, 188, 197-98); (3) statements concerning the Company's investments in its infrastructure (¶¶ 139, 171, 181-82, 184, 188, 191, 198); and (4) statements concerning the Company's efforts to address (or "fix") issues that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

arose with its infrastructure systems as it operated in the ACA marketplace (¶¶ 171-73, 184-85, 188-89, 196, 198.)[3]  Regardless of how they are labeled, however, all four types of statements are defectively pled.

### 1.      Plaintiff's Puzzle-Style Pleading Violates the PSLRA

The FAC's puzzle-style pleading clearly violates the strict pleading requirements of the PSLRA.  Here, Plaintiff includes in the FAC at least forty-four quotations from Defendants' public filings, a press release, earnings calls, and other public conferences over a three-year period, and professes to have marked in "bold and italics" the portions of these statements that it contends are "false and misleading" (¶ 134, n. 16).[4]  Plaintiff then follows each group of statements with a list of conclusory assertions why they are false, but without tying these assertions in any specific way to any specific statement.  (*See, e.g.*, ¶¶ 136, 140, 143, 146, 151, 153, 155, 162, 174, 183, 187, 190, 192, 203, 211).  This "puzzle pleading" improperly puts the burden on Defendants and the Court to figure out exactly what statements Plaintiff claims are false, and to match them with the purported reasons why.  *See Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *4 (N.D. Cal. Feb. 2, 2011) ("[T]he Court is not required 'to search through' the [complaint] in an effort to link the allegedly false statements to the reasons those statements purportedly are false.").

---

[3]      For the Court's convenience, all of the allegedly false statements are included in Appendix A to this Motion.

[4]      Plaintiff's selective use of emphasis in the FAC makes it even more confusing.  Plaintiff bolds and italicizes certain phrases yet does not emphasize virtually identical language in other sections.  *Compare* FAC ¶ 149, *with id.* ¶ 154.  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074-75 (N.D. Cal. 2001) ("The fact that certain sections of the report have been highlighted is not a reliable guide to determining which statements are alleged to be false, as bolded statements sometimes do not turn out to be actionable, while non-bolded statements sometimes are actionable.")  Plaintiff also bolds and italicizes multiples statements that it does not allege to be false and misleading requiring Defendants to guess whether Plaintiff is indeed challenging these statements. (*Compare* ¶¶ 165, 167 *with* ¶ 174.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

## 2.    The Allegedly False Statements Are Protected Under The PSLRA's Safe Harbor

As an initial matter, the overwhelming majority of the statements that Plaintiff now claims to be "false" were forward-looking, and therefore not actionable under the securities laws.  The statute's "safe harbor" makes forward-looking statements inactionable as a matter of law, even if the statements prove to be false.  *In re Cutera*, 610 F.3d at 1112-13.  Such statements are protected if they are identified as forward-looking and accompanied by meaningful cautionary language.  15 U.S.C. § 78u-5(c)(1)(A)(i); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (hereinafter, "*Intuitive*"); *In re Cutera*, 610 F.3d at 1112-13.  Both elements are satisfied here.

A statement is forward-looking if its "truth or falsity . . . cannot be discerned until some point in time after the statement is made." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *12 (N.D. Cal. Mar. 24, 2014).  Such statements include projections, "plans and objectives of management for future operations" and the assumptions "underlying or relating to" those objectives.  *Intuitive*, 759 F.3d at 1058.  That a forward-looking statement also references the company's current condition does not remove the "safe harbor" protection: "every future projection depends on the current state of affairs."  *Wochos v. Tesla, Inc.*, 2018 WL 4076437, at *5 (N.D. Cal. Aug. 27, 2018).  In *Lomingkit v. Apollo Educ. Group Inc.*, 2017 WL 633148, at *17 (D. Ariz. Feb. 16, 2017), for example, the court found the defendant's statement that its "new systems [would] improve the productivity, scalability, reliability and sustainability of our IT infrastructure and improve the student experience" to be a "classic forward-looking statement."  *See also Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5-6 (C.D. Cal. Jan. 9, 2017) (company's statement that it was "on track in completing the migration" to new software system was forward-looking).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Here, statements in all four categories of the challenged statements qualify as forward-looking because, "examined as a whole," they relate "to future expectations and performance." *Intuitive*, 759 F.3d at 1059.  For instance, statements that the Company's "existing administrative infrastructure" was "scalable," and thus had the "ability to accommodate growth" are forward-looking. (¶¶ 134-135, 138-140, 141, 147, 149, 152, 154, 156-157, 160, 191, 196-198.)  Indeed, as Plaintiff admits, Molina's assessment of "scalability" was by definition a forward-looking projection, not a statement of fact: "[s]calability . . . [r]efers to a system's capacity to handle a growing amount of work."  (FAC, p. vii).  The same is true of Molina's statements about its ability to leverage costs (*see, e.g.* ¶ 135 ("Stabilization and margin expansion will come as we integrate new members into our care models"), its infrastructure investments (*see, e.g.*, ¶ 140 ("[W]e are starting to reap the benefits of those [investments] as we move forward and have the ability to scale up and grow"), and its attempts to fix operational problems (*see, e.g.,* ¶ 171 ("[W]e have built a capacity that we need for the next several years, and we're confident that we're not going to have another strain like we just experienced in the first quarter of this year.").[5]  In fact, Molina expressly told investors that these types of statements were forward-looking. (Exs. 1-3.) (Forward-looking statements "provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. . . . The words "future," "anticipates," "*believes*," "estimates," "*expects*," "intends," "plans," "predicts," "*will*," "would," "could" "can," and "*similar terms*" are intended to identify forward-looking statements") (emphasis added).

It is furthermore beyond dispute that these statements were accompanied by meaningful cautionary language.  To qualify as "meaningful," the cautionary language need only "mention important factors of similar significance to those

---

[5] *See also* Appendix A.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

12

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

actually realized." *Lomingkit*, 2017 WL 633148, at *18 (internal citations omitted).  Cautionary language need not be specific, as even general assertions that statements "may be deemed to contain forward-looking statements" and "[a]ctual results may differ materially" have been held to be sufficiently cautionary.  *See Intuitive*, 759 F.3d at 1059; *Gammel*, 905 F. Supp. 2d at 1066.

Molina provided investors with cautionary disclosures in its Form 10-Ks that went well beyond the minimum "meaningful cautionary" language required, and addressed in extensive detail the challenges posed by the ACA and the Company's related growth:

- "Due to the breadth and complexity of the ACA, the lack of implementing regulations and interpretative guidance, and the phased nature of the ACA's implementation, the overall impact of the ACA on our business and on the health industry in general over the coming years is difficult to predict and not yet fully known. . . ."

- "Our information systems and applications require continual maintenance, upgrading, and enhancement to meet our operational needs.  Moreover, our acquisition activity requires transitions to or from, and the integration of, various information systems.  If we experience difficulties with the transition to or from information systems or are unable to properly implement, maintain, upgrade or expand our system, we could suffer from, among other things, operational disruptions, loss of members, difficult in attracting new members, regulatory problems, and increases in administrative expenses."

- "Ineffective management of our growth may negatively affect our business, financial conditions, or results of operations."

- "Portions of our information technology infrastructure also may experience interruptions, delays, or cessations of service or produce errors in connection with systems integration or migration work that takes place from time to time . . . Such disruptions could adversely impact our ability to fulfill orders and interrupt other processes."

- "Continued rapid growth could place a significant strain on our management and on our other resources."

- "There are numerous risks associated with the initial implementation of a new program, with a health plan's expansion into a new service area, and with the provision of medical services to a new population which has not previously been in managed care."

(*See* Exs. 1-2; *cf.* Ex. 3.)

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

13

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

These disclosures "identif[ied] the very risks that [Plaintiff alleges] came to fruition here," *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016)—that Molina's administrative infrastructure would prove insufficient to absorb growth, that its expenses would be too high (and thus not be leverageable), that its investment in its systems might not be sufficient, and that it might not be able to maintain those systems successfully. *See In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *16 (N.D. Cal. Dec. 4, 2008) (risk warnings generally were "precise" and "relate[d] directly to the forward-looking statements at issue").

Moreover, every earnings call, conference, and "Investor Day" presentation cited in the FAC *specifically incorporated* this cautionary language from Molina's public filings, putting investors on full notice of the risks that the Company was facing as it moved into the uncharted waters of the ACA. *See, e.g.,* Exs. 8-24; *Emp'rs Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.,* 353 F.3d 1125, 1132-33 (9th Cir. 2004) (approving cautionary language directing investors to a company's SEC filings that, in turn, listed specific factors that could affect actual results). Plaintiff is accordingly barred from relying on Defendants' forward-looking statements as a basis for its Section 10(b) claim.[6]

### 3. The Challenged Statements Include Non-Actionable "Puffery

Many of the challenged statements Plaintiff identifies are merely "vague, generalized assertions of corporate optimism" that cannot be the subject of a securities fraud claim. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880

---

[6] Defendants' forward-looking statements also fall within the ambit of the Safe Harbor because Plaintiff fails to plead any facts establishing that Defendants had "actual knowledge that they were false" at the time they were made. *In re Splash*, 160 F. Supp. 2d at 1069; *see* 15 U.S.C. § 78u-5(c)(1)(B). As discussed more fully in Section III.B below, Plaintiff has not alleged particularized facts demonstrating that Defendants made any statement with scienter—much less facts meeting the "stricter standard of actual knowledge of falsity."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

14

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

F. Supp. 2d 1045, 1063 (N.D. Cal. 2012). Statements by officers that they are "pleased" with the company's performance, that results are "good," and other similar "feel good monikers" of the type that are ubiquitous in earnings calls, are deemed "puffery" upon which no reasonable investor would rely, and thus are exempt from liability under the PSLRA. *See Intuitive*, 759 F.3d at 1060; *In re Cutera*, 610 F.3d at 1111 (noting that investors "know how to devalue the optimism of corporate executives").

Here, the statements Plaintiff cites are in many instances indistinguishable from statements that courts have found non-actionable puffery. For instance:

| Challenged Statements[7] | Statements Found to be Non-Actionable in Prior Cases |
|---|---|
| "[B]ecause of the things that we have done in terms of our IT and in terms of some of the other infrastructure things, we do have the ability to grow and I think leverage that administrative infrastructure" (¶ 140.)<br><br>[W]e have designed our administrative and operational infrastructure to be scalable for cost-effective expansion into new and existing markets." (¶ 141.)<br><br>"This success underscores the current growth opportunities of our business and validates our strategic push to diversify into new markets and new programs . . . and to leverage our administrative infrastructure" (¶ 144.)<br><br>"We continue to benefit from administrative cost leverage" (¶ 152; *see also* ¶ 188.) | "[The] company was 'on track'" and "making significant progress" (*In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1072-73 (C.D. Cal. 2012))<br><br>"[Company] could provide 'higher scalability, flexibility, and stability [to be] non-actionable puffery.'" (*Guangyi Xu*, 2017 WL 114401, at *9)<br><br>"[We will] deliver innovation at an unmatched scale" (*Gammel*, 905 F. Supp. 2d at 1071)<br><br>"[C]ustomers see the value proposition of our efficient, scalable, storage solution" (*McDonald v. Compellent Tech., Inc.*, 2011 WL 13228408, at *9 (D. Minn. Aug. 3, 2011))<br><br>"[We are focused on] development of a competitive, highly scalable system |

---

[7] *See also* Appendix A.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

15

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

| "[The losses] ha[ve] not changed the positive trajectory in our core business" (¶ 196.)<br><br>"The acquisitions that we did in 2015 that we're able to absorb in 2016 were accretive and they're turning out for us and performing very well, just as we had thought they would."  (¶ 197.) | that is able to meet the rigorous technological demands of rapidly growing global service providers and their networks" (*Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004, at \*8 (E.D.N.C. March 22, 2013)). |

These statements by CEO and CFO Molina—replete with phrases like "did make good," "benefit," "cost-effective," "validates our strategic push," "accretive" and "positive trajectory"—are classic puffery.  Such generically optimistic corporate-speak cannot be objectively verified, and cannot be the basis of a fraud claim.  *In re Cutera*, 610 F.3d at 1111; *see also Callan v. Motricity Inc.*, 2013 WL 195194, at \*20 (W.D. Wash. Jan. 17, 2013) ("This is not a statement about the 'specific or absolute characteristics' of the software.  . . . . These statements are non-actionable puffery."), *aff'd sub nom. Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016).

### 4. The Challenged Statements Include Non-Actionable Statements Of Opinion

Numerous statements identified as "false" by Plaintiff are furthermore merely opinions—"a belief[,] a view, or a sentiment which the mind forms of persons or things." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (internal citation omitted).  Such opinions are not actionable unless Plaintiff can plead facts demonstrating both that the statement is *objectively* untrue, and *subjectively* false, *i.e.*, that the "speaker did not hold the belief she professed." *Id.* at 1327.

All four groups of statements challenged by Plaintiff undeniably reflect the opinions of Molina and its management.  *See, e.g.*, ¶ 140 ("Because of the things that we have done in terms of our IT and in terms of some of the other

LATHAM&WATKINS<sup>LLP</sup><br>ATTORNEYS AT LAW<br>LOS ANGELES

16

CASE NO. 2:18-cv-03579-R-JC<br>MOT. TO DISMISS PL'S.<br>AMENDED COMPL.

infrastructure things, we do have the ability to grow and I think leverage that administrative infrastructure") (addressing scalability, cost leverage and investment)); ¶ 173 ("Right now we think we have worked through the major issues and we would anticipate the cost to come down over time" (addressing Company's attempt to fix problems).) *See also* Appendix A.  The FAC ascribes falsity to many statements that were subjective judgments—not statements of fact. *See e.g.*, *Markette v. XOMA Corp.*, 2017 WL 4310759, at *4 (N.D. Cal. Sept. 28, 2017) ("The Court finds it clear that these are opinion statements, since they inherently reflect the speaker's assessment of and judgment about the underlying circumstances.").  And in any event, as discussed in detail below in Section III.B, Plaintiff pleads *zero* facts demonstrating that Molina management did not believe the opinions it expressed to be true at the time.  *See City of Dearborn Heights Act 345 Police & Ret. Syst. v. Align Tech., Inc.*, 856 F.3d 605, 616-17 (9th Cir. 2017) (finding no liability for opinions where plaintiff failed to "plead[] sufficient facts that would allow [the Court] to infer subjective falsity").

To the extent Plaintiff tries to argue that Molina's opinions were rendered false because of purported "omissions" regarding the alleged technical issues raised by the CWs, Plaintiff fails to "identify particular (and material) facts" that were known to Defendants, were not disclosed, and the omission of which made these opinions "misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 615 (internal quotations omitted).  Investors could not reasonably have been misled about Molina's infrastructure given the comprehensive risk disclosures factors described above (*see* Section III.A.2).  *See id.* ("[W]hether an omission makes an expression of opinion misleading always depends on the context, which includes all of its surrounding text, including hedges, disclaimers, and apparently collecting information.")

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

17

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

### 5.    The FAC Fails to Identify Any Statements that were False When Made

To plead falsity under the PSLRA, a complaint "must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the . . . misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).  It furthermore "must set forth facts explaining why the difference between two statements is not merely the difference between two permissible judgments, but rather the result of a falsehood."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012).

As an initial matter, Plaintiff has not pled particularized facts showing that Molina's administrative infrastructure was *not* "scalable," or at least scalable to a degree consistent with the Company's initial expectations.  *See In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d. 871, 895 (D. Minn. 2007) *aff'd* 527 F.3d 749 (8th Cir. 2008) (company's announcement of a production goal for new technology was not rendered false by technical challenges, where plaintiff had failed to adequately allege that the challenges were "so large and insurmountable" that defendants knew it could not meet that goal.)  The existence of operational kinks or hitches does not make a positive statement about technology false.  *In re Read-Rite Corp.,* 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004) (dismissing complaint where plaintiffs "fail[ed] to specify the magnitude of [software] problems"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 378 (S.D.N.Y. 2007) ("[I]t is to be expected that a manufacturer would face some mechanical difficulties when embarking on a new product line.").

Plaintiff also tries to plead falsity by relying on Company statements made well *after* the alleged false statements, and in most cases, well after the class period.  In particular, Plaintiff points to the statements made by Interim CEO White on August 2, 2017, when White acknowledged that the Company's efforts to "prepare[] for . . . growth" by investing in its existing infrastructure had "in

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

18

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

hindsight," been a "mistake."  (¶ 280.)  But these "hindsight" statements do nothing to establish that the Company's prior statements about scaling its existing administrative infrastructure were false *when made*.  The fact that business conditions and circumstances changed does not convert prior statements of business prospects into actionable falsehoods.  *See In re Am. Apparel*, 855 F. Supp. 2d at 1080 ("[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."); *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014) ("Standing alone, the fact that Microsoft reduced the retail price of the Surface RT in July 2013 does not make its positive statements about the product months earlier actionably misleading.").  The same is true as to the post-class period statements of Molina executives in 2018 that Plaintiff cites.  (*See* ¶¶ 233-252).  Moreover, these later statements merely confirm that the Company's growth had outstripped its resources, not that it misled investors: "[a]nd last year it grew too fast, too aggressive, beyond our capacity to manage."  (¶ 284.)  *See In re Apple Comput., Inc.*, 127 Fed. App'x 296, 301 (9th Cir. 2005) (rejecting allegations based on post-class-period statements that did not specify when the defendant learned what he or she currently knows).

Plaintiff employs the same strategy in alleging that CEO Molina and CFO Molina's Sarbanes-Oxley ("SOX") certifications regarding the adequacy of the Company's internal controls as included in the Company's 2014 and 2015 Form 10-Ks were false statements.  Plaintiff bases this claim of falsity on  the Company disclosure of a "material weakness" in its internal controls over financial reporting "as of December 31, 2016."  (¶¶ 208-211.)  But that the Company—and both Molinas—acknowledged a weakness in financial reporting controls in 2016 says *nothing* about the state of internal controls in 2014 and 2015, and Molina has never identified those controls as deficient.  *See Rok v. Identiv, Inc.*, 2017 WL 35496, at *9 (dismissing falsity allegations based on SOX

certifications where it was not clear alleged control weakness existed at time), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Moreover, SOX certifications attest only that the signing executives have disclosed to a company's auditors and audit committee all "significant deficiencies" and "material weaknesses" in financial reporting controls.[8]  Plaintiff pleads no facts suggesting that CEO Molina and CFO Molina did not do so here. Nor does Plaintiff plead any link between the specific "material weakness" identified in 2016, which concerned the "internal control over financial reporting relating to the operation of an element of its process for calculating the amount owed to California by its California health plan," and the IT infrastructure systems issues that are the subject of the FAC.  (¶ 209.)

Finally, courts have repeatedly held that there can be no liability for securities fraud where, as here, the allegedly concealed information was disclosed and known to the market.  *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405-11 (9th Cir. 1996) (affirming dismissal where SEC filing disclosed information allegedly concealed); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 513 (S.D.N.Y. 2011) ("A complaint fails to state a Section 10(b) claim when the alleged omission has actually been disclosed.").  The very problems that Plaintiff complains Molina hid—that Molina's infrastructure would not "scale," that its costs were not "leverageable," that its investments in its systems were misdirected, and its attempts to "fix" problems would not work—were the same risks of which the Company advised its investors, again and again, in its SEC filings.  *See* Section III.A.2. above.

---

[8]     Indeed, because the representations made in SOX certifications are made by officers to a specific audience (*i.e.*, the company's auditors and audit committee), some courts have noted that SOX certifications are not independently actionable under Section 10(b).  *See, e.g., Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1182 (N.D. Cal. 2009)("Plaintiff does not cite, nor has the Court located, any case holding that a statement in a SOX certification that financial statements comply with GAAP is independently actionable under § 10(b) or Rule 10b-5.").

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

20

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Moreover, as the FAC confirms, when the growth in enrollment began to hamper Molina's infrastructure in a way that hurt its financial performance in the first quarter of 2016, CEO Molina spelled out the problems in fulsome detail: "we need once again to think about administrative capacity" (¶ 165); "member and provider services, care and utilization management, provider payment, and information technology [were] all areas that felt the strain of rapid growth" (*Id.*); we had "higher than anticipated costs" (*Id.*); "we had increased system downtime" (*Id.*); "[t]here are certain key issues around claims, and processing of enrollment and premiums, reconciliation, and so forth where we could probably strengthen things a little bit" (*Id.*);  "[t]here were some IT issues" (¶ 167); the Company's newly hired personnel were "inexperienced and some of them are not very fast with the computer systems" and "they are not as effective as they otherwise would be" (¶ 168); and "we got hit with two things," including integrating a "number of acquisitions" and a "large increase in the marketplace that put an additional strain on the systems and the people" (¶ 169.).  *Every* "systems" issue of which Plaintiff complains was fully disclosed.

While Plaintiff will doubtless contend these disclosures should have been made earlier, the Company's performance in 2015 makes clear that the problems had not surfaced earlier, in anything like the degree they did in the first quarter of 2016.  It was not until the fourth quarter of 2015 that Molina experienced disappointing financial results.  (*See* ¶¶ 144, 147, 152, 156; Exs. 10-12.)  Nor need the Company have disclosed the existence of every "problem," large or small: "[p]roblems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements." *Ronconi*, 253 F.3d at 434.  The Company explicitly warned its investors of the risks it faced from changing its business under the ACA, and told them as soon as any of those risks materialized.  There can be no viable claim for securities fraud here.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

21

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

## B.  Plaintiff Fails To Establish A Strong Inference Of Scienter

In addition to the stringent pleading requirements of Rule 9(b), the PSLRA requires Plaintiff to state with particularity facts giving rise to a strong ("cogent and compelling") inference of scienter—*i.e.*, that Defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

To plead scienter, "the plaintiff must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Mattel*, 321 F. Supp. 3d at 1151.  The recklessness standard "is actually much closer to one of intent." *In re NVIDIA*, 768 F.3d at 1053.  It is not enough to allege that a defendant had "access" to information inconsistent with the defendant's statements.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (holding that mere access to information was insufficient to adequately allege scienter).  It is not enough to allege that others in the company may have believed a defendant's statement to be wrong.  *See In re Apple Comput., Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false.").  Nor is it enough to allege that a defendant was careless, engaged in mismanagement, or made bad business decisions. *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1161 (S.D. Cal. 2008) ("As recognized by federal courts nationwide, allegations of mismanagement are not actionable in securities fraud cases.").  Instead, a plaintiff must plead that the defendant's conduct in making a challenged statement was an "extreme departure from the standards of ordinary care"—so extreme that the danger of misleading investors was either actually "known to the defendant" or "so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

22

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Thus, a complaint will survive a motion to dismiss only "if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* This means that "the court must consider *all* reasonable inferences . . . including inferences unfavorable to the [P]laintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). Moreover, Plaintiff may only plead scienter as to Molina by successfully pleading the scienter of the Individual Defendants. *See In re Apple*, 127 Fed. App'x at 303 ("A corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement.").

Plaintiff's purported "evidence" of scienter here consists of statements from CWs, statements by the Company at the end of and after the Class Period, allegations about the circumstance of the departures of the Individual Defendants from the Company, allegations regarding stock sales by some of the Individual Defendants, and a charge that the Company's "growth strategy" by itself creates an inference of scienter. (¶ 248.) But the FAC is devoid of particularized allegations that call into question the genuine belief of the Individual Defendants that the Company's infrastructure could keep up with its growth.

### 1.    The Confidential-Witness Allegations Do Not Support An Inference Of Scienter

Plaintiff's scienter allegations depend primarily on the statements from five CWs—all unnamed witnesses that formerly worked at the Company. To establish scienter using CW statements, Plaintiff must meet two criteria: (1) the CWs must be described with sufficient particularity to establish their reliability and personal knowledge; and (2) the statements themselves must be indicative of the defendants' scienter. *See Zucco*, 552 F.3d at 995.[9] The key question here is

---

[9]    Plaintiff also relies on the same CW allegations to establish falsity. To attempt to plead falsity relying on CW statements, Plaintiff must both "supply an adequate factual basis to support the source's basis of knowledge with regard to the information provided," *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

23

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

whether Plaintiff's CW allegations are sufficiently informed and detailed such that it may be strongly inferred that Defendants actually "believed that they made false or misleading statements." *In re Rigel*, 697 F.3d at 883. Plaintiff's CW allegations come nowhere close.

**CW-1**: Plaintiff alleges that CW-1 was a former Associate Vice President, Information Systems, who "worked in the office of Chief Information Officer ("CIO") Hopfer" (¶ 70.) While CW-1 purportedly communicated with CEO Molina on many occasions about "IT concerns" (¶ 271), the FAC provides no details as to what form these communications took, when they occurred, what specific "concerns" they addressed, or how CEO Molina responded. In short, Plaintiff alleges nothing that speaks to CEO Molina's mental state, nor that of the other Defendants, of whom CW-1 has nothing to say at all. Such allegations reflect only the opinions and characterizations of Plaintiffs' witnesses; they are not indicative of scienter. *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) ("second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud.").

Moreover, the substance of CW-1's allegations is that the Company "'cobbled together' its system in an attempt to handle its expansion into ACA" (¶ 72), that "as Molina entered new markets there were 'limitations on scaling,'" and that enrollment at one point caused a "system-wide outage" at Molina's call centers. (¶ 74) None of these assertions suggest that Defendants made any false statements at all, much less *knowingly* did so. To the contrary, CW-1 confirms that problems occurred as unanticipated growth outstripped Company resources, and that the Company implemented "patche[s]" and "temporary [IT] solutions" to try and address the issues. (¶ 75.) This is exactly consistent with what CEO

1469654, at *15 (N.D. Cal. May 25, 2006), and identify facts that are inconsistent with the challenged statements. *Ronconi*, 253 F.3d at 432-33. Given the overlap with Plaintiff's scienter allegations, the analysis of their CW allegations is consolidated here.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

24

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Molina himself told the market in April 2016, and does not demonstrate fraud. (¶ 165) (ACA expansion had "stretched [Molina's] operational resources" required the Company to "once again think about administrative capacity," led to "increased system downtime" and caused it to "redouble our efforts around . .. information technology").

**CW-2**: CW-2 is identified as a Program Director in the Company's "EPMO Marketplace line of business," who was at least three reporting levels away from Bayer, and only at Molina for a little over a year.  (¶ 76.)  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (allegations from CWs who were not at company during the entire Class period "entitled to little weight"), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).  CW-2 is not alleged to have had any direct contact with any of the Individual Defendants, and instead only to have prepared "weekly status reports" for a "Steering Committee that included COO Bayer and CIO Hopfer," which were "circulated to the attendees by email," and allegedly broke down "IT issues" and "enrollment data problems" by state.  (*Id.*)  But the fact that Bayer and Hopfer were potentially apprised of unidentified IT "issues" and data "problems" via their "periodic attendance" at meetings or were on email distribution lists does not create an inference of scienter.  *Ronconi*, 253 F.3d at 434 ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements.").  Indeed, Plaintiff elsewhere admits that this Steering Committee worked with Molina's external consultant Deloitte in identifying and addressing "twelve major projects that were required before going live in the ACA Marketplace" (¶ 126)—a *contra-*indicator of Bayer and Hopfer's scienter.

Nor does the substance of CW-2's statements add to the scienter inquiry. He states only that the ACA was a "different beast" that Molina's QNXT platform was "not set up to handle," and that there were problems with ACA

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

25

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

enrollment.  (¶¶ 76-80.)  Again, these vague allegations merely confirm what Molina itself publicly stated—that as events unfolded, its systems were challenged by its expansion under the ACA.

**CW-3**:  As a "Senior Project Manager-PM III," CW-3 was at least 4 reporting levels away from Bayer.  While CW-3 is also alleged to have "prepared materials for inclusion in presentations for the weekly status meetings" that were allegedly circulated to Bayer and Hopfer (among others) and included information about "enrollment data challenges QNXT could not handle" (¶ 273), Plaintiff pleads *no* facts suggesting that Bayer or Hopfer actually saw these presentations or, if so, how they responded.  *See Lipton*, 284 F.3d at 1036 (access to information insufficient to allege scienter).  Like CW-2, CW-3 is not alleged to have ever even *spoken* with any of the Individual Defendants.

Further, nothing CW-3 has to say provides "contemporaneous" information suggesting that Defendants' statements were knowingly false. Instead, CW-3 merely confirms once more that Molina experienced "'challenges' when it started expanding into the ACA marketplace," and when "Molina's ACA membership 'exploded.'" (¶ 84.)   Such "unspecific and speculative" assertions by an employee far removed from management do not contribute to an inference of Defendants' scienter.  *See In re NVIDIA Corp.*, 768 F.3d at 1061-62.

**CW-4**:  Plaintiff provides no identifying information regarding CW-4 other than to describe him as a "former leader at Molina California" who was "responsible for the provider networks."  (¶ 90.)  That is nowhere near enough. While Plaintiff offers to provide identifying additional details *in camera*, there is "no precedent in the law of federal securities fraud allowing *in camera* review of details about confidential witnesses (as plaintiffs propose) instead of pleading those details within the complaint."  *See In re Dot Hill*, 594 F. Supp. 2d at 1162 (citing *Silicon Graphics*, 183 F.3d at 983 n.12).  The Court should disregard CW-4 entirely.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

26

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

In any event, the FAC alleges only that CW-4 participated in "Monthly Network Strategy calls" that were "periodically attended by COO Bayer" where "[o]verall system problems . . . were reported in" the meeting (¶¶ 274-275). The FAC is devoid of specific details as to what these problems were, whether Bayer actually was informed of them, and how she responded—in short, nothing that would establish an inference of her scienter, much less that of the other Individual Defendants. At bottom, CW-4 simply repeats the same narrative as the other witnesses in different words: that the QNXT system proved inadequate for the "sharp growth in Molina's ACA subscribers," that Molina tried to "manipulate [QNXT], retrofit it to try and make it work," (¶ 91) and that the Company "did not efficiently manage the QNXT systems and it could not get 'the system fixed fast enough.'" (¶ 92.) *Nothing* in these statements is indicative of Defendants' scienter as to any statement in the Class Period.

**CW-5**: CW-5 is identified as "Associate Vice President of Utilization Management," again at least several levels removed from COO Bayer, with no reporting relationship to her (or any other Individual Defendant). Plaintiff alleges that CW-5 participated in "regularly scheduled meetings" attended periodically by "CIO Hopfer and COO Bayer" where "system scalability and capacity issues" were brought to the attention of CW-5's superiors, and that CW-5 also "informed CFO John Molina" of his concerns with "deficiencies in Molina's utilization management system." (¶¶ 276-78.) That CW-5 may have relayed "concerns," "issues," and "problems" to certain Defendants does not create an inference of scienter, as the FAC fails to "provide any concrete information about the level of discussion" that occurred. *Avila v. LifeLock Inc.*, 2017 WL 3669615, at *2 (D. Ariz. Aug. 21, 2017); *see also Zucco*, 552 F.3d at 997 (allegations are not reliable enough to support an inference of scienter where they "fail[] to provide specifics or dates"). There are no allegations indicating where these meetings took place, the dates on which they occurred, the details of what was discussed, or whether

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

27

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

the Defendants attended the meetings at which the issues were raised. *See In re Nuverra Envtl. Sols. Sec. Litig.,* at \*5 (D. Ariz. Nov. 17, 2014) (that defendants "attended meetings" does not create a compelling inference of scienter).

Finally, CW-5's allegations merely repeat the familiar refrain that "the ACA Marketplace business 'really pushed' the QNXT system over its limits" (¶ 97), that the platform rapidly became "overburdened" (¶ 98), that "everyone knew that QNXT could not properly process or handle Molina's IT needs after the Company expanded into ACA and further expanded its Medicaid business" but that the Company decided to "modify, modify, modify . . . tweak" rather than "overhaul" the QNXT system. (¶ 99.) The Ninth Circuit has specifically rejected generic allegations like these—*i.e.*, that "everyone knew"—as insufficient: "These generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998.

In sum, Plaintiff's CWs cannot speak with any personal knowledge to the scienter of any of the Individual Defendants.

### 2. The Replacement of Molina's Management Team Does Not Support An Inference Of Scienter

Plaintiff also alleges that the termination of CEO Molina and CFO Molina, the resignation of Hopfer, and the retirement of Bayer provide evidence of scienter. (¶¶ 285, 290, 292.) This is patently false. "Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Zucco*, 552 F.3d at 1002; *see also In re U.S. Aggregates, Inc. Sec. Litig.,* 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

28

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

[defendant's employee] was fired simply because the errors that lead to the restatement occurred on his watch or because he failed adequately to supervise his department.").

Here, Plaintiff makes no particularized allegation (including from any of the CWs) to refute the reasonable assumption that CEO Molina and CFO Molina were terminated because of anything but "the Company's poor financial performance," just as the Company stated.  (¶ 289.)  Similarly, Plaintiff says nothing about Bayer's retirement and Hopfer's resignation besides noting the dates of each event, and stating that – without any factual support – that Hopfer's resignation was forced.  (¶ 290.)  This is clearly insufficient to demonstrate that these departures are indicative of scienter.  *See In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 932 (N.D. Cal. 2010) ("there is nothing suspicious about the timing of his resignation, even though it occurred weeks after Accuray's August, 2008 backlog revision").

### 3.    The Company's "After-The-Fact" Statements Do Not Create an Inference of Scienter

As with falsity, Plaintiff cites to the same statements by Interim CEO White at the end of the Class Period, and the same statements by Molina executives in 2018 (well *after* the Class Period) as suggestive of scienter.  (¶¶ 280-84.)  And for the same reasons, such allegations are irrelevant to the analysis.  As discussed in Section III.A.5. above, White's statements do not suggest the existence of a fraud, but instead merely admit (with the benefit of "hindsight") an error in business judgement.  (¶ 280.)  Similarly, while the statements by Company officers in 2018 discuss the challenges that Molina faced during the Class Period, they do not ascribe these challenges to fraud by former management, but instead to the fact that the ACA marketplace "grew too fast, too aggressive, beyond our capacity to manage."  (¶ 284.)  Nothing in these *post hoc* assessments suggests Defendants' scienter; to the contrary, they suggest their

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

29

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

good faith.  *See In re Am. Apparel*, 855 F. Supp. 2d at 1080 (scienter cannot be pled simply by pointing to changed circumstances); *In re Vical Inc. Sec. Litig.*, 2015 WL 1013827, at *8 (S.D. Cal. Mar. 9, 2015) (plaintiff cannot plead a securities fraud claim by "attacking perfectly reasonable-if overly optimistic statements proved wrong only in hindsight").

### 4. CEO Molina's, CFO Molina's, and Bayer's Stock Sales Do Not Support An Inference Of Scienter

Plaintiff relies on CEO Molina's, CFO Molina's, and Bayer's stock sales during the Class Period as evidence of scienter, claiming they are unusual and suspicious.  Not so.  Insider sales become unusual or suspicious only when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citation omitted).  To evaluate whether stock sales by corporate insiders support an inference of scienter, courts consider the following factors:  (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Ronconi*, 253 F.3d at 435.  Plaintiff has not met its burden of demonstrating that these considerations support a finding of scienter here.

### a. The Amount And Percentage Of Shares Sold Are Not Suspicious

While Plaintiff alleges that CEO Molina, CFO Molina, and Bayer collectively sold approximately $55 million in stock during the Class Period, nothing about these sales is either "unusual" or "suspicious" given the nearly three-year long (144-week) Class Period.  In *In re Vantive Corporation Securities Litigation*, the Ninth Circuit held that a sixty-three week class period was "unusually long" and could not support a finding that stock sales were suspicious. 283 F.3d 1079, 1092 (9th Cir. 2002) *abrogation on other grounds recognized by*

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

30

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  The Class Period here is more than two times longer than the one at issue in *Vantive*—a "major mitigating factor" against scienter.  *In re Splash*, 160 F. Supp. 2d at 1083; *see also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia,* 2015 WL 1775221, at *35 (C.D. Cal. Apr. 14, 2015) (sales not suspicious where class period was nearly a year longer than the period in *Vantive*); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118 (N.D. Cal. 2009) (sale of $870 million not suspicious due to 118-week class period).

Further undercutting any evidence of scienter is the simple fact that CEO Molina, CFO Molina, and Bayer all retained a majority of their shares during the Class Period, and that Hopfer is not alleged to have sold any stock at all.  CEO Molina sold only approximately 36.3% of his total personal holdings, CFO Molina sold only approximately 12.7% of his total personal holdings, and Bayer sold only approximately 49.6% of her total personal holdings.  (*See* ¶¶ 254-256.) The Ninth Circuit "typically requires larger sales amounts . . . to allow insider trading to support scienter."  *Metzler*, 540 F.3d at 1067 (finding 37% of total stock holdings insufficient to support an inference of scienter); *see also In re Vantive*, 283 F.3d at 1092 (holding sales of 38% not suspicious in light of an abnormally long sixteen-month class period); *Ronconi*, 253 F.3d at 435-36 (stock sales not suspicious even though defendants sold between 69% and 98% of their holdings).  Accordingly, the amount and percentage of shares sold by the Individual Defendants cannot be deemed unusual or suspicious on this basis.

### b.     The Timing Of The Stock Sales Was Not Suspicious

As Plaintiff also acknowledges, nearly all of CEO Molina's, CFO Molina's, and Bayer's stock sales were done pursuant to pre-determined 10b5-1 sales plans (¶¶ 265-268), which by itself rebuts an inference of scienter.  *See Metzler*, 540 F.3d at 1067 n.11 ("Sales according to pre-determined plans may rebut [ ] an inference of scienter.") (quotation and citation omitted).  All of CFO

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

31

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

Molina's stock sales during the Class Period, all but one of Bayer's stock sales during the Class Period, and all but two of CEO Molina's stock sales during the Class Period, were made pursuant to such pre-scheduled trading plans. (*See* Exs. 4-6.); *see also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814 (C.D. Cal. 2011) (finding that stock sales do not provide support for plaintiffs' pleading of scienter where made pursuant to a pre-determined a 10b5–1 plan). There is accordingly nothing "suspicious" about the timing of their sales.[10]

### c. The Stock Sales Were Consistent With Defendants' Prior Trading Histories

Finally, CEO Molina's, CFO Molina's, and Bayer's stock sales during the Class Period are not "dramatically out of line with prior trading practices." *Ronconi*, 253 F.3d at 436-37. Plaintiff alleges that CEO Molina and Bayer "more than doubled" the number of shares they sold in the Class Period as compared to the preceding three years. (¶¶ 253, 260.) However, increasing shares sold at "a rate of roughly 2:1" is "not suspicious." *See In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12734014, at *4-5 (C.D. Cal. July 28, 2015); *see also Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012) (increase of 2.5x not suspicious), *aff'd sub nom. Ingram v. VIVUS, Inc.,* 591 Fed. App'x 592 (9th Cir. 2015). Moreover, CFO Molina actually sold more shares in the Control Period than he did in the Class period, which further undercuts any inference of scienter. (¶ 252.)

Notably, CEO Molina, CFO Molina, and Bayer also *acquired* numerous shares at the same time they were engaging in sales—another contra-indicator of

---

[10] The mere fact that CFO Molina and Bayer entered into certain trading plans during the class period does not support an inference of scienter because no facts are pled suggesting they entered into those plans "strategically" so as to capitalize on insider knowledge of the company's infrastructure issues. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014). Notably, while Plaintiff identifies a number of dates throughout the Class Period where Molina stock allegedly moved on unusual trading volume after an announcement by the Company (¶¶ 145, 148, 159, 170, 186, 202, 213, 225), none of the trading plan dates for CFO Molina or Bayer fell on or near those dates. (*See ¶* 267.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

32

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL.'S.
AMENDED COMPL.

scienter: "Selling 2.3 million shares becomes far less suspicious when accompanied by a simultaneous acquisition of more than one million shares." *In re Herbalife*, 2015 WL 12734014, at *4 (C.D. Cal. July 28, 2015). Specifically, CEO Molina acquired 312,690 shares, CFO Molina acquired 181,780 shares, and Bayer acquired 97,415 shares. *See* Exs. 4-6 (Form 4s during Class Period). All three individuals suffered huge losses during the Class Period. *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("[A]ny inference of scienter is defeated when an insider sells only a portion of his stock holdings and 'end[s] up reaping the same large losses as did' Plaintiff when the stock price dropped.").

### 5. The Company's Emphasis On Strategic Growth Does Not Support An Inference Of Scienter

Finally, Plaintiff's suggestion that the Company's "growth strategy" is suggestive of Defendants' scienter makes no sense at all. (¶ 248.) Plaintiff appears to be suggesting that because of the importance of the Company's expansion plans, Defendants should therefore be charged with knowledge of all of the deficiencies in the Company's administrative infrastructure that occurred once that growth occurred. (¶ 304). Such an allegation falls far short of pleading with particularity what the Defendants knew and when they knew it: "As this court has noted on more than one occasion, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1968. In any event, Defendants' supposed knowledge of unanticipated problems with Molina's infrastructure as it struggled to manage the enrollment growth creates no inference of scienter as to Defendants' alleged misstatements. Plaintiff's own allegations establish that these same officers—consistent with their public statements—had invested enormously in that infrastructure, projected

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

33

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

that it would be sufficient, openly acknowledged when it experienced problems, and devoted significant resources to "fixing" it. (¶¶ 134, 140-41, 149, 165, 181-82, 184-85, 188.)

### 6. Viewed Holistically, The FAC Creates No Inference of Scienter

Just as Plaintiff's individual allegations of scienter each fail for the reasons stated above, examining the FAC "holistically," *Tellabs*, 551 U.S. at 326, leads to the same result. Viewing the FAC as a whole, the most compelling and obvious inference is that Defendants believed their statements about the Company's infrastructure to be true, and that the sea-change in Molina's business caused by the ACA, and resulting surge in enrollment growth, undid the Company's best-laid plans. Plaintiff has pled no facts suggesting otherwise.[11] *See Solow v. Citigroup, Inc.*, 2012 WL 1813277 at *4 (S.D.N.Y. May 18, 2012) (statements about capitalization were not misleading simply because levels of capitalization were in danger of changing and later did change). At worst, the picture that the FAC paints is that Defendants—in talking about the Company's scalability, anticipated cost leverage, infrastructure investments and their attempts to fix issues as they arose—simply misjudged and/or underestimated the Company's needs. This does not suffice to plead scienter, and is not and cannot constitute securities fraud.[12]

### C. Plaintiff Fails To State A Claim Under Section 20(a) Against The Individual Defendants

Because Plaintiff fails to allege a primary violation of Section 10(b), its Section 20(a) claim against the Individual Defendants must be dismissed as well.

_____

[11] Some of the facts Plaintiffs allege support an inference of scienter, actually support the opposite. In particular, Plaintiff alleges that Molina "*understated* [its] net income by $44 million for the year ended December 31, 2016" (*see* ¶ 209). It defies belief that Molina would engage in a scheme to inflate its stock price by *understating* its income.

[12] While Plaintiff also fails to plead loss causation with the particularity required, because the falsity and scienter arguments are each dispositive, Defendants do not address that argument here.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

34

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

*See In re NVIDIA*, 768 F.3d at 1052.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's FAC should be dismissed with prejudice.

Dated: October 19, 2018

LATHAM & WATKINS LLP
MANUEL A. ABASCAL (171301)
ROBERT W. PERRIN (194485)
KENDALL M. HOWES (294285)
JAMES N. ROTSTEIN (305072)


/s/ *Robert W. Perrin*
Robert W. Perrin (194485)

Attorneys for Defendants Molina Healthcare, Inc., Terry P. Bayer, and Rick Hopfer

Dated: October 19, 2018

COOLEY LLP
JOHN C. DWYER (136533)
SHANNON M. EAGAN (212830)
JEFFREY D. LOMBARD (285371)
JESSIE A. R. SIMPSON LAGOY (305257)


/s/ *John C. Dwyer*
John C. Dwyer (136533)

Attorneys for Defendants J. Mario Molina and John C. Molina

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

35

CASE NO. 2:18-cv-03579-R-JC
MOT. TO DISMISS PL'S.
AMENDED COMPL.

**ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2), I hereby attest that all other signatories listed, on and whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

Dated:  October 19, 2018                LATHAM & WATKINS LLP

                                        By:  /s/ *Robert W. Perrin*
                                             Robert W. Perrin

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

ATTESTATION